RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Marc D'Angiolillo, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800
mdangiolillo@riker.com

IN THE UNITED STATES COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LCG 1 CHAPEL AVE LLC, LANCE LUCARELLI,<br><br>Plaintiffs,<br><br>vs.<br><br>PGA TOUR, INC.,<br><br>Defendant. | Case No. 2:21-cv-00426<br><br>Judge.<br><br>**AMENDED COMPLAINT**<br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs, LCG 1 Chapel Ave LLC and Lance Lucarelli (collectively "Plaintiffs" or "LCG"), by way of Complaint against Defendant, the PGA Tour, Inc. (the "PGA"), allege and say:

**THE PARTIES**

1. Plaintiff LCG 1 Chapel Ave LLC ("LCG ") is a New Jersey LLC, with its principle place of business located at 534 Broadway, Bayonne, New Jersey 07002.

2. Lance Lucarelli ("Lucarelli"), is a citizen of New Jersey and a managing member of LCG.

3. Defendant, the PGA, is an entity with its principle place of business located at 112 PGA Tour Boulevard, Ponte Vedra Beach, Florida, 32082.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiffs Lucarelli and LCG and Defendant PGA.

5. Plaintiffs' claim for damages exceeds the sum or value of $75,000, exclusive of interest and costs.

6. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(a)(1) as a substantial part of the events giving rise to this action occurred in New Jersey.

**STATEMENT OF THE CLAIM**

**The Notice of Availability**

7. On or about September 6, 2013, the United States Army (the "Army") issued a Notice of Availability for United States Army Reserve Real Property Exchange ("NOA") under the legislative authority of 10 USC § 18240. (Exhibit 1.)

8. The NOA made an offer to exchange fee title to land and facilities of two U.S. Army Reserve ("USAR") properties located in New Jersey for other property on which an exchange partner would build a new USAR center.

9. One Army property was the USAR Center ("USARC") located at Caven Point at the intersection of Caven Point Road and Chapel Avenue in Jersey City, New Jersey ("the Caven Point Property").

10. The Caven Point Property consists of approximately 27 acres of land with approximately 60,252 square feet of improvements.

11. The Caven Point Property is adjacent to the Liberty National Golf Club ("Liberty National"), which is located at 100 Caven Point Road, Jersey City, New Jersey.

12. Liberty National is owned by Paul Fireman ("Fireman") or an entity owned and managed by Fireman.

13. The second Army property was the Alexander Hamilton USARC located between Interstate 80 and Highway 17 in Lodi, New Jersey ("the Lodi Property").

14. The NOA sought to exchange the Caven Point and Lodi Properties (collectively the "Exchange Properties") for land and construction of a new USARC in or near Jersey City, New Jersey.

15. The NOA also included a DD 1391 Form setting forth the Military Construction Project Data reflecting the construction scope of work for the new USARC.

16. The NOA specified that the land to be exchanged needed to be at least 20 acres, within an approximately five-mile radius of the existing Jersey City USARC. The NOA set forth other requirements and preferences.

17. The NOA described a four-step exchange process to "ensure that the Government receives the best value from a qualified and responsible Offeror." (Exhibit 1 at. 5.)

18. The first step in the process required all interested applicants or "Offerors" to meet specified qualification requirements. (Id. at 15.)

19. The application process sought extensive and very detailed information including, but not limited to, financial information, relevant experience, references, dispute history, an Offeror profile, a description of the project implementation, summary of the design, and other such information.

20. The second step required approved Offerors to provide written submissions in accordance with the comprehensive requirements of the NOA.

21. The third step consisted of an Offeror Evaluation Process whereby an Evaluation Board reviewed the applications and selected an Offeror as a "conditional Exchange Partner, subject to approval by the DASA [Deputy Assistant Secretary of the Army]." (Id. at 6.)

22. In conducting its evaluation, the Evaluation Board was to evaluate each application "on its own merit, independently and objectively." (Id. at 20.)

23. Following completion of the submission evaluations, the Evaluation Board was to forward the name of the Offeror with the "highest overall ranking to the DASA (IH&P)[Deputy Assistant to the Secretary of the Army] for consideration for selection to serve as the Exchange Partner for this RPX [Real Property Exchange]." (Id. at 21.)

24. Following DASA approval, the third step also contemplated that the Exchange Partner would enter into a Letter Agreement with the USACE Savannah District.

25. Per the NOA, the "Letter Agreement is in furtherance of good faith and exclusive negotiations of a Real Property Exchange Agreement between the Exchange Partner and the Government." (Id. at 6.)

26. The fourth, and final step of the process, was an "Exchange Agreement," which would document the "specific business terms and legal conditions" as well as the draft conveyance documents. (Id.)

**LCG Submits An Application for the RPX And Enters Into A Letter Agreement With the Army**

27. LCG obtained a right to purchase approximately 20 acres of land located at 84 Harbor Drive in Jersey City, New Jersey (the "Harbor Drive Property"), which would meet the requirements of the Army's RPX. The Harbor Drive Property is also sometimes referenced as the LCG Property or the LCG Parcel.

28. LCG submitted an application to be the Exchange Partner pursuant to the NOA.

29. LCG submitted all required information in connection with the Offeror evaluation step.

30. LCG was accepted as an Offeror on or about December 18, 2014, after which it began preparing the detailed and extensive submission required for the second step.

31. At the Army's recommendation, LCG retained Mason & Hanger, an architectural and engineering services firm with extensive experience in working with the U.S. Army, to develop the plans for the new reserve center.

32. Mason & Hanger immediately began preparing the plans for the new reserve center at the Harbor Drive Property.

33. LCG's application was subject to the rigorous review and evaluation set forth in the NOA.

34. LCG's application was selected as the successful application following the Evaluation Board's review of each Offeror's application.

35. LCG's application was approved by the DASA.

36. Accordingly, LCG and the Army entered into a Letter Agreement, dated May 5, 2015, between The United States of America and LCG 1 Chapel Ave LLC. (Exhibit 2).

37. The Letter Agreement was executed on behalf of the Army by Ralph J. Werthmann ("Werthmann"), of the Savannah District, Chief, Real Estate Division, Real Estate Contracting Officer. (Id.)

38. The Letter Agreement provided, among other things, that the proposal of LCG, as the Exchange Partner, was "selected in response to the solicitation dated September 6, 2013, agreeing to the terms and conditions set forth in the solicitation package." (Id.)

39. The Letter Agreement provided that the "Parties acknowledge that this LA [Letter Agreement] is in furtherance of good faith negotiations in contemplation of the conveyance of the Government property known as the Caven Point U.S. Army Reserve Center (USARC) .. . .and the Alexander Hamilton USARC . . .." (Id. at Section 1(a).)

40. The Letter Agreement further provided that it was "specifically and solely intended to support all activities, to include those activities listed in Attachment A, necessary to complete the contemplated Exchange Agreement so that the exchange will be accomplished at minimal cost to the U.S. Government." (Id. at. Section 1(b).)

41. The Letter Agreement also provided that the parties intend that it "constitute a legally binding contract, notwithstanding the Parties have not yet entered into the Exchange Agreement." (Id. at Section 1(c).)

42. Under the Letter Agreement, LCG paid $186,000.00 to the Army to "fund the estimated cost" of services to be provided by the U.S. Army Corps of Engineers, Savannah District ("USACE"). (Id. at Section 2(a).)

43. LCG was obligated to pay any additional costs for the USACE services above the $186,000.00.

44. The Letter Agreement contained the "entire agreement between the parties regarding funding preliminary activities" for the exchange of the Caven Point and Lodi Properties for the LCG property in Jersey City. (Id. at Section 3 (b).)

45. After signing the Letter Agreement, LCG undertook further activities in furtherance of a Real Property Exchange with the Army.

46. At that point, LCG and the Army moved towards executing an Exchange Agreement.

47. Indeed, on August 3, 2015, Stephen W. Bruce ("Bruce"), Realty Specialist for the U.S. Army Corps of Engineers, Savannah District,

forwarded Lucarelli a draft of the Exchange Agreement for review purposes. (Exhibit 3)

**Terms and Conditions for the Exchange Agreement Between the Department and LCG**

48. On April 7, 2016, the Department and LCG executed a "Summary of Exchange Terms and Conditions for Army Reserve Center located at the Caven Point and Lodi, New Jersey By And Between The United States of America, Acting By and Through the Army Corps of Engineers and LCG 1 Chapel Ave LLC" (the "Terms and Conditions"). (Exhibit 4)

49. The Terms and Conditions constituted the fourth and final step of the process towards finalizing the Real Property Exchange ("RPX") that LCG and the Army had been negotiating and working towards.

50. The "Purpose" of the Terms and Conditions provided that:

> The Army and LCG desire to do a Real Property Exchange (RPX) under the authority of 10 USC 18240 and have agreed, in principle, to the principal terms and conditions herein to be included in an Exchange Agreement. Although the Army and LCG mutually intend to pursue an Exchange Agreement based on these terms and conditions, the intent to proceed and these terms and conditions are not binding upon either party unless and until incorporated into an Exchange Agreement signed by both parties following the process set forth herein.

(Id. at 1.)

51. The "Exchange" section described that LCG would convey the Harbor Drive Property to the Army and "construct a new reserve center to include a 66,376 square foot Training Building, a 9,902 square foot Maintenance

Building, a 4,254 square foot Unheated Storage Building, and supporting facilities. . . .” (Id. at 2.)

52. The Terms and Conditions provided that, following the negotiation of further terms and conditions, the Army and LCG “will prepare and execute an Exchange Agreement setting forth the terms, conditions and schedule for the exchange of the Reserve Center Parcels for the LCG Parcel and construction” of the various facilities LCG had committed to construct for the Army as part of the Exchange Agreement. (Id. at 2-3.)

53. Exhibit F to the Terms and Conditions set forth “Major Milestones” starting with a “site visit for environmental” and ending with “Construction Completed” and subsequent remediation and conveyance activities. (Exhibit 5.)

54. The Terms and Conditions itself sets forth various activities which LCG or the Army had to complete prior to entering into a final Exchange Agreement.

**Third-Party Influence on the Army to Terminate the RPX**

55. LCG had extensive and impressive plans for the Caven Point Property, which he named “Shops & Living at Liberty.”

56. These plans included luxury townhomes and residences, upscale shops, a park with a European-style ice skating ribbon, and other tasteful amenities.

57. The Caven Point Property borders the Liberty National, which is owned by venture capitalist Fireman or one of Fireman’s ownership entities.

58. Fireman had expressed great interest in obtaining the ownership of, or access rights to, the Caven Point Property.

59. After Fireman learned that LCG was pursuing an RPX agreement with the Army, Fireman contacted LCG to learn more about its plans for the Caven Point Property.

60. In or about May 2014, Fireman visited LCG's office to review the Master Plan Lucarelli had created for the Caven Point Property.

61. Lucarelli even provided Fireman with a copy of the most recent Master Plan.

62. On May 6, 2014 Lucarelli wrote to Fireman, further expounding on his plans and offering Fireman an investment proposal.

63. On June 25, 2014, an attorney for Fireman wrote to John Cali, one of LCG's partners, that he wanted to "discuss the army base with you and Lance." (Exhibit 6.)

64. Fireman's lawyer continued that, "Paul Fireman has basically offer[ed] $5 million for the option or to step into your shoes, as well as to pave the chapel ave lot and get paid back out of the parking revenue 75/25 until paid off then flip 25/75 and the right to use the lot for a week ever year there i[n] a major tournament." (Id.)

65. Lucarelli and LCG rejected this proposal.

66. In July 2014, newspaper articles began to appear relating to efforts by Fireman to develop a multi-billion dollar casino in Jersey City.

67. For example, on July 9, 2014, the Associated Press published an article entitled "Developer pitches $4.6B Jersey City casino." (Exhibit 7.)

68. The article reported that Paul Fireman, described as a venture capitalist, wanted to build a $4.6 billion casino in Jersey City near Liberty State Park.

69. The Associated Press article quoted State Senator Ray Lesniak as being supportive of a casino and that he and then Governor Chris Christie, as well as other politicians, were briefed by "Fireman's group."

70. In another article in nj.com, it was reported that Fireman had been "quietly meeting with leading New Jersey politicians in recent months, pushing a proposal for a casino and hotel rising 95 floors above New York Harbor." (Exhibit 8.)

71. Officials from Jersey City expressed enthusiasm about the potential for a facility that would include a "casino, hotel and convention center as well as the largest ferris wheel in the world all located next to Liberty State Park." (Id.)

72. The nj.com article reported that "[a]ccording to lawmakers, the casino would be situated near the waterfront, next to the Liberty National Golf Course. . .." (Id.)

73. The Caven Point Property is next to the Liberty National Golf Course and near the waterfront.

74. Accordingly, it appeared that Fireman and certain New Jersey legislators had alternative plans for the Caven Point Property that did not include LCG.

75. Upon information and belief, Fireman has been continuing to pursue his own plans to develop the Caven Point Property.

76. Liberty National, which is owned by Fireman, hosts PGA golf tournaments.

77. Prior to Lucarelli and LCG pursuing an RPX with the Army, the PGA had used the Caven Point Property as a staging area for tournaments held at Liberty National.

78. In August of 2014, the PGA Tour Commissioner announced that Liberty National would be the host club for the Presidents Cup golf tournament, which was to be held from September 28 to October 1, 2017

79. The Presidents Cup is a series of men's golf matches between a team representing the United States and an International Team representing the rest of the world, excluding Europe. The Presidents Cup is held biennially.

80. In or about May of 2016, the PGA made specific request of the 99th Regional Support Command ("99th RSC") to use portions of the Army's facilities at the Caven Point Property for a 2017 PGA tour event, and specifically raised the issue of a real property exchange between the PGA and the Army for the Caven Point Property.

81. On May 4, 2016, Julian Nierva ("Nierva"), LTC, Deputy Staff Judge Advocate for the 99th RSC, wrote to Matt Kamienski ("Kamienski") of the

PGA to respond to the PGA's inquiry regarding the Caven Point property. (Exhibit 9.)

82. Nierva wrote that the "99th Regional Support Command has responsibility for that facility and can assist you with this request." Nierva went on to write that they were "unsure of exactly what your organization is asking of us" but that "[p]preliminary indications were that your organization wanted an area to park vehicles but in speaking with Mr. Flaschner [of the PGA], **it appears that your request may involve much more, to include a possible real property exchange**." (Id.)**(**emphasis added)**.**

83. In May of 2016, Fireman, Liberty National and the PGA were fully aware that Lucarelli and LCG were pursuing an RPX with the Army for the Caven Point Property.

84. Nierva asked Kamienski to send a "detailed request [to] specifically layout what your organization seeks from the 99th RSC." (Id.)

85. On August 29, 2016, Kamienski wrote back to Nierva, with a copy to other members of the 99th RSC, concerning the PGA's intentions with regard to the Caven Point Property. (Id.)

86. In his August 29, 2016 e-mail, Kamienski asked for a phone call to "discuss use of the Caven Point Army reserve Center during our event next year." (Id.)

87. Kamienski continued that:

> In the near term we are hoping to acquire use of the land for parking, staging and TV operations in the lead up and during the Presidents Cup which will be held at Liberty National Golf Club the week of September 25th

> next year. **There is long term vision surrounding the possibility of land swap, etc. based on the 25 year agreement between LNGC [Liberty National Golf Course] and the PGA TOUR that will see at minimum 8 events played over the course of the contract.** I think it's best to focus on the near term needs and discuss other possibilities as they become more clear.

(Id.)(emphasis added.)

88. On the same day, August 29, 2016, Paul Sayah ("Sayah"), Deputy DPW for the 99th RSC, wrote to David Robinson Chief of Assets, ARIMD regarding the PGA's interest in the Caven Point Property.

89. Sayah wrote that:

> The PGA Tour is requesting to use the Army Reserve facilities at Caven Point, NJ in connection with a tour event scheduled 25 Sep – 1 Oct 2017.
>
> Additionally there is also interest in an RPX. For this matter we are only focusing on the request for 2017.
>
> I am cautious to consider an 833 at Caven Point due to the ongoing discussions and RPX that your office is working.
>
> Please review the request below and feel free to talk with Mr. Matt Kamienski of PGA TOUR, INC. on this matter.
>
> They are looking to primarily use the site for TV equipment/studio air coverage.
>
> We are looking for any advice that will help us in determine if an 833 is doable for the planned event.

(Id.)

90. On December 22, 2016, Robert Gregory ("Gregory"), the RPX Program Manager, rejected the PGA's request to use the Caven Point Property and responded that:

> **In view of the progress being made on consummating the Exchange Agreement, and the City's approval of the Exchange Partner's Master Plan, we anticipate that some construction will start within the next 6 – 8 months on our site.** This, coupled with security concerns, would preclude allowing any outside source access and use of the facilities.

(Id.)(emphasis added).

91. Even though Gregory had rejected the PGA's use of the Caven Point Property based on the existing RPX, the PGA persisted in seeking access to the site trying to leverage the favors it had extended to the 99th Army Division in the past, and accommodations it was prepared to make going forward.

92. On July 20, 2017, Lucarelli and Gregory exchanged e-mails concerning Liberty National's request for use of the Caven Point Property. (Exhibit 10.)

93. In an e-mail to Lucarelli, Gregory wrote that the golf course used the Caven Point Reserve center as a "staging area" in August 2013. (Id.)

94. Gregory went on to state that the "[p]roblem is with our side is that it appears at the moment it may have been allowed without paperwork. Not sure yet and I have people digging to verify. The point of contact who approached the Army to utilize the Reserve Center for this is a Mr. Hurley – not sure if he is associated with Liberty National or just the PGA." (Id.)

95. Gregory also wrote that in his July 20, 2017 e-mail that:

> The person I am more concerned with on the Army side and who I need to find out whether or not he is getting any kind of free stuff from any of this is a Paul Sayah with the 99th. He has been there all of this time and has a strange approach to all of this. As I get more info I will get it to you.

(Id.)

96. In an August 2, 2017, Patrick Hurley ("Hurley") of the PGA admitted in an e-mail that the PGA was attempting to leverage favors that the PGA had provided to the Army in exchange for use of the Caven Point Property:

> In the past we [the PGA] have used this Army Base for staging space (2009 & 2013) and didn't need it for working space, however, they would of [sic] allowed us for use in 2013 if we so chose to do so. **In the past, we have also funded their [the Army's] Holiday Party, which we would certainly look to do again in 2017**.

(Exhibit 11.)(emphasis added).

97. **Hurley further admitted that he had been negotiating with Brandi Peraria and Vinny Giordano of the 99th RSC for a year to attempt to obtain use of the Caven Point property -- while LCG was diligently, and in good faith, pursuing an RPX with the Army. Tellingly, Hurley further admitted that the PGA was sponsoring an event for the wives and families of military personnel as an in inducement to the PGA's use of the Caven Point property:**

> . . . who have been as accommodating as can be (both are with 99th RSC, DPW, Real Estate). They have been a huge help, and really have worked with us to get to where we are today. **We've been meeting and talking with them for the last year +, have a solid plan for how we will be utilizing the base, security, etc., which everyone on their team has blessed and signed off on (General of the base included I believe). This started out as conversations and dialog that these guys would love to work with us, support this important event in JC, and how it's been escalated to the top (Washington) where they need to do an appraisal, get fair market value, etc.**

> For us, this piece of land is one of the most crucial as it's serving as NBC Sports Broadcast Compound, who will be broadcasting the event to over a billion people around the world. This is the first time the Presidents Cup has been in the NY/NJ Metro area.
>
> The PGA TOUR has had a close working relationship with the military, and support of our troops. **We are hosting an Operation Shower at Liberty National Golf Course on the Sunday before event week for wives and families of military men oversees [sic] which is a big program across the board at the PGA TOUR.**

(Id.)(emphasis added).

98. Upon information and belief, the PGA had provided free services, gifts, and other favors to the 99th Division in order to induce the 99th Division to allow the PGA access to the Caven Point Property for tournaments.

99. Upon information and belief, representatives of the PGA approached members of the Army and/or the 99th Division to complain about its inability to access the Caven Point Property for the Presidents Cup tournament.

100. Upon information and belief, representatives of the PGA approached members of the Army and/or the 99th Division to persuade them to terminate the RPX with LCG so that the PGA could obtain rights to the Caven Point Property.

101. Upon information and belief, representatives of the PGA approached members of the Army and/or the 99th Division to persuade them to terminate the RPX with LCG so that the PGA could enter into its own RPX with the Army for the Caven Point Property.

**The Army Wrongfully and in Bad Faith Terminates the RPX with LCG**

102. LCG performed all that was required of it under both the Letter Agreement and Terms and Conditions, and worked diligently, and in good faith, toward the execution of a final Exchange Agreement with the Army. (Exhibit 12.)

103. In May of 2017, Stephen W. Bruce ("Bruce"), Realty Specialist for the U.S. Army Corps of Engineers, Savanah District, forwarded Lucarelli an updated draft of the RPX Exchange Agreement.

104. Indeed, as of September 29, 2017, Lucarelli and Bruce were negotiating a final Exchange Agreement.

105. Thereafter, in November of 2017, Bruce advised Lucarelli that he was meeting with the 99th RSC to discuss the "path forward" with regard to Lucarelli's RPX with the Army. (Exhibit 13.)

106. The 99th RSC was not responsible for negotiating the RPX and had not previously had any input into approving the RPX or negotiating the Exchange Agreement.

107. It was not the 99th RSC's decision to move forward with the RPX.

108. Rather, the RPX was a decision made by the "United States of America, acting by and through the Department of the Army, Army Corps of Engineers."

109. The RPX was being managed by Gregory, the RPX Program Manager for Army Reserve Installation Management Directorate, based in Fort Belvoir, Virginia.

110. Accordingly, Bruce's statement to Lucarelli that the "Reserves" would be making a decision about the RPX was contrary to the terms of the Terms and Conditions and indicated a procedure that was different from, and contrary to, that set forth in the Terms and Conditions.

111. After working with Lucarelli and LCG for nearly five (5) years, at considerable expense to Lucarelli and LCG, on February 8, 2018, the Army inexplicably, and without justification, terminated the RPX with LCG. (Exhibit 14.)

112. In terminating the RPX, the Army provided Lucarelli and LCG with no explanation whatsoever, other than a vague and oblique reference to "evolving requirements for the units using the Caven Point Reserve Center." (Id.)

113. Upon information and belief, there were no "evolving requirements" with regard to the units assigned to Caven Point that justified the termination of the Army's RPX with LCG.

114. Upon information and belief, the 99th RSC, at the request of the PGA, wrongfully, and in bad faith, influenced the Army to terminate the RPX.

115. Upon information and belief, the PGA unduly influenced 99th RSC to advocate for the termination of the RPX with LCG in consideration for favors and accommodations that the PGA had made, and promised to continue to make, to the 99th RSC.

116. Upon information and belief, the PGA willfully and deliberately interfered with the RPX to the detriment of LCG, and to the benefit of the PGA.

117. Upon information and belief, Major General Troy D. Kok, who had command of the 99th Regional support command, advised and encouraged Lieutenant General Charles D. Luckey, the Chief of Army Reserve and Commanding General, United States Army Reserve Command to terminate the RPX.

118. Upon information and belief, Lieutenant General Luckey directed that the RPX be terminated.

**FIRST CAUSE OF ACTION**
**(TORTIOUS INTERFERENCE WITH CONTRACT)**

119. Plaintiffs repeat the allegations contained in paragraphs 1 through 119 of this Complaint and incorporates those allegations in this Cause of Action as if fully set forth herein.

120. Plaintiffs and the Army entered into binding contracts with Lucarelli and LCG to effectuate the RPX.

121. The Letter Agreement and Terms and Conditions are valid and enforceable contracts between LCG and the Army.

122. The Letter Agreement was executed and approved with a governmental agent with actual authority to bind the United States.

123. The Letter Agreement specifically obligated the Army to engage in exclusive, good faith, negotiations with Lucarelli to complete the RPX.

124. The Terms and Conditions were executed and approved with a governmental agent with actual authority to bind the United States.

125. The Terms and Conditions explicitly set forth the parties' mutual intent to pursue an Exchange Agreement based on the terms and conditions set forth therein.

126. The Terms and Conditions reflected a mutual intent to execute an Exchange Agreement following Plaintiffs' satisfaction of conditions set forth in the Terms and Conditions.

127. Plaintiffs performed all that was required of them under both the Letter Agreement and the Terms and Condition, and worked diligently, and in good faith, toward the execution of a final Exchange Agreement with the Army.

128. Plaintiffs satisfied the conditions set forth under the Letter Agreement and Terms and Conditions, and expended substantial time and money satisfying those conditions.

129. The Army accepted the benefit of the services and other investments expended by Plaintiffs in satisfying the conditions set forth under the Letter Agreement under the Terms and Conditions.

130. The PGA had knowledge of the existence of a contract between Plaintiffs and the Army.

131. The PGA interfered with valid and enforceable contracts between the Army and LCG.

132. The PGA was not a party to the contracts.

133. The PGA's interference was inflicted willfully, deliberately and intentionally.

134. The PGA's interference was without justification.

135. The PGA's interference caused damage to Plaintiffs to the benefit of the PGA.

136. Plaintiffs have been damaged as a direct and proximate result of the PGA's tortious interference with Plaintiffs' contracts with the Army.

## SECOND CAUSE OF ACTION (TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE)

137. Plaintiffs repeat the allegations contained in Paragraphs 1 through 136 of this Complaint and incorporate those allegations in this Cause of Action as if fully set forth herein.

138. Plaintiffs had a reasonable expectation of deriving an economic advantage through an RPX with the Army.

139. The PGA had knowledge of Plaintiffs' expectancy of deriving an economic advantage.

140. The PGA willfully, deliberately, intentionally, and with malice interfered with Plaintiff's prospective economic advantage.

141. The PGA's interference resulted in Plaintiffs' the loss of the prospective gain.

142. Plaintiffs have been damaged as a direct and proximate result of the PGA's tortious interference with a prospective economic advantage.

WHEREFORE, Plaintiff demands judgment against the Defendant for the following relief:

a. The full amount of his compensatory damages, which is in an amount that exceeds the sum or value of $75,000;

b. Prejudgment interest;

c. Attorneys' fees and costs;

d. Injunctive relief precluding the PGA from interfering in Plaintiffs' rights to pursue an RPX with the Army; and

e. Such other and further relief as the Court deems just and equitable.

**DESIGNATION OF TRIAL COUNSEL**

Plaintiffs hereby designate Marc D'Angiolillo, Esq. as their trial counsel.

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
*Attorneys for Plaintiffs,*
LCG I Chapel Avenue LLC and
Lance Lucarelli

By: /s/*Marc D'Angiolillo*
Marc D'Angiolillo, Esq.

Headquarters Plaza
One Speedwell Avenue
PO Box 1981
Morristown, NJ 07962-1981
(973) 538-0800
mdangiolillo@riker.com

Dated: January 22, 2021

# EXHIBIT 1

# NOTICE OF AVAILABILITY (NOA)
# FOR
# UNITED STATES ARMY RESERVE
# REAL PROPERTY EXCHANGE

**US Army Reserve Center (USARC) (Site 1)**
**116 Chapel Ave & Caven Point Rd**
**Jersey City, New Jersey**



**Alexander Hamilton US Army Reserve Center (USARC) (Site 2)**
**76 Route 17 and Essex Street**
**Lodi, New Jersey**



**U.S. DEPARTMENT OF ARMY**

When referring to this offering, please identify it as:
"NOTICE OF AVAILABILITY for USAR REAL PROPERTY EXCHANGE:
Jersey City and Lodi, New Jersey"

## TABLE OF CONTENTS


| | Page Number |
|---|---|
| I. INTRODUCTION | 5 |
| II. EXCHANGE PARCEL | 6 |
| A. General | 6 |
| B. Location/Area | 10 |
| C. Site Plan | 13 |
| D. Zoning and Land Use | 13 |
| E. Environment | 13 |
| F. Legal Description | 14 |
| III. FACILITIES CONSIDERATION | 14 |
| IV. ADMINISTRATIVE RESPONSIBILITIES/COSTS | 15 |
| V. EXCHANGE PROCESS | 15 |
| A. Step One - Qualification Requirements and Application Evaluation Factors | 15 |
| B. Step Two – Submission of Applications | 19 |
| C. Step Three – Offeror Evaluation Process | 20 |
| D. Step Four – Exchange Agreement | 22 |
| VI. EVALUATION AND RATING PROCESS | 22 |
| A. Qualification | 22 |
| B. Individual Factor Ratings | 22 |
| C. Risk Ratings | 23 |
| D. Overall Ratings | 23 |
| E. Arrangement for Inspection of the Sites | 24 |
| VII. PROJECTED SCHEDULE | 24 |
| VIII. QUESTIONS AND QUALIFICATION SUBMITTAL | 24 |
| IX. SPECIAL CONDITIONS AND LIMITATIONS | 24 |
| A. No Obligation | 24 |
| B. Waiver | 25 |
| C. Protection Afforded to Sensitive Material | 25 |
| D. Rights Reserved | 25 |
| E. Hold Harmless | 25 |
| F. Title and Title Evidence | 25 |
| X. POINT OF CONTACT | 26 |

APPENDICES

Appendix 1. Legislative Authority

Appendix 2. DD Form 1391 Military Construction Project Data

Appendix 3. Draft Letter Agreement

Appendix 4. Draft Exchange Agreement

Appendix 5. Draft Construction Management Letter Agreement

Appendix 6. Key Team Member Experience Form

Appendix 7. Environmental Documents and Link

Appendix 8. Survey of U. S. Army Reserve Centers

*****Note: Offers will be subject to the terms and conditions contained in the attached Appendices, unless otherwise negotiated, and should be reviewed carefully by Offerors before submission of applications in response to this NOA.**

## I. INTRODUCTION

The U.S. Army Reserve (USAR) owns a number of properties throughout the United States that are improved with USAR facilities. New development and changing land use patterns in the vicinity of these properties have created value in them for higher and better uses. By offering these properties in exchange for existing and/or to be constructed facilities, the USAR will update and strategically realign its inventory of training facilities.

The Real Property Exchange (RPX) Program is conducted under the legislative authority of 10 USC 18240, as amended (see: **Appendix 1**). Commonly known as the "Exchange Authority," this legislation permits DOD reserve components to convey certain real property assets to States, local governments, local authorities, or private parties in exchange for facility or facilities, existing and/or to be constructed, including utility services for the facilities. The cost of the Replacement Facilities must be of a combined value at least equal to the fair market value of the property to be conveyed, as determined by the Government.

Pursuant to the Exchange Authority, acceptance of replacement facilities or additions to an existing facility requires the Deputy Assistant Secretary of the Army for Installations, Housing and Partnerships {DASA(IH&P)} to determine that the facilities:

(1) are complete and usable, fully functional, and ready for use;
(2) satisfy all operational requirements; and
(3) meet all applicable Federal, State, and local requirements relating to health, safety, fire, and the environment.

In this Notice of Availability (NOA), the Government is offering to convey fee title to the land and facilities of the USARC in Jersey City, NJ (Site 1) and the Alexander Hamilton USARC in Lodi, NJ (Site 2). The Government prefers to exchange both parcels as a package, but is willing to consider a separate exchange for individual parcels.

This property is offered in exchange for land and construction of a new USARC. The land needs to be at least 20 acres and within a 5 mile (+/-) radius of the existing Jersey City USARC. The site must provide for easy access to public transportation, such as metro/train and bus lines. The new USARC will be referred to as the Replacement Facility. Property offered must be approved by the Army Reserve. Property offered in excess of the 5 mile radius will be considered on a case by case basis, and is subject to approval by the Army Reserve.

The NOA process established for this RPX Project is structured to ensure that the Government receives the best value from a qualified and responsible Offeror. The exchange process is composed of the following four steps, discussed in detail in Section V, pages 15-22 of this NOA:

(1) <u>Qualification Requirements</u>. Interested parties (or "Offerors") must meet the qualification requirements of this NOA by submitting a description of the qualifications, experience and past performance of the team that will fund and satisfy the Government's objective, documentation demonstrating the Offeror's financial and

technical capability and capacity to perform, and a line of credit from a financial institution. Interested parties must also submit a deposit to fund the estimated cost of the administrative actions required to complete the proposed exchange.

(2) Submission of Applications. Offerors provide written submissions which satisfy the requirements set forth in this NOA.

(3) Offeror Evaluation Process. An Evaluation Board (EB) reviews the applications which have been received from Offerors and selects an Offeror as a conditional Exchange Partner, subject to approval by the DASA (IH&P). After DASA (IH&P) approval, the Exchange Partner enters into a Letter Agreement (**Appendix 3**) with the USACE Savannah District. The Letter Agreement is in furtherance of good faith and exclusive negotiation of a Real Property Exchange Agreement (**Appendix 4**) between the Exchange Partner and the Government. Either party may terminate negotiations prior to the execution of the Exchange Agreement.

(4) Exchange Agreement. The specific business terms and legal conditions associated with the exchange will be documented in the Exchange Agreement, including draft conveyance documents. Final execution of an Exchange Agreement requires completion of required National Environmental Policy Act (NEPA) analysis. The Exchange Partner may do more environmental work to comply with the Exchange Partner's due diligence requirements.

## II. THE EXCHANGE PARCELS

A. GENERAL.

Site 1: The Caven Point USARC consists of approximately 27± acres of land with 60,252 square feet of improvements. The Caven Point property is a level, irregularly shaped parcel located at the northeast corner of the intersection of Caven Point Road and Chapel Avenue. There is approximately 1,100 feet of frontage on the east side of Caven Point Road and 800± feet on the northerly side of Chapel Road. Site improvements include chain-link fencing, parking lots, maintenance building, and a mixed use building. All utilities are available at the site.

There is a permanent pipeline easement containing 1.708± acres on the property held by Spectra Energy. The easement is 50 feet wide and runs parallel to Caven Point Road. There is also a temporary construction easement that will terminate with the completion of the pipeline. Please see map below.

L



A portion of the site is located in an area included on the National Inventory of Wetlands. The wetland consists of 3.3± acres and is located at the northwest corner of the property. The wetland is categorized as a Marine and Emergent Wetland. Please see map below.



The Hudson County Assessor's Office further identifies the exchange parcel (site 1) as Block # 27401 Lot 10 and Lot 13. The actual boundary lines are further defined in the survey (Appendix 8)

Site 2: The Alexander Hamilton USARC consists of 5.33± acres of land with approximately 47,000 square feet of improvements. The subject property is a level, triangular shaped parcel of land located between Interstate 80 and Highway 17. Site improvements include macadam paved parking, chain-link fencing, training and storage facilities. All utilities are available at the site.

There is a 0.20± acre perpetual easement located on the subject property. This easement for the State of New Jersey is for the use of a permanent sewer line and traverses the northeastern portion of the site.

The Bergen County Assessor's Office further identifies the exchange parcel (site 2) as two different parcels (Pin # 0231_193.02_1, Block #193.02 Lot 1 and Pin # 0231_286_1.01, Block # 286 Lot 1.01). The actual boundary lines are further defined in the survey (Appendix 8).

**B. EXCHANGE PARCEL LOCATION/AREA**

**CAVEN POINT USARC, JERSEY CITY, NJ (SITE 1)**




**ALEXANDER HAMILTON USARC, LODI, NJ (SITE 2)**



**EXCHANGE PARCEL PHOTOS (SITE 1)**







**EXCHANGE PARCEL PHOTOS (SITE 2)**






**C. SITE PLAN**

Site 1: The site is developed with two separate buildings, one newer maintenance garage and one older irregularly shaped mixed use building. The parcel is located on the east side of Caven Point Rd, at the corner north of Chapel Avenue. The site is irregular shaped and is level with the streets. Both Chapel Avenue and Caven Point Roads are improved macadam roadways. Jersey City provides municipal water and sewer to the area as well as police and fire protection. The property abuts Liberty National Golf Club to the north and east. Also to the west of the site is Interstate 95, also known as the NJ Turnpike.

Site 2: The site, which is located in the southwest part of Bergen County, has access and frontage from Route 17 and frontage and visibility along Interstate Route 80. The property is developed with a 22,727 square foot, one story office building with an additional 17,321 square foot of finished basement space. The site is also improved with a 7,672 square foot warehouse/garage.

**D. ZONING and LAND USE**

Although the Government is exempt from local zoning requirements, the Exchange Parcel (site 1) currently lies within the boundaries of Jersey City, Hudson County and is zoned as a redevelopment area. Any proposals to develop this property have to be submitted to the City of Jersey City located at 30 Montgomery Street, Jersey City, NJ 07302 for approval. The Exchange parcel (site 2) currently lies within the boundaries of Lodi, Bergen County and is zoned as C-R (Regional commercial District). The current zonings are consistent with the trend in the neighborhood. There are no known moratoriums affecting the exchange parcels. Verification of the present zoning and determination of permitted uses there under, along with compliance of the Exchange Parcels for present or proposed future use), is the responsibility of the Exchange Partner; the Government makes no representation in regard thereto. Further, the Government does not guarantee that any zoning information is necessarily accurate or will remain unchanged. Any inaccuracies or changes in the zoning information shall not be cause for adjustment or rescission of any contract resulting from this NOA.

**E. ENVIRONMENTAL**

**1. Environmental Condition**

Consummation of the final exchange is contingent on all environmental clearances and reviews. An Environmental Condition of Property (ECP) for the Exchange Parcels (**Appendix 7**) will be completed. The ECP is an assessment of the environmental condition of the Exchange Parcel based on observation and review of available environmental information and leads to a determination of whether future use(s) of the Exchange Parcel poses a threat to human health and the environment. It is intended that the Government will provide the Offeror which is selected as the Exchange Partner from this NOA process with a Finding of Suitability to Transfer (FOST) prior to consummation of the Exchange Agreement. The FOST documents the ECP findings, describes any remedial actions taken, the current environmental condition of the Exchange

Parcels, and identifies any restriction on future use of the Exchange Parcel. The Exchange Partner may perform additional environmental work to satisfy these requirements. At the time of transfer, the Government will provide a Quitclaim Deed to the Exchange Parcels providing certain covenants and warrants to the environmental condition of the Exchange Parcels as required by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Those covenants will include confirmation that all required remedial action to protect human health and the environment has been taken. The Exchange Partner will be responsible for the cost of the preparation of the FOST as specified in the draft Letter Agreement (Appendix 3).

**2. Environmental Impact**

It is the intent of the Government that prior to execution of the Exchange Agreement; the Government will have prepared an Environmental Assessment (EA) and Finding of No Significant Impact (FNSI) or an Environmental Impact Statement (EIS) and Record of Decision (ROD), as appropriate, for the proposed exchange. Completion of the EA/FNSI or EIS/ROD fulfills requirements of the National Environmental Policy Act (NEPA) of 1969, as amended. The Exchange Partner will be responsible for the cost of the appropriate NEPA action as specified in the draft Letter Agreement (Appendix 3).

**F. LEGAL DESCRIPTION**

The Government will provide a legal description and survey suitable for recordation of the Exchange Parcel to the Exchange Partner prior to entering into an Exchange Agreement.

**III. FACILITIES CONSIDERATION**

As consideration for the Exchange Parcels, the Exchange Partner is required to provide a Replacement Facility in the form of land to be located within approximately a 5 mile radius of the existing Caven Point USARC and to construct a new USARC as specified in DD Form 1391, Military Construction Project Data at **Appendix 2**. In accordance with the RPX authorizing legislation, the total consideration to be provided by the Exchange Partner for the completion of the Replacement Facilities must have a value at least equal to the fair market value of the Exchange Parcel as determined by the Government. The Exchange Partner's responsibility for construction under this NOA will include all elements of design, demolition, construction, deconstruction, and quality control required to deliver fully operational facilities at the location specified for the Replacement Facility. Further descriptions of the required facilities are shown on Exhibits A, B, C, D and E.

During the design phase, the Government may provide additional information to the Exchange Partner such as design codes/requirements. The facility shall be constructed in accordance with local building and construction codes. All construction activities and requirements at the Replacement Facility provided by the Exchange Partner under this NOA shall be subject to the Davis Bacon Act.

## IV. ADMINISTRATIVE RESPONSIBILITIES/COSTS

The Exchange Partner will be required to fund the Government for administrative actions required to complete the proposed exchange. The estimated cost of $186,000.00 is a line item in the proposal submission requirements, and payment is one of the qualification requirements for inclusion in the selection process for this RPX opportunity. The payment shall be in the form of a Cashier's or Bank Certified Check payable to the "Finance & Accounting Officer, USACE Savannah" and shall be retained until selection of the Exchange Partner. The funds will be treated as a deposit for completion of the Letter Agreement (**Appendix 3**) for the selected Offeror and returned to the Offerors not selected within ten (10) working days after Exchange Partner selection. The Letter Agreement provides that the Offeror will fund the U.S. Army Corps of Engineers (USACE) costs to complete the proposed exchange, including but not limited to all items listed in **Appendix 3 Attachment A**.

## V. EXCHANGE PROCESS

### A. STEP ONE – QUALIFICATION REQUIREMENTS AND APPLICATION EVALUATION FACTORS

Respondents to this NOA must satisfy all of the requirements for applications in order to be considered for selection as the Exchange Partner. Offeror submittals are to be organized and structured in conformance with the outline below. Submittals should be clear and concise, and provide only relevant material. All application materials shall be submitted in binders with a table of contents and tabbed section dividers. The requirements listed below must be received by USACE, Savannah District not later than the date and time specified in the Schedule in paragraph V.B.1..

**1. Government Administrative Costs deposit.** The deposit shall be in the form of a Cashier's or Bank Certified Check payable to "Finance & Accounting Officer, USACE Savannah" in the amount of $186,000.00 and shall be submitted with the Offeror's application as provided in paragraph VI. A. 1.

**2. Letter confirming a minimum available Line of Credit.**
(Already completed)
The Offeror shall provide a letter guaranteeing a minimum available Line of Credit in the amount equal to the total value of the proposal as listed in the schedule on pages 17- 21, paragraph V.A. 3. f., to be completed by the Offeror. This letter shall be from a reputable financial institution, as determined by USACE, incorporated in the United States of America, addressed to USACE, Savannah District (See Paragraph VI.A. 1. below), and guarantee that the Line of Credit will be available for the duration of the proposed exchange project.

### 3. Application Evaluation Factors

**a. Factor 1. Offeror Profile**. This section describes the requirement for a description of the Offeror's proposed team, including the design and construction firm(s) to be assigned to this Project. Required documentation includes: each firm's qualifications, relevant experience and past performance with projects of a similar nature, scope and scale. Also include: the legal organizational structure; identifying data on principals, partners, etc.; insurance coverage; and other basic matters for each corporate member of the team. (Resumes for key people, contractors, etc. should be included in **Appendix 6**.

Each Offeror shall provide the following:

- The name, address, telephone, e-mails and fax numbers of each principal, partner and/or co-venture participating on Offeror's team and the name of the representative authorized to act on behalf of the team.
- Identification of any affiliation or other relationship between any of the members of the team responding to this application and any development company, parent company, or subsidiary.
- A description of Offeror's status indicating jurisdiction under whose law Offeror is organized and operating, and a brief history of Offeror's organization and its principals. And:
    - If the Offeror is a corporation, provide: 1) Articles of Incorporation and By-Laws; 2) Names, addresses of officers and participating principals; 3) Corporate resolution authorizing the proposed transaction; and 4) Summary of Corporate Activity and documentation that will be relied upon by the Government to assess the corporation's successful long-term operation.
    - If the Offeror is a partnership/joint venture, provide: 1) partnership/joint venture agreement; 2) Names, addresses of the partners; and 3) each principal member's appropriate history and background, assigned areas of responsibility and any agreements or other documentation that will be relied upon by the Government to assess the partnership/joint venture's successful long-term operation.
    - If the Offeror is a sole partnership, provide current address of the partner, and any agreements or other documentation that will be relied upon by the Government to assess the partnership's successful long-term operation.

Date and location of establishment/incorporation under the present name.

- The Dun & Bradstreet (D-U-N-S) numbers for all members of the Offeror's development team including, but not limited to: the principal, partner, and/or co-venture.

- An explanation of types of services the Offeror's firm provides and how they relate to this NOA and the RPX Project.
- An indication of whether Offeror ever maintained or currently maintains errors and omissions insurance and, if so, the amount of the coverage, the deductible, and the carrier of the insurance.

**b. Factor 2. Relevant Experience.** This section considers the extent of the Offeror's proposed design and construction firm's corporate and key personnel experience in successfully planning for, developing, and managing projects. The Offeror shall provide information about other projects performed by the Offeror and identified through any and all means (relevancy and recency), including but not limited to customer surveys and comments from Government agencies, if any.

Each Offeror shall provide the following:

- Relevant Project Experience – Provide information for at least three (3) projects for which Offeror (or team member) has completed and which demonstrate an ability to perform a project of the magnitude and complexity of this RPX Project - on time and within budget. For each project provided, please include the following:
  - Name, address, type and size of each project;
  - Name and address of the owner of each project;
  - No more than three (3) photos of each project (each photo not exceeding 8-1/2" by 11" in size) if available;
  - A description of how the project achieved an acceptable level of quality in the project planning, phasing/sequencing, design and construction, and coordination of roles and responsibilities amongst the team members;
  - A description of project economics and finance, including: 1) total development costs including hard and soft costs; 2) financing including debt and equity amounts and sources; 3) ownership structure including percentage of ownership by principal members; 4) economics of sharing arrangements between principal members or investors including identification of sources of return to the owners and investors;
  - Any other pertinent information necessary to sufficiently describe each project.

**c. Factor 3. References.** Provide the name, address, and telephone numbers of at least five (5) clients or other stakeholders for whom Offeror (or team member) has successful developed projects within the past ten (10) years. These client references should include the owners of or persons directly involved with projects referenced above. In addition, Offeror is encouraged to provide the above information from such other stakeholders that the Offeror considers important to understanding the success of Offeror's work. These references

should be able to assess the degree of client (or other stakeholder) satisfaction. The Government intends to contact all the references that the Offeror lists. Offeror's inclusion of the information requested above will be considered authorization to do so. The Offeror's references may be asked to discuss the following:

- Quality of the working relationship with the client (the tenant and/or the owner);
- Professionalism and integrity with which Offeror conducted business;
- Responsiveness to the client's needs and expectations;
- Level of communication;
- Value added to the project as the result of cost savings, favorable financing positive asset management, etc.;
- Delivery of the project within budget and on schedule;
- Quality control of the project design and construction;
- Other relevant aspects in the management of a project development for a client.

**d. Factor 4. Dispute Resolution**. State whether the Offeror (or a team member) has ever been terminated for default, noncompliance, or non-performance on a contract or Lease, and provide a detailed description. List all material instances and provide a detailed description of the litigation or formal Alternative Dispute Resolution (ADR) processes (e.g. binding arbitration) during the last ten (10) years and involving a claim in excess of $50,000 to which any principal member has been a party.

**e. Factor 5. Financial**. This section considers the extent of the Offeror's experience in dealing with the financing of projects. Additionally, the Offeror's proposed financial strategy and capability for this project will be considered.

- Offeror shall provide audited financial statements (or 10Ks if the entity is publicly owned) for the last three (3) years. Parent and holding companies should submit audited financial statements if they intend to commit resources to a developer or joint venture in which they own a controlling interest. The financial statements should be prepared in accordance with generally accepted accounting principles (GAAP) and the financial auditor must be an independent Certified Public Accountant or an independent licensed public accountant. Auditor contact information should also be provided.
- If audited financial statements have not been prepared for Offeror's corporation or partnership or if Offeror is an individual, in addition to financial statements, provide a complete and current personal financial statement for Offeror and all partners/officers.
- Apart from the references requested above, provide the names, addresses, telephone numbers, and e-mails of at least two commercial or institutional financial references from which the Offeror and each member of the development team has previously obtained financing.

Attach a letter authorizing each reference to respond to inquiries from the Government relating to this NOA.

- Discuss Offeror's capability to secure operating capital for the projects as well as Offeror's capability to secure payment and performance bonds (or other types of security) for this RPX Project.

**f. Factor 6. Project Implementation.**

- Describe the Offeror's organizational commitment to the design and construction of the Replacement Facility and how the Offeror will respond to the Government during these phases.
- Include an organizational chart and staffing plan that identifies the roles and responsibilities of the members of the Offeror's team to be utilized in the design and construction of the Replacement Facility.
- Provide a summary design and construction budget per line item of Section 9 on page 1 of the DD1391 (**Appendix 2**) in same format.

B. **STEP TWO – SUBMISSION OF APPLICATIONS**

1. **Deadline and Procedures for Submission of Applications**. All submissions to this NOA by Offerors are due no later than 5:00 PM Eastern Standard Time on the date specified below and identified on the RPX Project website http://www.sas.usace.army.mil/About/DivisionsandOffices/RealEstateDivision/AcquisitionsBranch.aspx. The Offeror shall submit one (1) original, complete application (stamped "Original" on title page) along with five (5) copies, plus one (1) electronic copy in the form of a CD or DVD. The application and copies shall be sent in one (1) package and clearly marked as a response to this NOA. The following information must appear in the lower left corner of the envelope:

"Sealed Application for: USAR Real Property Exchange"
Time: NLT 5:00 PM Eastern Standard Time
Date: 18 October 2013
Project Name: Caven Point USARC & Alexander Hamilton USARC

And addressed to:
U.S. Army Corps of Engineers
Savannah District Real Estate Division
Attn: CESAS-RE
100 W. Oglethorpe Ave
Savannah, GA 31401

NOTE: Any subsequent modifications to the Offeror's application shall be sent using one of the above methods only. In addition, the Offeror's application should be labeled with the Offeror's name, address, and name of contact person.

NOTE: Electronic, telegraphic, or facsimile offers and modifications will NOT be considered without the express written authorization of the USACE Savannah District Real Estate Division.

NOTE: Any application received after the time and date specified above will be rejected and returned to the Offeror unopened.

2. **Cancellation of Notice of Availability**. The Government is sponsoring this RPX Project solely for the purpose of achieving the goals established in the enabling legislation. While the Government intends to enter into an Exchange Agreement with an Exchange Partner, it is under no obligation to do so, and reserves the right to cancel this NOA and reject all application submissions. Further, the Government reserves the right to suspend or modify all aspect of this process and to waive informalities and minor irregularities in offers received where it is deemed by the Government in its sole discretion to be in the best interest of the Government.

3. **Amendment of NOA by the Government**. This NOA may be amended at any time by the Government, in its sole discretion. A Notice of Amendment shall be posted on the Project website and a written amendment shall be provided to each Offeror who has submitted a written submittal on or before the date of the NOA amendment. If this NOA is amended, then all terms and conditions that are not modified shall remain unchanged.

Offerors that have submitted their application prior to an amendment of the NOA shall be required to acknowledge receipt of such amendment by date and time specified in the amendment. Acknowledgment shall be made by signing and returning the amendment by mail to the address specified in paragraph VI.B.1.

4. **Amendment of Offeror's Written Submittal**. The Offeror may request an amendment of its previously submitted application to this NOA by providing the Government with a detailed description and explanation of the proposed changes which will be reviewed by the Government. To the extent that the Government consents to the proposed changes, such changes to the Offeror's previously written submittal shall be memorialized in a letter agreement and shall be executed by the appropriate representatives of the Offeror and the Government.

C. **STEP THREE – OFFEROR EVALUATION PROCESS**

1. **Evaluation Board (EB)**. An EB will evaluate each Offeror's written submission to this NOA. The members of the EB will determine the overall value of the application to the Government and the potential for meeting the goals of this RPX opportunity in accordance with the Evaluation Process set forth in Section VII below. The Offeror's written application should contain all the information that the Offeror deems necessary to comply with the information required in this NOA. Each application will be evaluated on its own merit, independently and objectively. The Government may contact an Offeror in order to clarify certain aspects of the Offeror's application or to correct clerical errors.

2. **Evaluation of Applications**. The applications which are submitted with respect to this NOA will be evaluated by the EB. Selection of the best application by the Government will be based on an integrated assessment of the factors set forth in Section VII below and a determination of the application which best meets the Government's requirements of this RPX Project.

3. **Best and Final Offers.** In the event multiple qualified Offerors propose similar levels of Facilities Consideration, Offerors may be selected to participate in additional discussions of qualifications, development concepts, and potential additional facilities and/or additional value to be converted to real property improvements. If necessary, USACE reserves the right to request additional Best and Final Offers from a short list of qualified Offerers.

4. **Selection of the Exchange Partner.** Upon completion of submission evaluations, the EB will forward the name of the Offeror with the highest overall ranking to the DASA (IH&P) for consideration for selection to serve as the Exchange Partner for this RPX. The Offeror being referred shall be notified in writing by USACE of this referral and of the resulting decision of the DASA (IH&P). Upon selection by the DASA (IH&P), the Government and the selected Exchange Partner will initiate steps toward entering into a Letter Agreement and an Exchange Agreement.

5. **Post Selection Press Releases**. Following DASA (IH&P) approval and selection of the Offeror with the best application which has been submitted in response to this NOA, the selected Offeror agrees to provide the Government with the opportunity to review and **approve** any press release relating to this RPX Project **prior to** any release to the media. The Government shall, in its sole discretion, provide the selected Offeror with any comments in a timely fashion.

6. **Notification to Offerors not selected**. Within four (4) business days following the selection of the best application to this NOA, the Government will provide written notice to all other Offerors of non-selection. Checks which were received from Offerors which were not selected shall be returned within ten (10) business days of the confirmation by the DASA (IH&P) of the selection of the Exchange Partner.

7. **Letter Agreement**. The selected Offeror must execute the Letter Agreement (see: **Appendix 3)** no later than thirty (30) days following the confirmation by the DASA (IH&P) of the selection of the Exchange Partner.

8. **Required Schedules and Concept Designs.** Within forty-five (45) days following confirmation by the DASA (IHP) of the selection, the Exchange Partner shall furnish the following:

- Design and construction schedules (approximate durations of major milestones) and;
- Concept designs in accordance with requirements listed in Appendix 2.

**D. STEP FOUR – EXCHANGE AGREEMENT**

1. During this step, the specific terms and legal conditions associated with the exchange will be documented in a formal Exchange Agreement **(draft agreement at Appendix 4)**. All administrative actions required to complete the Exchange Agreement will be completed, as well as all other appropriate documentation required. Such documentation includes the Congressional notification, NEPA analysis, and other documents needed to clearly articulate the terms of the exchange.

NOTE: The execution of the Exchange Agreement is not acceptance of the Replacement Facilities. Pursuant to the Exchange Authority, acceptance of Replacement Facilities requires the DASA(IH&P) to determine that the facilities:

(1) are complete and usable, fully functional, and ready for occupancy;
(2) satisfy all operational requirements; and
(3) meet all applicable Federal, State, and local requirements relating to health, safety, fire, and the environment.

2. **Construction Monitoring Letter Agreement.** Concurrently and inclusive with the Exchange Agreement, the Exchange Partner shall enter into a Construction Monitoring Letter Agreement (CMLA) with USACE **(see draft at Appendix 5)**.

**VI. EVALUATION AND RATING PROCESS**

**A. Qualification.** The members of the EB will evaluate the Offeror's application. The following must be received by the Government in a timely manner as specified in paragraph V.B.1. above in order for the EB to evaluate each Offeror.

1. Cashier's or Bank Certified Check in the amount of <u>$186,000.00</u> for payment of Government Administrative Costs.

2. A letter from a reputable financial institution incorporated in the United States of America providing a Line of Credit for the duration of construction in the amount equal to the total value of the Replacement Facility proposed in the Offeror's application.

3. Written Application including the elements described above relating to qualifications, experience, and past performance with respect to development of projects and properties of a similar nature, scope, and scale, as well as Offeror's financial capability/capacity to carry out the required construction of the Replacement Facility.

**B. Individual Factor Ratings.** Each evaluation factor will be rated as indicated below. The members of the EB will assign one of the following ratings to each factor.

- Exceptional (E): The Offeror has addressed substantially all of the elements of this factor in a manner that demonstrates superior added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates high added value above a satisfactory response.
- Acceptable Plus (A+): The Offeror has addressed many of the elements of this factor in a manner that demonstrates some added value above a satisfactory response and has addressed substantially all of the remaining elements in this factor in a manner that demonstrates a satisfactory response.
- Acceptable (A): The Offeror has addressed substantially all of the elements in this factor in a satisfactory manner.
- Unacceptable (U): The Offeror has failed to address substantially all of the elements of this factor in a satisfactory manner or has simply failed to address substantially all of the elements in this factor.

**C. Risk Factors.** The members of the EB will determine evaluation factor ratings by drawing upon the strengths, weaknesses, and risks identified for each of the evaluation factors. In addition to the ratings above, a risk rating will be assigned to each of the individual factors. The purpose of this rating is to assess the level of risk associated with each Offeror. The members of the EB will assign one of the following ratings to each of the individual factors:

- Low Risk: Any weaknesses identified by the evaluators have little potential to cause disruption to the planning and implementation phases. Normal contractor/Government effort monitoring will probably minimize any difficulties.
- Moderate Risk: These are weaknesses identified by the evaluators that can potentially cause disruption to the planning and implementation phases. Special contractor/Government emphasis and close monitoring will probably minimize any difficulties.
- High Risk: These are weaknesses identified by the evaluators that have the potential to cause significant disruption to the planning and implementation phases even with special contractor/Government emphasis and close monitoring.

The members of the EB will document the strengths and weaknesses of the Offeror's submission and the potential impact on disruption to the planning and implementation phases of the Replacement Facility to justify the selection rating.

**D. Overall Ratings.** The members of the EB will assign an overall rating for each submittal as indicated below:

- Exceptional (E): The Offeror has addressed substantially all of the elements in all of the factors in a manner that demonstrates superior added value above a satisfactory response and has addressed substantially all of the remaining factors in a manner that demonstrates high added value above a satisfactory response.
- Acceptable Plus (A+): The Offeror has addressed many of the factors in a manner that demonstrates some added value above a satisfactory response and has addressed

substantially all of the remaining factors in a manner that demonstrates a satisfactory response.

- Acceptable (A): The Offeror has addressed substantially all of the factors in a satisfactory manner.
- Unacceptable (U): The Offeror has failed to address substantially all of the factors in a satisfactory manner or has simply failed to address substantially all of the factors.

**E. Arrangements for Inspection of the Sites.** USAR and USACE will conduct an Industry Forum at a site to be determined. Details of specific location and time will be posted on the RPX Project website http://www.sas.usace.army.mil/About/DivisionsandOffices/RealEstateDivision/AcquisitionsBranch.aspx. At the time of the Industry Forum, arrangements will be made for inspection of the Exchange Parcel and directions provided to the location of the Replacement Facility construction site for individual inspection.

## VII. PROJECTED SCHEDULE

| | Target Date |
|---|---|
| • NOA Issued | 06 Sep 2013 |
| • Industry Forum | 18 Sep 2013 |
| • Offerors' Applications/Proposals Due | 18 Oct 2013 |
| • Evaluation Board convenes | 28 Oct 2013 |
| • Evaluation Board's Offeror Referral to DASA (I&H) | 08 Nov 2013 |
| • DASA (I&H) Selection of Offeror as Exchange Partner | 22 Nov 2014 |
| • Letter Agreement Executed | 06 Dec 2014 |
| • Exchange Agreement Executed (120 days) | April 2014 |

## VIII. QUESTIONS AND QUALIFICATION SUBMITTAL

Questions regarding the exchange process or the information contained in this NOA may be submitted by two means: 1) in writing to USACE Savannah District, Real Estate Division, or 2) on line using the RPX Project website http://www.sas.usace.army.mil/About/DivisionsandOffices/RealEstateDivision/AcquisitionsBranch.aspx. Substantive question(s) and answer(s) regarding the exchange process or the information contained in this NOA, which do not contain proprietary information, will be posted to the website within two (2) business days following receipt of the questions(s).

## IX. SPECIAL CONDITIONS AND LIMITATIONS

**A. NO OBLIGATION.** While the Government intends to enter into an agreement with an Exchange Partner selected through this NOA process, it is under no obligation to do so. Notification to Congress of the proposed real property exchange and approval of the Exchange Agreement rests with the DASA (IH&P), after favorable review by the Army Office of General Counsel. The Government reserves the right to cancel this NOA at any time, and/or to reject any

and all submissions prepared in response. The Government is not responsible for any costs incurred by an Offeror in order to participate in this exchange process.

### B. WAIVER

The Government reserves the right to waive informalities and minor irregularities in offers received if it is determined that such is in its best interest of the Government.

### C. PROTECTION AFFORDED TO SENSITIVE MATERIAL

Information contained in materials submitted in response to this NOA will be afforded protection from public disclosure.

### D. RIGHTS RESERVED

The Government reserves the right to hold exclusive negotiations with a selected Offeror that result in terms and conditions that differ from the terms and conditions originally offered. Furthermore, the Government reserves the right to terminate negotiations with the selected Offeror and initiate negotiations with others, if within twelve (12) months of selection of the Offeror it is determined that the Government will be unable to conclude successful negotiations with the selected Offeror.

### E. HOLD HARMLESS

By participating in this exchange process, each Offeror agrees to hold the Government, its officers, employees and consultants harmless from all claims, liabilities and costs related to all aspects of this transaction. Under no circumstances shall the Government be liable for any real estate brokerage commissions, finder's fees or other forms of compensation related in any way to activities undertaken by any person or entity as a result of this exchange process.

### F. TITLE AND TITLE EVIDENCE

Conveyance of the Exchange Parcel to the Exchange Partner will be by Quitclaim Deed. Any title evidence desired by the Exchange Partner shall be at its sole cost and expense. The Government agrees to cooperate with the Exchange Partner or its authorized agent in this matter, and will permit examination and inspection of such deeds, abstracts, affidavits of title, judgments in condemnation proceedings, or other documents relating to the title of the exchange parcel and real property involved, as it may have available. The Exchange Partner will be responsible for any expense incurred in connection with title matters or survey of the Exchange Parcel. The Quitclaim Deed may be modified based on the outcome of all environmental analyses and studies or other legal requirements.

## X. POINT OF CONTACT

Questions, clarifications and inquiries about this RPX opportunity should be directed to:

Stephen Bruce
Realty Specialist
Email:Stephen.w.bruce@usace.army.mil
PHONE: (912) 652-5201
FAX: (912) 652-5751

U.S. Army Corps of Engineers, Savannah District
Attn.: Real Estate Division
100 W. Oglethorpe Ave
Savannah, GA 31401

# *Appendix 1*

TITLE 10. ARMED FORCES
SUBTITLE E. RESERVE COMPONENTS
PART V. SERVICE, SUPPLY, AND PROCUREMENT
CHAPTER 1803. FACILITIES FOR RESERVE COMPONENTS

*10 USCS § 18240*

§ 18240. Acquisition of facilities by exchange

(a) Exchange authority. In addition to the acquisition authority provided by section 18233 of this *title [10 USCS § 18233*], the Secretary of Defense may authorize the Secretary of a military department to acquire a facility, or addition to an existing facility, needed to satisfy military requirements for a reserve component by carrying out an exchange of an existing facility under the control of that Secretary through an agreement with an Executive agency (as defined in section 105 of title 5 [*5 USCS § 105*]), the United States Postal Service, or a State, local government, local authority, or private entity. The acquisition of a facility or an addition to an existing facility under this section may include the acquisition of utilities, equipment, and furnishings for the facility.

(b) Facilities eligible for exchange. Only a facility of a reserve component that is not excess property (as defined in section 102(3) of title 40) may be exchanged using the authority provided by this section.

(c) Equal value exchange. In any exchange carried out using the authority provided by this section, the value of the replacement facility or addition to an existing facility, including any utilities, equipment, and furnishings, to be acquired by the United States shall be at least equal to the fair market value of the facility conveyed by the United States under the agreement. If the values are unequal, the values may not be equalized by any payment of cash consideration by either party to the agreement.

(d) Requirements for replacement facilities. The Secretary of a military department may not accept a replacement facility, or addition to an existing facility, to be acquired by the United States in an exchange carried out using the authority provided by this section until that Secretary determines that the facility or addition--
(1) is complete and usable, fully functional, and ready for occupancy;
(2) satisfies all operational requirements; and
(3) meets all applicable Federal, State, and local requirements relating to health, safety, fire, and the environment.

(e) Consultation requirements. The Secretary of a military department authorized to enter into an agreement under subsection (a) to convey an existing facility under the control of that Secretary by exchange shall consult with representatives of other reserve components to evaluate--

(1) the value of using the facility to meet the military requirements of another reserve component, instead of conveying the facility under this section; and

(2) the feasibility of using the conveyance of the facility to acquire a facility, or an addition to an existing facility, that would be jointly used by more than one reserve component or unit.

(f) Advance notice of proposed exchange.

(1) When a decision is made to enter into an agreement under subsection (a) to exchange a facility using the authority provided by this section, the Secretary of the military department authorized to enter into the agreement shall submit to the congressional defense committees a report on the proposed agreement. The report shall include the following:

(A) A description of the agreement, including the terms and conditions of the agreement, the parties to be involved in the agreement, the origin of the proposal that lead to the agreement, the intended use of the facility to be conveyed by the United States under the agreement, and any costs to be incurred by the United States to make the exchange under the agreement.

(B) A description of the facility to be conveyed by the United States under the agreement, including the current condition and fair market value of the facility, and a description of the method by which the fair market value of the facility was determined.

(C) Information on the facility, or addition to an existing facility, to be acquired by the United States under the agreement and the intended use of the facility or addition, which shall meet requirements for information provided to Congress for military construction projects to obtain a similar facility or addition to an existing facility.

(D) A certification that the Secretary complied with the consultation requirements under subsection (e).

(E) A certification that the conveyance of the facility under the agreement is in the best interests of the United States and that the Secretary used competitive procedures to the maximum extent practicable to protect the interests of the United States.

(2) The agreement described in a report prepared under paragraph (1) may be entered into, and the exchange covered by the agreement made, only after the end of the 30-day period beginning on the date the report is received by the congressional defense committees or, if earlier, the end of the 21-day period beginning on the date on which a copy of the report is provided in an electronic medium pursuant to section 480 of this *title [10 USCS § 480*].

(3) Section 2662 of this *title [10 USCS § 2662*] shall not apply to an exchange carried out using the authority provided by this section.

(g) Relation to other military construction requirements. The acquisition of a facility, or an addition to an existing facility, using the authority provided by this section shall not be treated as a military construction project for which an authorization is required by section 2802 of this *title [10 USCS § 2802*].

**HISTORY:**

(Added Oct. 30, 2004, P.L. 108-375, Div B, Title XXVIII, Subtitle A, § 2809(a)(1), 118 Stat. 2125; Jan. 6, 2006, P.L. 109-163, Div B, Title XXVIII, Subtitle A, § 2808(a), 119 Stat. 3508; Jan. 28, 2008, P.L. 110-181, Div B, Title XXVIII, Subtitle A, § 2807, 122 Stat. 541.)

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

Amendments:

2006. Act Jan. 6, 2006, in subsec. (a), added the sentence beginning "The acquisition . . ."; and, in subsec. (c), inserted "including any utilities, equipment, and furnishings, to be".

2008. Act Jan. 28, 2008, in subsec. (a), substituted "with an Executive agency (as defined in section 105 of title 5), the United States Postal Service, or a State" for "with a State".

# *Appendix 2 (1391)*

http://www.sas.usace.army.mil/About/DivisionsandOffices/RealEstateDivision/AcquisitionsBranch.aspx

# *Appendix 3*

## *DRAFT*

## LETTER AGREEMENT
BETWEEN
**THE UNITED STATES OF AMERICA**
AND
***EXCHANGE PARTNER NAME***

This Letter Agreement (LA) is made as of the _____ day of __________, 20___, by and between the United States of America, acting by and through the Department of the Army, U.S. Army Corps of Engineers, Savannah District (USACE), and *Exchange Partner Name* (hereinafter referred to as the "**Exchange Partner")**.

WHEREAS, Title 10, United States Code, Section 18240, allows the Secretary of Defense to authorize the Secretary of the Army to acquire a facility, or an addition to an existing facility, needed to satisfy military requirements by exchange of an existing facility;

WHEREAS, The Defense Authorization Act of 1998, Section 2813(a), codified at 10 United States Code 2695, authorizes acceptance of funds to cover administrative expenses related to certain real property transactions with a non-federal person or entity such that "...the Secretary of a military department may accept amounts provided by the person or entity to cover administrative expenses incurred by the Secretary in entering into the transaction." Covered transactions are further described as follows:

1. The exchange of real property.

2. The grant of an easement over, in, or upon real property of the United States.

3. The lease or license of real property of the United States;

WHEREAS, the Exchange Partner's proposal was selected in response to the solicitation dated______________, 2013, agreeing to the terms and conditions set forth in the solicitation package; and

WHEREAS, Certain activities (see Attachment A) relative to the Government property known as the ............ are necessary to further facilitate the contemplated exchange per the above referenced solicitation.

Now Therefore:

**1. PURPOSE AND INTENT**

a. The Parties acknowledge that this LA is in furtherance of good faith negotiations in contemplation of the conveyance of the Government property known as the Exchange Parcel in exchange for a ________ as set forth in the solicitation.

b. This LA is specifically and solely intended to support all activities, to include those activities listed in Attachment A, necessary to complete the contemplated Exchange Agreement so that the exchange will be accomplished at minimal cost to the U.S. Government. This LA imposes no obligation on either Party beyond the terms and conditions of this LA, and either Party, at its sole discretion, may elect not to proceed with the contemplated exchange with no obligation or liability beyond the terms and conditions of this LA.

c. The Parties intend that this LA constitute a legally binding contract, notwithstanding the Parties have not yet entered into the Exchange Agreement. The Parties acknowledge that neither Party has made a decision concerning the contemplated exchange and that the Parties shall be obligated to proceed with the exchange only in the event the Parties execute a formal Exchange Agreement.

**2. OBLIGATIONS OF THE PARTIES**

a. In consideration of the services to be conducted or actions to be taken by USACE, listed on Attachment A, the Exchange Partner has furnished $186,000.00 as provided for by said solicitation, to fund the estimated cost of the USACE services being provided therein. If the costs estimated by USACE under this LA are later forecasted to exceed the amount of funds available under this LA, USACE shall promptly notify the Exchange Partner of the amount of additional funds required to accomplish the items listed in Attachment A. While Attachment A is an attempt to identify the activities necessary to accomplish the contemplated Exchange Agreement, additional activities may subsequently be identified by the Government. If the required additional funds are not provided within 30 days of said notice, the Government will direct termination of the work under this LA. The Exchange Partner further understands that failure to provide the additional funds necessary to complete the actions for the contemplated exchange will preclude the formal execution of the Exchange Agreement as contemplated by the parties. On a monthly basis, if requested, USACE, shall provide to the Exchange Partner an accounting of the actual costs of work. Within thirty (30) days of completing the work under this LA, USACE shall conduct an accounting to determine the actual costs of the work. Within thirty (30) days of completion of this accounting, USACE, shall return to the Exchange Partner any funds advanced in excess of the actual costs as then known. Established Federal Government accounting procedures shall be used. Except as provided herein the amount of funds advanced by the Exchange Partner, under this LA, shall be nonrefundable.

b. Funds provided by the Exchange Partner shall be in the form of a Cashier's or Bank Certified check made payable to the "Finance and Accounting Officer, Savannah District" and forwarded to the following address with a copy of this LA attached.

U.S. Army Corps Engineer
Attn: CESAS-RE
100 W. Oglethorpe Ave.
Savannah, GA 31401

## 3. MODIFICATION OR TERMINATION OF AGREEMENT

a. The Exchange Partner or USACE shall have the option to terminate this agreement by giving written notice to the other party, specifying the effective date of the termination of work, at least ten (10) days before such effective date. Within thirty (30) days following the effective date of the termination of work USACE shall provide to the Exchange Partner a final accounting of the actual costs of the work by USACE and return to the Exchange Partner any funds advanced in excess of the actual costs as provided in Article 2.

b. This LA contains the entire agreement between the parties regarding funding preliminary activities for the exchange of certain United States owned land at the Exchange Parcel for Exchange Partner's real property in the form of a ______and any agreement hereafter made shall not operate to change, modify, or discharge this LA in whole or in part, unless that agreement is in writing and signed by the parties hereto. This LA shall not merge into any subsequent agreements by the parties to include the Exchange Agreement and all documents relating thereto.

c. This LA shall be in effect as of the date executed by both parties and shall remain in effect until the said Replacement Facility is completed and accepted by the Government or by written notice by a party to the other and after final accounting of funds under Article 2.a.

## 4. LIMITATION OF LIABILITY

The Government's obligation to pay any money under this LA is subject to the availability of appropriated funds to the Department of Army, and nothing in this LA shall be interpreted to require obligations or payments by the United States in violation of the Anti-Deficiency Act, 31 U.S.C. 3142, as amended, provided that the Government shall otherwise comply with all applicable statutory requirements and its obligations under the terms of this LA.

## 5. DISPUTES

a. This contract is subject to the Contract Disputes Act of 1978, 41 U.S.C. 7101-7109 et seq., as amended. Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

b. "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.

c. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by the following paragraph. A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to a liability or amount or is not acted upon in a reasonable time.

d. A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer. For Contractor claims exceeding $100,000, the Contractor shall submit with the claim a certification that the claim is made in good faith, supporting data are accurate and complete to the best of the Contractor's knowledge and belief and the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

e. If the Contractor is an individual, the individual shall execute the certification. If the Contractor is not an individual, the certification shall be executed by a senior company official in charge at the Contractor's plant or location involved or an officer or general partner of the Contractor having overall responsibility for the conduct of the Contractor's affairs.

f. For Contractor claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date of which the decisions will be made.

g. The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

h. The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Office receives the claim (properly certified if required) or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6 month period as fixed by the Treasury Secretary during the pendency of the claim.

i. The contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action arising under the contract and comply

with any decision of the Contracting Officer who shall be the Chief of Real Estate, Savannah District, U. S. Army Corps of Engineers.

**6. NOTICES**

Notices pursuant to this LA will be sent by the parties to each other by U.S. Mail or by rapid courier (such as Federal Express) addressed to the following addresses, or such other addresses as the parties may from time to time designate to each other in writing.

To: **USACE**

U.S. Army Corps of Engineers, Savannah District
Attn: CESAS-RE
100 W. Oglethorpe Ave
Savannah, GA 31401

To: **EXCHANGE PARTNER**

Name
Address
City, State Zip

**BASED ON THE FOREGOING,** the Parties hereto, acting by and through their duly authorized representatives, have executed this Letter Agreement as of the day and year first above written.

| **THE UNITED STATES OF AMERICA** | **EXCHANGE PARTNER** |
|---|---|
| BY: ______________________ | BY: ______________________ |
| NAME: ______________________ | NAME: ______________________ |
| TITLE: ______________________ | TITLE: ______________________ |

**ATTACHMENT "A"**
**COST ESTIMATE**
**REAL PROPERTY EXCHANGE**

**TASK LIST**

| | |
|---|---|
| Appraisal Updates and Reviews | $25,000 |
| Appraisal Proposed Land | $15,000 |
| Exchange Agreement Development & Administration | $20,000 |
| LA Development & Administration | $4,000 |
| Review of Plans and Specs/Construction | $50,000 |
| Environmental | $25,000 |
| Attorney Review | $10,000 |
| Title 10s | $5,000 |
| Bill of Sales | $2,000 |
| Quit Claim Deeds | $20,000 |
| Audit | $10,000 |
| **Total Estimated Costs:** | $186,000 |

Prepared in accordance with Department of Defense Financial Management Regulation, Chapter 1, Volume 11A.

Note: Costs are subject to actual cost. Estimate includes all known tasks necessary to perform complete exchange process and is an attempt to identify the activities necessary to accomplish the contemplated Real Property Exchange; Additional activities may subsequently be identified by the Government.

# *APPENDIX 4*

## *DRAFT*

## EXCHANGE AGREEMENT

This Agreement entered into this _______day of ___________, 20___, by and between,

The UNITED STATES OF AMERICA,
represented by the
DEPARTMENT OF THE ARMY,
hereinafter referred to as the Government

And

*EXCHANGE PARTNER NAME*,
hereinafter referred to as the EXCHANGE PARTNER.

WITNESSETH:

WHEREAS, the Government desires to acquire a "Replacement Facility" to be constructed on Government owned land at the ................. described in Exhibit(s) A (DD1391) B (Project Summary), constructed by the EXCHANGE PARTNER and transferred to the Government upon completion;

WHEREAS, the EXCHANGE PARTNER, desires to acquire Exchange Parcels, owned in fee by the Government;

WHEREAS, authority for the Government to enter into this Agreement is found in Title 10, United States Code, Section 18240;

WHEREAS, pursuant to Section 18240(a), the Secretary of Defense has delegated to the Department of the Army his authority under Section 18240 to make such exchanges; and

WHEREAS, the **(Operating Agreement/Ordinance of/OTHER AUTHORIZING DOCUMENT FOR EXCHANGE PARTNER ENTITY)** ", dated ____________, authorizes EXCHANGE PARTNER to execute this Agreement, and any and all documents related to this exchange (THIS SHOULD BE INCLUDED IN THE FINAL EXCHANGE PACKAGE AS BACKUP DOCUMENTATION).

THEREFORE, in consideration of the benefits conferred, the mutual covenants and conditions contained herein, and the duties and obligations incurred, the parties hereto agree as follows:

## I. GENERAL PROVISIONS

**A.** The terms and conditions of this Agreement and its attachments and exhibits apply to and bind the successors and assignees of the parties hereto.

**B.** All of the provisions of this Agreement and its attachments and exhibits shall survive the settlement of the exchange of conveyances contemplated herein, and shall remain obligations of the parties hereto until satisfied.

**C.** The EXCHANGE PARTNER warrants that it has not employed or retained any person or selling agency to solicit or secure this Agreement or any contracts or obligations arising from this Agreement, upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees of bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Agreement or require payment from the EXCHANGE PARTNER for the amount of such commission, percentage or contingent fee.

**D.** No member of or Delegate of Congress or Resident Commissioner shall be admitted to any share or part of this Agreement or to any benefit that may arise there from, but this provision shall not be construed to extend to this Agreement if made with a corporation for its general benefit.

**E.** The Government may, by written notice to the EXCHANGE PARTNER terminate the right of EXCHANGE PARTNER to proceed under this Agreement if it is found, after notice and hearing, by the Secretary of the Army or his duly authorized representative, that gratuities (in the form of entertainment, gifts, or otherwise) were offered or given by any agent or representative of EXCHANGE PARTNER, to any officer or employee of the Government with a view toward securing any contracts or obligations arising from this Agreement or securing favorable treatment with respect to the awarding or amending, of the making of any determinations with respect to the performing, of such contracts or obligations, provided that the existence of facts upon which the Secretary of the Army or his duly authorized representative make such findings shall be in issue and may be reviewed in any court of competent jurisdiction.

**F.** Neither the EXCHANGE PARTNER nor its contractor(s) will discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

**G.** The EXCHANGE PARTNER agrees that the District Engineer, U.S. Army Engineer District, Savannah, Georgia, or any of his duly authorized representatives shall, until the expiration of three (3) years after acceptance of the construction of the (Replacement Facilities) by the Government, have access to and the right to examine any books, documents, papers and records of the EXCHANGE PARTNER or its contractor(s) involving activities or transactions related to this Agreement and its attachments.

**H.** The PARTIES to this EXCHANGE AGREEMENT agree that the Chief of Real Estate, Savannah District, U.S. Army Corps of Engineers shall serve as the Contracting Officer for this Agreement with the authority and responsibility for rendering all decisions, issuing notices, and/or furnishing instructions on the behalf of the Government with regard to this Agreement when executed by the DEPUTY ASSISTANT SECRETARY OF THE ARMY, (INSTALLATIONS, HOUSING AND PARTNERSHIPS).

**I.** The EXCHANGE PARTNER shall hold the Government harmless from any costs, claims, damages, loss or other costs, including fines and penalties, arising out of this exchange.

**J**. The Government has provided notice of the proposed exchange to the US Congress, pursuant to Title 10, U.S. Code, Section 18240.

**II. ACKNOWLEDGMENTS**

**A. Environmental Documentation**. The environmental documentation includes, but is not limited to, the following: **(THE FOLLOWING PROVISIONS CAN BE MODIFIED TO FUTURE TENSE, HAVING THE EXCHANGE AGREEMENT SIGNED, BUT CONTINGENT ON SATISFACTORY COMPLETION OF ENVIRONMENTAL DOCUMENTATION, BUT MUST ADD SUGGESTED NULL AND VOID LANGUAGE IN MISCELLANEOUS PROVISIONS)**

**1. Environmental Baseline Surveys**. The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Environmental Condition of Property Baseline Survey (ECP), ECP sampling and/or testing, completed by the Government per the Letter Agreement executed by the Government and the Exchange Partner dated ______, 20___ (Letter Agreement), for the Government Property . The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit E**. (Does this provision conflict with prior NOA conditions on when ENV will be completed?)

**2. Finding of Suitability to Transfer**. The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Finding of Suitability to Transfer (FOST) for the Government Property, completed by the Government per the Letter Agreement. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit F.**

**3. Environmental Assessment.** The EXCHANGE PARTNER and the Government acknowledge and accept, for the purpose of use with this Agreement, the Environmental Assessment (EA) completed by the Government for the Government Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit G.**

**4. Finding of No Significant Impact**. The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the

Finding of No Significant Impact (FNSI), completed by the Government per the Letter Agreement, for the Government Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit G.**

5. **Environmental Impact Statement.** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Environmental Impact Statement (EIS), completed by the Government per the Letter Agreement, for the Government Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit H.**

**B. Land Surveys and Legal Descriptions.** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the survey and legal description completed by the Government per the Letter Agreement, for the Government Property . The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibits D & C**.

**C. National Historic Preservation Act (NHPA).** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement the NHPA documentation completed by the Government per the Letter Agreement. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit I**.

**D.** To the extent that the EXCHANGE PARTNER agrees to remediate the Government property for the future intended use, the EXCHANGE PARTNER agrees to provide in each contract for remediation, a provision that the contractor will indemnify and hold harmless the Government from any costs, claims, damages, loss or other costs, including fines and penalties, arising out of such investigation and remediation actions

.

## III. OBLIGATIONS OF THE EXCHANGE PARTNER

**A**. EXCHANGE PARTNER shall provide Replacement Facilities satisfactory to the Government, in its sole discretion. The value of the Replacement Facilities to be provided to the Government shall be at least equal to the fair market value of the Government property to be conveyed.

**B.** EXCHANGE PARTNER shall reimburse the Government for all administrative costs and all costs of whatever kind or nature, contemplated or not, associated with the execution of this Agreement or in the fulfillment of its obligations under this Agreement, whether or not they are otherwise specifically provided for herein, as set forth in the Letter Agreement executed by the Exchange Partner dated _________, 20___ (Letter Agreement). This Agreement shall not merge into any subsequent agreement between the Parties, including the Letter Agreement and documents related thereto.

**C**. EXCHANGE PARTNER has executed the Letter Agreement to reimburse USAED Savannah for estimated administrative costs associated with the transaction, including but not limited to costs related to negotiation and review of this Agreement,

engineering services, environmental surveys work and real estate actions such as all associated survey, recording, escrow, and closing fees (**EXHIBIT J**). Exchange Partner acknowledges that if the estimated costs under this LA are later forecasted to exceed the amount of funds available under the LA, it shall provide the additional funds within 30 days of notice by the Government to preclude direct termination of the work under this LA.

**D**. EXCHANGE PARTNER shall obtain all necessary permits, licenses, services, and any and all approvals, at its own risk and expense, to accomplish the construction work under this section. This includes applying for and satisfying all requirements for a license or construction permit on Government Property as required in Federal (including Army) regulations. EXCHANGE PARTNER shall own and be responsible for all materials, equipment and personnel used in conjunction with the construction on Government property until such time as ownership is conveyed in accordance with this Agreement. Construction shall conform to all applicable local, state and Government standards. Approval of EXCHANGE PARTNER's draft Design Narrative and final Construction Documents (schedules, plans, drawings, specifications and permits to construct) will not constitute Government's acceptance of risk of or responsibility for such conformance unless explicitly included in this document. **(LIST ANY KNOWN PERMITS, OTHER OUTSTANDING ISSUES)**

**E**. The rights and obligations of EXCHANGE PARTNER in the contract(s), including all attachments thereto, to construct a Replacement Facility suitable to the Government's needs, shall be deemed to be incorporated in this Agreement when fully executed between EXCHANGE PARTNER and their obligors and all benefits, rights, title and interest in said contract or contracts shall inure to the benefit of the Government. Said agreement shall provide that the improvements for said Replacement Facility shall be completed no later than _____ days after the execution date of this Agreement. Said time shall be expressed in the construction contract as a certain day based on these time lines and shall provide that time is of the essence. **(EXHIBIT O)**

**F.** The EXCHANGE PARTNER shall prepare all Construction Documents. The Government in its sole discretion will approve in writing all Construction Documents prior to their incorporation in the EXCHANGE PARTNER's contract for construction. Further, at all times during and after construction, the Government shall have the right to enter upon the premises, from time to time, to determine compliance with said final Construction Documents, with the intent that the facilities will be constructed in a manner which complies with the standards of the Government regarding such, in order to allow the Government to accept such structures as hereinafter provided. Further, EXCHANGE PARTNER shall furnish any change or modification to the final Construction Documents to the Government in writing, and obtain written Government approval prior to commencement of construction.

**G.** The EXCHANGE PARTNER shall execute the Construction Monitoring Letter Agreement(s) simultaneously with this Agreement, provide the Government with funds sufficient to cover administrative costs associated with the construction of the

Replacement Facilities, including but not limited to, the design and construction monitoring, as set forth in the Construction Monitoring Letter Agreement, **Exhibit K**.

**H. Warranties**

**1.** EXCHANGE PARTNER shall, after completion of all improvements to the land, and in addition to any other warranties set forth elsewhere in this Agreement, furnish the Government a one (1) year warranty that the work performed and facilities built, materials and equipment installed by EXCHANGE PARTNER, its contractor(s), its sub-contractors(s), or supplier(s) performing work on said project at the request of EXCHANGE PARTNER, conforms to the final Construction Documents and overall design of said project. This warranty shall continue for a period of one (1) year from the date of the Government's final acceptance of the work. The Contracting Officer will notify the EXCHANGE PARTNER in writing, within thirty (30) days of discovery of any failure, damage or defect in equipment or material furnished. If EXCHANGE PARTNER fails to remedy any failure, damage or defect within thirty (30) days after receipt of said notice, the Government shall have the right to repair, replace or otherwise remedy the failure, defect damage, and the EXCHANGE PARTNER shall reimburse the Government within thirty (30) days of said repairs or replacements.

**2.** The EXCHANGE PARTNER shall remedy at the EXCHANGE PARTNER'S expense any failure to conform, or any defect. In addition, the EXCHANGE PARTNER shall remedy at the EXCHANGE PARTNER'S expense any damage to Government-owned or controlled real or personal property, when that damage is the result of (a) the EXCHANGE PARTNER'S, its contractor(s), or subcontractor(s) failure to conform to the final Construction Documents as set forth herein or (b) any defect of equipment, material or workmanship furnished by the EXCHANGE PARTNER, its contractor(s) or subcontractor(s).

**3.** The EXCHANGE PARTNER shall restore any real property damaged in fulfilling the terms and conditions of the warranties set forth herein.

**4.** The EXCHANGE PARTNER'S warranty with respect to repairs shall run for one (1) year from the date of repair or replacement.

**5.** The warranties set forth herein shall not limit any Government rights, including, but not limited to, latent defects, gross mistake or fraud.

**6.** The Government's monitoring does not relieve the EXCHANGE PARTNER from the requirements set forth in the final Construction Documents, and the Government's acceptance of said construction does not constitute acknowledgement or acceptance of any item(s) of the construction that do not conform to the final Construction Documents without the Government's written authorization as stated in Paragraph G of this section.

**I. Final Acceptance**

Final acceptance by the Government will be given in writing and determined by the following:

1. Completion of construction, as determined in the sole discretion of the Government;

2. Upon completion of construction the EXCHANGE PARTNER shall furnish to the Government six (6) bound copies of the Operator manuals to systems installed in, on or around said structure of the mechanical and electrical system operation and maintenance (O&M) manuals. The manuals shall be loose binder format, indexed, and clearly divided by technical sections. The manuals shall list the name, phone numbers and addresses of all manufacturers' points of contact. In addition, the manuals shall include manufacturer's standard product brochures, schematics, printed instructions, general operating procedures, and safety precautions. Additionally, the manuals shall outline step-by-step procedures required for system startup, operation, adjustment, preventive maintenance, inspection and testing. The O&M manual requirements must be provided prior to the building certification and will become a qualifying part of the punch list. Building or mechanical acceptance cannot be accomplished until this requirement is satisfied.

3, Upon delivery by the EXCHANGE PARTNER and acceptance by the Government of the original marked up final Construction Documents showing "as-built" conditions with three (3) hard copy sets and three (3) sets on CD of the same.

4. These items will be furnished by the EXCHANGE PARTNER to the Government, prior to final acceptance, at the address listed in Article VII, paragraph I, below.

**J.** Further, EXCHANGE PARTNER shall furnish to the Government, before transfer of title to the improvements to the Government, all operator manuals supplied by the manufacturer, to any system installed in, on or around said structure.

**K.** EXCHANGE PARTNER hereby assigns to the Government any warranties given to EXCHANGE PARTNER by its contractor(s) or its subcontractor(s).

**L.** EXCHANGE PARTNER shall, before transfer of title to the property and its improvements to the Government, furnish the Government one complete set of original marked up final Construction Documents showing "as-built" conditions.

**M.** Prior to the commencement of construction of the Replacement Facility, EXCHANGE PARTNER shall require each contractor to furnish it with a certificate of insurance, naming the Government as an additional insured, with minimum limits of bodily injury and property damage as follows:

1. $300,000 for each individual;

2. $1,500,000 for each incident involving bodily injury;

3. $500,000 aggregate for all property damage that may be incurred during the term of the policy;

4. $1,500,000 comprehensive general liability umbrella;

5. $3,000,000 builder's risk insurance.

Prior to construction, the EXCHANGE PARTNER shall furnish the certificate of insurance to the Government. The EXCHANGE PARTNER must maintain all insurance coverage, without any lapse in service, at all times during construction of the Replacement Facility and shall provide copies of each certificate of insurance to the Government.

**N.** The EXCHANGE PARTNER shall provide, at its expense, utility line connections, replacement or relocations of existing utilities and pay any and all tapping and connection fees related thereto. Utility services shall experience no lapse in service.

**O**. The EXCHANGE PARTNER shall be responsible for all costs, to include all costs to the Government, of whatever kind or nature, contemplated or not, associated with this Agreement, whether or not they are otherwise specifically provided for herein.

**P.** The Government shall at its sole discretion determine whether the facilities are acceptable for the operation of an AMSA under the guidelines provided by Federal law and Army regulations. However, the Government's acceptance of the improvements shall not be unreasonably withheld.

**Q.** The EXCHANGE PARTNER shall, within sixty (60) days of acceptance of the Replacement Facility by the Government, convey, by Bill of Sale, preliminary, not final, draft of which is attached as **Exhibit L**, EXCHANGE PARTNER's interest to the Replacement Facility, with all improvements, free and clear of all encumbrances and special assessments which are a lien against said improvements. EXCHANGE PARTNER acknowledges the attached Exhibit is a preliminary draft and is subject to change to accommodate changes including, but not limited to, changes in local, state or federal standards/Government standards. This preliminary draft may be modified based on issues that may arise, including, but not limited to, the outcome of all environmental analyses and studies, including the NEPA process. The delivery of the Quitclaim Deed to the EXCHANGE PARTNER for the Government property and acceptance of the conveyance of the EXCHANGE PARTNER property, shall be deemed full performance by the Government of its obligations hereunder with regard to the Government property conveyed thereby, except for the continuing obligation of the Government provided for in the deed of conveyance, and as may be specifically provided for in this Agreement. The EXCHANGE PARTNER shall remain liable for all losses and damages to the Private property not yet conveyed to the Government hereunder, and for all damages or injuries to persons or property occurring thereon or related thereto (except as may be caused by the negligence or

willful misconduct of the Government or its agents), prior to the conveyance of said property to the Government hereunder.

**R**. EXCHANGE PARTNER shall coordinate with the Government in completing a real property accountability form, DD1354 - Transfer and Acceptance of Military Real Property, in the format required. The EXCHANGE PARTNER shall furnish a draft of the document to the Government, upon transfer of title to the improvements, which will then be reviewed and finalized for final approval and execution by the Government.

**S.** EXCHANGE PARTNER shall provide a statement of constructability which provides that the construction site is adequate for the construction of the Replacement Facilities.

## IV. OBLIGATIONS OF THE GOVERNMENT

**A**. The Government will provide the EXCHANGE PARTNER with access to all historical and environmental data for the Government Property consistent with applicable law and regulation. If any such data has been marked as "For Official Use Only," the Commander, 88th Regional Support Command or his or her delegate will coordinate with the appropriate record custodian for release to EXCHANGE PARTNER for use related to this Agreement. EXCHANGE PARTNER agrees that, to the extent permitted by STATE law, use of any such data will be used solely for the purposes of this exchange action and that no data will be disclosed outside of EXCHANGE PARTNER or its environmental contractors, or consultants, if any, without the express written permission of the 88th Regional Support Command's Record Custodian.

**B**. The Government has provided all environmental analyses and documentation necessary for the exchange of the properties, at the EXCHANGE PARTNER's expense as set forth in the Letter Agreement. (OR WILL PROVIDE, satisfactorily to the Government, prior to conveyance of the Government Property).

**C**. The Government has provided the ECP for the Government Property.

**D**. The Government has provided the FOST for the Government property.

**E.** The Government has provided the EA, FNSI (or EIS and ROD, if applicable) for the exchange of the Government property, at the EXCHANGE PARTNER's expense as set forth in the Letter Agreement (OR WILL PROVIDE, as required and satisfactorily to the Government, prior to conveyance of the Government Property).

**F**. The Government has acquired a plat, survey, and legal description of the Government owned exchange parcel of land suitable for recordation in the local land records as required by (State) law.

**G**. The Government has provided all consultation on behalf of the Government required under Section 106, NHPA, as implemented in 36 C.F.R. Section 800, at the Exchange Partner's expense as set forth in the Letter Agreement. (OR WILL PROVIDE, as required and satisfactorily to the Government, prior to conveyance of the Government Property).

**H**. The Government will reasonably approve all engineering and environmental reviews/analysis and required real estate documents related to this exchange.

**I**. The Government will conduct all NEPA reviews and execute Records of Environmental Consideration for any NEPA Categorical Exclusions, if necessary. If the Government determines that an EA is required for either of these actions, it will notify EXCHANGE PARTNER as soon as is practicable after making such determination.

**J**. The Government will not unreasonably delay acceptance of the construction of the Replacement Facility because of incidental items of a minor nature which remain to be completed and which would not unduly delay occupancy and use of such facility for the purpose for which it is intended, unless items specified in paragraph III.K. have not been furnished.

**K**. The Government will, within sixty (60) days of acceptance of the construction of the Replacement Facilities by the Government, convey by Quitclaim Deed, preliminary, not final, draft of which is attached as **Exhibit M**, the Government's interest to the 4.41 acres, more or less, subject to existing easement(s) for public roads and highways, utilities, railroads and pipelines. The EXCHANGE PARTNER acknowledges the attached Exhibit is a preliminary draft and is subject to change to accommodate changes, including, but not limited to, changes in local, state or federal standards. This preliminary draft may be modified based on issues that may arise, including, but not limited to, the outcome of all environmental analyses and studies, including the NEPA process. Upon conveyance of the E. Earle Rives USARC to the EXCHANGE PARTNER as provided herein, the Government shall have no responsibility for the provision of police, fire, emergency medical services, trash pick-up, road maintenance, utility services or any other maintenance or other municipal type services to said property.

**L**. All of the Government property is conveyed under this Agreement in an "as is," "where is," condition, without any representation or warranty whatsoever by the Government or its agents concerning the state of repair or condition of said property, except as may otherwise be specifically provided hereunder or within the deed of conveyance.

## V. MUTUAL OBLIGATIONS

**A**. The Quitclaim Deed/Bill of Sale shall be exchanged contemporaneously, after the Government has provided final acceptance of the Bill of Sale and all supporting documentation as referenced in III.K.2 and 3 herein.

**B.** Satisfactory Completion of Environmental Work by the Government. All obligations of the Government under this Exchange Agreement are subject to, and conditioned upon, the satisfactory completion (at the Government's sole discretion) of all environmental documentation required to convey the Government Property. If any item is not satisfactorily completed, this agreement shall be null and void. [ONLY USE THIS PARAGRAPH IF EXCHANGE AGREEMENT IS TO BE EXECUTED PRIOR TO COMPLETION OF ENVIRONMENTAL]

**C.** The Parties agree to immediately notify each other of any significant change in community sentiment or opposition to the proposed exchange by local, state or Federal Government officials.

**D.** Should retrocession of legislative jurisdiction be required for the property to be conveyed by the Government, both parties agree to make all efforts necessary to effectuate such retrocession, at the Exchange Partner's expense as set forth in the Letter Agreement.

**E.** The EXCHANGE PARTNER, its contractors, and subcontractors shall comply with the requirements of the Davis-Bacon Act, Federal Acquisition Regulation (FAR) Section 52.222-6.

**F.** The Government will issue to EXCHANGE PARTNER a Right of Entry, **Exhibit N,** for construction of the Replacement Facility on the Charlotte USARC Concurrently and inclusive with the Exchange Agreement, the Exchange Partner shall enter into a Construction Monitoring Letter Agreement (CMLA) with USACE **(see draft at Appendix 5)**. The Right of Entry will provide EXCHANGE PARTNER, its contractors, its sub-contractors, or any other entity performing work on the Replacement Facility, all required access to Charlotte USARC for the purposes of constructing the Replacement Facility.

**VI. DISPUTES**

**A.** This contract is subject to the Contract Disputes Act of 1978, 41 U.S.C. 7101-7109 et seq., as amended. Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

**B.** "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.

**C.** A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the EXCHANGE PARTNER seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by the following paragraph. A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The

submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to a liability or amount or is not acted upon in a reasonable time.

**D.** A claim by the EXCHANGE PARTNER shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the EXCHANGE PARTNER shall be subject to a written decision by the Contracting Officer. For EXCHANGE PARTNER claims exceeding $100,000, the EXCHANGE PARTNER shall submit with the claim a certification that the claim is made in good faith, supporting data are accurate and complete to the best of the EXCHANGE PARTNER's knowledge and belief and the amount requested accurately reflects the contract adjustment for which the EXCHANGE PARTNER believes the Government is liable.

**E.** If the EXCHANGE PARTNER is an individual, the individual shall execute the certification. If the EXCHANGE PARTNER is not an individual, the certification shall be executed by a senior company official in charge at the EXCHANGE PARTNER's plant or location involved or an officer or general partner of the EXCHANGE PARTNER having overall responsibility for the conduct of the EXCHANGE PARTNER's affairs.

**F.** For the EXCHANGE PARTNER claims of $100,000 or less, the Contracting Officer must, if requested in writing by the EXCHANGE PARTNER, render a decision within 60 days of the request. For EXCHANGE PARTNER certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the EXCHANGE PARTNER of the date of which the decisions will be made.

**G.** The Contracting Officer's decision shall be final unless the EXCHANGE PARTNER appeals or files a suit as provided in the Act.

**H.** The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Office receives the claim (property certified if required) or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6 month period as fixed by the Treasury Secretary during the pendency of the claim.

**I.** The EXCHANGE PARTNER shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action arising under the contract and comply with any decision of the Contracting Officer, U.S. Army Engineer District, Savannah, Georgia.

**J.** Notwithstanding any other provision of the Contract Disputes Act of 1978, as amended, the EXCHANGE PARTNER and the Contracting Officer, U.S. Army Engineer District, Savannah, Georgia, may use any alternative means of dispute resolution under 5 USC 571, or other mutually agreeable procedures, for resolving claims. The EXCHANGE PARTNER shall certify the claim when required to do so as provided under this Act or as

otherwise required by law. All provisions of 5 USC 58 et seq shall apply to such alternative means of dispute resolution.

## VII. MISCELLANEOUS PROVISIONS

**A**. This Agreement incorporates and includes all prior negotiations and agreements, except the Letter Agreement (**EXHIBIT K**), applicable to the matters contained herein. The parties agree that this Agreement constitutes the entire understanding between the parties and supersedes previous representations whether written or oral and any other written or oral agreement between the parties.

**B.** This Agreement may be amended only by written mutual consent of the parties to this Agreement.

**C**. This transaction requires that the Government will receive a Replacement Facility that is equal to or greater than the value of the existing land and facilities located at the Exchange Parcel.

**D**. Nothing contained in this Agreement will make or will be construed to make the parties hereto partners or joint venture with each other nor be construed to render either of the parties hereto liable to any third party for debts or obligations of the other party hereto.

**E**. The failure of either party to insist upon strict performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or a relinquishment of that party's rights to future performance of any such term(s), covenants, or conditions by the other party.

**F**. All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, will include all other genders.

**G**. The EXCHANGE PARTNER may not transfer or assign its rights and interests in and under this Agreement without the written consent of the Government. The covenants, agreements, rights, and responsibilities contained in this Agreement inure to the benefit of and are binding upon the parties hereto, their successors, and assigns. Nothing in this Agreement shall be construed as creating any rights of enforcement against any persons or entities that are not a party hereto, nor shall this agreement be construed as creating any rights, interest, or third party beneficiary status for any persons or entities not a signatory to this Agreement.

**H.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void then both parties shall be relieved of any obligations under that provision. Notwithstanding such a finding, this Agreement shall remain in full force and effect and be binding on the parties hereto as to the remaining terms to the fullest extent permitted by law.

I. **Notices**. A notice, demand, or other communication under this Agreement by either party to the other shall be sufficiently given or delivered if it is dispatched by registered or certified mail, postage prepaid, return receipt requested, or delivered personally, and, (1) in the case of the Government, is addressed to:

U.S. Army Corps of Engineers, Savannah District
Attn: Chief, Real Estate Division
100 W. Oglethorpe Avenue
Savannah, GA 31401

and, (2) in the case of the EXCHANGE PARTNER, is addressed to:

________________________________
________________________________
________________________________
________________________________

or such other address with respect to either party as that party may, from time to time, designate in writing and forward to the other party as provided in this Section.

## VIII. ANTI-DEFICIENCY ACT

Should it be construed that the Government shall have been obligated under this Agreement to pay or reimburse any money hereunder, nothing in this Agreement shall be interpreted to require obligations or payments by the United States in violation of the Anti-Deficiency Act, as amended, 31 U.S.C. §1341.

## IX. EFFECTIVE DATE

The effective date of this Agreement shall be the date on which this Agreement is signed by the Deputy Assistant Secretary of the Army (Installations & Housing).

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals on the date subscribed opposite their respective names.

**EXCHANGE PARTNER, CITY, STATE**

_________________________ BY: ______________________________
Date (TYPED NAME)

TITLE: ________________________________

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE ARMY**

_________________________ BY: ______________________________
Date

Deputy Assistant Secretary of Army
(Installations and Housing) DASA (I&H)

"BELOW ARE THE RECOMMENDED EXHIBITS FOR EACH EXCHANGE AGREEMENT"

(SAMPLE LIST) **EXHIBITS**

EXHIBIT A - DD 1391

EXHIBIT B - DESIGN NARRATIVE

EXHIBIT C - GOVERNMENT PROPERTY - LEGAL DESCRIPTION:

EXHIBIT D – SURVEY – GOVERNMENT PROPERTY

EXHIBIT E - ECP

EXHIBIT F - FOST

EXHIBIT G - EA FNSI

EXHIBIT H – EIS/ROD (if applicable)

EXHIBIT I – NHPA

EXHIBIT J - LETTER AGREEMENT *(Draft Format)*

EXHIBIT K - LETTER AGREEMENT FOR CONSTRUCTION MONITORING *(Draft Format)*

EXHIBIT L - DRAFT BILL OF SALE *(Draft Format)*

EXHIBIT M - DRAFT QUITCLAIM DEED *(Draft Format)*

EXHIBIT N - RIGHT OF ENTRY FOR CONSTRUCTION OF REPLACEMENT FACILITY *(Draft Format)*

EXHIBIT O - CONSTRUCTION SCHEDULE

**EXHIBIT A**

**DD 1391**

*(See Appendix 2 of NOA.)*

# EXHIBIT B

## DESIGN NARATIVE

*(To be provided by Exchange Partner prior to entering into Exchange Agreement.)*

# <u>EXHIBIT C</u>

## GOVERNMENT PROPERTY–LEGAL DESCRIPTION

*(To be provided by the Government prior to entering into the Exchange Agreement.)*

# EXHIBIT D

## SURVEY – GOVERNMENT PROPERTY

*(To be provided by the Government prior to entering into the Exchange Agreement.)*

**EXHIBIT E**

**ECP**

**EXHIBIT F**

**FOST**

*(To be provided by the Government prior to entering into the Exchange Agreement.)*

**EXHIBIT G**

**EA / FNSI**

*(To be provided by the Government prior to entering into the Exchange Agreement.)*

# EXHIBIT H

## EIS/ROD (if applicable)

*(To be provided by the Government prior to entering into the Exchange Agreement.)*

# EXHIBIT I

**NHPA**

*(If required, to be provided by the Government prior to entering into the Exchange Agreement.)*

# EXHIBIT J

## LETTER AGREEMENT

*(See Appendix 5 of NOA.)*

*(To be provided by the Government prior to entering into the Exchange Agreement.)*

# EXHIBIT K

## CONSTRUCTION MONITORING LETTER AGREEMENT

*(See Appendix 6 of NOA.)*

**EXHIBIT L**

DRAFT BILL OF SALE

For good and valuable consideration, receipt of which is hereby acknowledged, {Exchange Partner}, Seller ("Exchange Partner"), does hereby grant, bargain, sell, release, and transfer to the Government, Buyer ("Government"), and Government hereby agrees to take ownership of the following described items of property, to have and to hold the same unto Government, its successors and assigns forever:

{Description of Construction: A __________________ which consists of _______ square feet, three bay masonry, plaster, and steel structure, constructed on Government owned property located at ___________________________________.}

Exchange Partner shall, after completion of construction and delivery of the Operating Manuals for the _____________, and in addition to any other warranties set forth elsewhere in this Bill of Sale or the Exchange Agreement executed by the Exchange Partner and Government on _______{date}, furnish the Government a 1-year warranty that the work performed and facilities built, materials and equipment installed, by its contractor, its sub-contractors, Exchange Partner or any other entity performing work on said project at the request of Exchange Partner conforms to the final Construction Documents and overall design of said project.

Exchange Partner hereby assigns to the Government any warranties given to Exchange Partner by its contractor(s) or its subcontractor(s).

In addition to any other warranties in this Bill of Sale or the Exchange Agreement, the Exchange Partner warrants that work performed, pursuant to the Exchange Agreement, conforms to the final Construction Documents as identified in the Exchange Agreement, and is free of any defect in equipment or material furnished, or workmanship performed by the Exchange Partner or any contractor or supplier for a period contemporaneous with the aforementioned 1-year warranty.

During the 1-year warranty period, the Contracting Officer will notify the Exchange Partner, in writing, within thirty (30) days the discovery of any failure or defect in equipment or material furnished. If Exchange Partner fails to remedy any failure or defect within thirty (30) days after receipt of said notice, or during a reasonable period if the failure or defect is not susceptible to remediation within thirty (30) days, the Government shall have the right to replace, repair, or otherwise remedy the failure or defect at Exchange Partner's expense.

IN WITNESS WHEREOF, the Exchange Partner and Government have caused this instrument to be executed by their duly authorized officers on the dates set forth below.

**EXCHANGE PARTNER**

By: ______________________________
Name
Title

Date: ____________________________

**UNITED STATES OF AMERICA**

**DEPARTMENT OF THE ARMY**

By: ______________________________________

Title:

Date: ______________________________________

**EXHIBIT M**

WHEN RECORDED RETURN TO:

**U. S. ARMY CORPS OF ENGINEERS**
**SAVANNAH DISTRICT**
**ATTN: Chief, Real Estate Division**
**100 W. Oglethorpe Ave**
**Savannah, GA 31401**

**QUITCLAIM DEED**

**THIS QUITCLAIM DEED**, made and entered into between the **UNITED STATES OF AMERICA**, hereinafter referred to as **GRANTOR**, acting by and through the Deputy Assistant Secretary of the Army (I&H), pursuant to a delegation of authority from the SECRETARY OF THE ARMY, under and pursuant to the power and authority contained in United States Code Title 10 Section 18240, as amended, and in furtherance of the Exchange Agreement dated __________________ ("Exchange Agreement"), and EXCHANGE PARTNER, hereinafter referred to as the **GRANTEE**.

**WITNESSETH**: That the **GRANTOR** for and in consideration of (REAL PROPERTY/DESCRIBE COSTRUCTION), the covenants and conditions contained herein, and other good and valuable consideration, in hand paid, the receipt of all of which is hereby acknowledged, does hereby convey, REMISE, RELEASE and forever QUITCLAIM, unto the **GRANTEE**, its successors and to its assigns, all its right, title and interest in and to the following described property situated in __________, State of _________, hereinafter referred to as the Property:

[LEGAL DESCRIPTION]

The Grantor further conveys and quitclaims, for the same consideration, all right, title or interest which the Grantor may have in the banks, beds, and waters of any streams bordering upon said land, and in any alleys, roads, streets, ways, strips, gores, or railroad rights-of-way abutting or adjoining said land and in any means of ingress or egress appurtenant thereto.

It being the intent of the foregoing description to include all of those lands acquired by the United States of America by Warranty Deed from _________, filed for record (date) and recorded in Book No. _____ Page ________ of the records of the Recorder's office ________ County, _________.

**1. CONDITION OF PROPERTY**

It is understood and agreed the Property is conveyed "As Is" and "Where Is" without any representation, warranty, or guarantee as to quantity, quality, character, condition, size, or kind, or that the same is in condition or fit to be used for the purposes intended. There is no obligation on the part of the GRANTOR to make any alterations, repairs or additions, and said GRANTOR shall not be liable for any latent or patent defects in the Property, except to the extent required by applicable law. The GRANTEE acknowledges that the GRANTOR has made no representation or warranty concerning the condition and state of any appurtenances on the Property.

**2. EASEMENTS, LICENSES AND PERMITS**

The Property is conveyed subject to all general and special taxes, penalties, interest, assessments, collection fees lawfully accrued and unpaid, if any; and subject to any and all existing reservations, easements, restrictions, and rights, recorded and unrecorded, for private and public roads, highways, streets, pipelines, railroads, utilities, water lines, sewer mains and lines, storm sewers and drains, power lines, and any other rights of way, including but not limited to any specific easements, restrictions, reservations rights or covenants described herein.

**3. CERCLA NOTICE, CONVENANTS AND ACCESS**

(fill in pursuant to FOST)

**4. ENVIRONMENTAL PROTECTION PROVISIONS**

(fill in pursuant to FOST)

**5. NON-DISCRIMINATION**

With respect to activities related to the property, the Grantee hereby agrees that it will comply with the requirements of Title VI of the Civil Rights Act of 1964 (Public Law No. 88-352) and all requirements imposed by or pursuant to the regulations issued pursuant to the Act and now in effect, to the end that, in accordance with said Act and regulations, no person in the United States shall, on the ground of race, color, national origin, sex, or handicap be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity related to the property of the GRANTEE, its successors or assigns.

6. **ANTI-DEFICIENCY ACT**

**The GRANTOR'S obligation to pay or reimburse any money under this Deed is subject to the availability of appropriated funds to the Department of the Army, and nothing in this deed shall be interpreted to require obligations or payment by the GRANTOR in violation of the Anti-Deficiency Act.**

**7. NOTICES**

Any notice, demand, request, consent, approval or communication that either party desires or is required to give to the other shall be in writing and shall either be served personally or sent by mail, postage prepaid, addressed as follows:

| GRANTOR: | GRANTEE: |
|---|---|
| USACE, Savannah<br>ATTN: CESAS-RE<br>100 W. Oglethorpe Ave<br>Savannah, GA 31401 | |

TO HAVE AND TO HOLD the said premises, unto the said GRANTEE, its successors and assigns, forever, subject to the covenants and conditions herein set forth.

The provisions of 10 U.S.C. Section 18233a have been complied with.

IN TESTIMONY WHEREOF, witness the GRANTOR has caused this Deed to be executed in its name by the Secretary of the Army and the seal of the Department of the Army to be hereunto affixed this __________ day of ____________, 20__.

**BY:** ______________________________________

**SECRETARY OF THE ARMY**

ACKNOWLEDGEMENT

COMMONWEALTH OF VIRGINIA )
) SS:
COUNTY OF ARLINGTON )

I, the undersigned, a Notary Public in and for the Commonwealth of Virginia, County of Arlington, do certify that, on the day shown above, personally appeared before me in the Commonwealth of Virginia, County of Arlington, *(Secretary of the Army's Name)*, Secretary of the Army, personally known to me or proven through satisfactory evidence of identity to be the person whose name is subscribed to the forgoing document, who acknowledged that the signature on the document was voluntarily affixed by him for the purposes therein, on this date, and acknowledged the same for and on behalf of the UNITED STATES OF AMERICA.

______________________________
Notary Public

Notary Registration No. __________

My Commission Expires: ____________________

## ACCEPTANCE

**EXCHANGE PARTNER** and its successors hereby accepts this Quitclaim Deed for itself, its successors and assigns, subject to all of the conditions, reservations, restrictions and terms contained therein.

**IN WITNESS WHEREOF**, **EXCHANGE PARTNER** has caused these presents to be executed by its governing body and is within the scope of its legal powers.

**EXCHANGE PARTNER**

By: ______________________,
Title

Date: ____________________________

STATE OF ______________ )
):
COUNTY OF ____________ ):

On this ________________ day of ______________, 20__, before me, a Notary Public in and for said County and State, personally appeared _______________________________, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed same for and on behalf of the County of __________________.

WITNESS my hand and official seal.

__________________________
NOTARY PUBLIC

__________________________
My commission expires:

# EXHIBIT N

## INSTALLATION NAME

## DEPARTMENT OF THE ARMY

## RIGHT OF ENTRY FOR CONSTRUCTION

**THE UNITED STATES OF AMERICA** (the "GRANTOR"), acting by and through the Deputy Assistant Secretary of the Army (IH&P) pursuant to a delegation of authority from the SECRETARY OF THE ARMY (the "Army"), hereby grants to COMPANY NAME, hereinafter referred to as the ("GRANTEE"), a Right of Entry for Construction ("Right of Entry") for the purpose of construction of _________ and any other improvements to the Government's property as set forth in the Exchange Agreement dated _________ between the Grantee and Grantor, over, across, in and upon lands of the United States, as identified in **Exhibit "A"** which is attached hereto and made a part hereof, and all hereinafter referred to as the premises.

This Right-of-Entry is subject to the following terms and conditions:

### 1. TERM

This Right-of Entry is granted for a term of ____ year(s), beginning _____ 20__, and ending _______ 200__, but revocable at will by the Secretary.

### 2. CONSIDERATION

The consideration for this Right-of-Entry shall be the mutual benefit to be derived by the parties hereto under the terms and conditions of the Exchange Agreement referenced in the granting clause hereof.

### 3. NOTICES

All notices and correspondence to be given pursuant to this Right-of-Entry shall be addressed, if to the Grantee, to ____________; and if to the Grantor, to the District Engineer, Attn: Chief, Real Estate Division, P.O. Box 889, Savannah, Georgia 31402-0889; or as may from time to time otherwise be directed by the parties. Notice shall be deemed to have been duly given if and when enclosed in a properly sealed envelope addressed as aforesaid, and deposited, postage prepaid, in a post office regularly maintained by the United States Postal Service.

### 4. AUTHORIZED REPRESENTATIVES

Except as otherwise specifically provided, any reference herein to "Installation Commander", shall include their duly authorized representatives. Any reference to "Grantee" shall include any duly authorized representatives.

**5. SUPERVISION BY THE INSTALLATION COMMANDER**

The use and occupation of the premises shall be subject to the general supervision and approval (which approval shall not be unreasonably withheld) of the Installation Commander hereinafter referred to as said officer, and to such rules and regulations as may reasonably be prescribed from time to time by said officer.

**6. APPLICABLE LAWS AND REGULATIONS**

The Grantee shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

**7. CONDITIONAL USE BY GRANTEE**

The exercise of the privileges herein granted shall be:

a. without cost or expense to the United States;

b. subject to the right of the United States to improve, use or maintain the premises;

c. subject to other outgrants of the United States on the premises; and

d. personal to the Grantee, and this Right of Entry, or any interest therein, may not be transferred or assigned.

**8. CONDITION OF PREMISES**

The Grantee acknowledges for the limited purposes of this Right of Entry, that it has inspected the premises, is generally familiar with its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States except as otherwise provided by law.

**9. COST OF UTILITIES**

The Grantee shall pay the cost, as determined by the officer having immediate supervision over the premises, of producing and/or supplying any utilities and other services furnished by the Government or through Government-owned facilities for the use of the Grantee, including the Grantee's proportionate share of the cost of operation and maintenance of the Government-owned facilities by which such utilities or services are produced or supplied. The Government shall be under no obligation to furnish utilities or services. Payment shall be made in the manner prescribed by the officer having such jurisdiction.

## 10. PROTECTION OF PROPERTY

The Grantee shall keep the premises in good order and in a clean, safe condition by and at the expense of the Grantee. The Grantee shall be responsible for any damage that may be caused to property of the United States by the activities of the Grantee, its contractor(s) and its subcontractors under this Right-of-Entry, and shall exercise due diligence in the protection of all property located on the premises against fire or damage from any and all other causes. Any property of the United States damaged or destroyed by the Grantee, its contractor(s) or subcontractor(s) incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition reasonably satisfactory to said officer, or at the election of said officer, reimbursement made therefore by the Grantee in an amount necessary to restore or replace the property to a condition reasonably satisfactory to said officer.

## 11. INDEMNITY

The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.

## 12. RESTORATION

In the event this Right-of-Entry expires, is revoked or terminated pursuant to the terms hereof, the Grantee shall vacate the premises, remove the property of the Grantee, and restore the premises to a condition reasonably satisfactory to said officer. Thereafter, if the Grantee shall fail or neglect to remove said property and restore the premises, then, at the option of said officer, the property shall either become the property of the United States without compensation therefore, or said officer may cause the property to be removed and no claim for damages against the United States. The Grantee shall also pay the United States on demand any sum which may reasonably be expended by the United States after the expiration, revocation, or termination of this Right-of-Entry in restoring the premises.

## 13. NON-DISCRIMINATION

The Grantee shall not discriminate against any person or persons or exclude them from participation in the Grantee's operations, programs or activities because of race, color, religion, sex, age, handicap or national origin in the conduct of operations on the premises. The Grantee will comply with the Americans with Disabilities Act and Attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board.

**14. TERMINATION**

This Right-of-Entry may be terminated by the Grantor upon ten (10) days written notice.

**15. ENVIRONMENTAL PROTECTION**

**a.** The Grantee shall comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any Federal, state, interstate or local governmental agency having jurisdiction to abate or prevent pollution. The disposal of any toxic or hazardous materials within the premises is specifically prohibited. Such regulations, conditions, or instructions in effect or prescribed by said Environmental Protection Agency, or any Federal, state, interstate or local governmental agency are hereby made a condition of this Right-of-Entry. The Grantee shall not discharge waste or effluent from the premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

**b.** The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs from the Grantee's, its contractor(s), subcontractor(s) activities, and the Grantee shall be liable to restore the damaged resources.

**c.** The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the premises.

**d.** In the event of discovery of any environmental hazard on the premises, the Grantee will immediately report the particulars of such hazard to said officer. Additionally, Grantee will provide said officer with copies of applicable environmental permits and hazardous waste disposal documents.

**16. HISTORIC PRESERVATION**

The Grantee, its contractor(s), subcontractor(s) shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, remains or objects of antiquity. In the event such items are discovered on the premises, the Grantee shall immediately notify said officer and protect the site and the material from further disturbance until said officer gives clearance to proceed.

**17. INSURANCE**

**a.** Prior to the commencement of construction of the ___________________, EXCHANGE PARTNER shall require the ________________ contractor, respectively, to furnish it with a certificate of insurance, naming the Government as an additionally insured, with minimum limits of bodily injury and property damage as follows:

(1) $300,000 for each individual;

(2) $1,500,000 for each incident involving bodily injury;

(3) $500,000 aggregate for all property damage that may be incurred during the term of the policy;

(4) $1,500,000 comprehensive general liability umbrella;

(5) $3,000,000 builder's risk insurance.

This coverage may be cancelled or automatically expire at such time as the terms and conditions of the Exchange Agreement are fulfilled.

**b.** The insurance policy or policies shall be of comprehensive form of contract and shall specifically provide protection appropriate for the types of facilities, services and activities involved. The Grantee shall require that the insurance company give the District Engineer thirty (30) days written notice of any cancellation or change in such insurance. The District Engineer may require closure of any or all of the premises during any period for which the Grantee does not have the required insurance coverage.

**SITE SPECIFIC CONDITIONS**

**18.** The following activities are expressly prohibited unless otherwise authorized in the relevant and executed Exchange Agreement:

a. drilling wells on the property;

b. extracting soil borings from the property;

c. discharging or discarding any materials, trash, waste (liquid or solid), or lab equipment on the property;

d. interfering with or delaying Government contractors performing on-site activities; and

e. entering areas of the property without appropriate training and protective personal equipment required by applicable law.

**19.** The Installation Commander or his designee has the right to stop work if he observes unsafe or inappropriate practices.

**20. DISCLAIMER**

This Right-of-Entry is effective only insofar as the rights of the United States in the premises are concerned; and the Grantee shall obtain any permit or license which may be required by Federal, state, or local statute in connection with the use of the premises.

It is understood that the granting of this Right-of-Entry does not preclude the necessity of obtaining a Department of the Army permit for activities which involve the discharge of dredge or fill material or the placement of fixed structures in the water of the United States, pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (33 USC 403), and Section 404 of the Clean Waters Act (33 USC 1344).

**21.** This Right of Entry is issued in contemplation of the Real Estate Exchange as stated in the Exchange Agreement referenced herein.

**THIS RIGHT-OF-ENTRY** is not subject to Title 10, United States Code, Section 2662, as amended. This Right of Entry is part of the Exchange Agreement that was submitted and approved pursuant to Title 10, United States Code, Section 18233, as amended.

**IN WITNESS WHEREOF,** I have hereunto set my hand by authority of the Secretary of the Army, this _________ day of _________________, 20___.

BY: ________________________________
RALPH J. WERTHMANN
Chief, Real Estate Division
Savannah District, Corps of Engineer

THIS Right-of-Entry is also executed by the Grantee this ____________ day of _________________, 20__.

____GRANTEE________________________

BY:_______________________________
TITLE:_____________________________

# EXHIBIT O

## CONSTRUCTION SCHEDULE

*(To be provided by Exchange Partner prior to entering into Exchange Agreement.)*

# *Appendix 5*

# *DRAFT*

**CONSTRUCTION MONITORING**
**LETTER AGREEMENT**
BETWEEN
THE UNITED STATES ARMY AND
*(EXCHANGE PARTNER NAME)*

This Construction Monitoring Letter Agreement (CMLA) is made as of the _____ day of ___________, 20___, by and between the United States of America, acting by and through the Department of the Army, U.S. Army Corps of Engineers (USACE), Savannah, and the *(EXCHANGE PARTNER NAME)*, hereinafter also referred to as "Exchange Partner".

WHEREAS, The Defense Authorization Act of 1998, Section 2813(a), codified at 10 United States Code 2695, authorizes Acceptance of funds to cover administrative expenses related to certain real property transactions, including exchanges of real property with a non-federal person or entity; and

WHEREAS, the exchange agreement for real property at the Exchange Parcel included the design and construction of facilities on Government property located at Charlotte USARC, NC, and will necessitate Government monitoring of the design, construction, and inspection (quality assurance) of these facilities.

Now Therefore:

## 1. PURPOSE AND INTENT

a. The Parties acknowledge that this CMLA is in furtherance of the conveyance of Government property pursuant to an Exchange Agreement, dated ______________.

b. This CMLA is specifically and solely intended to address funding actions in support of design, construction, and inspection oversight of activities that are part of the Exchange Agreement, as required by law or regulation, so that the exchange will be accomplished at minimal cost to the U.S. Government.

c. The Parties intend that this CMLA constitute a legally binding contract, subject to the terms of the Exchange Agreement.

**2. OBLIGATIONS OF THE PARTIES**

a. In consideration of the services conducted or actions taken by the USACE, Savannah, the Exchange Partner is responsible for hiring an independent *construction management* firm to monitor the Exchange Partner's Contractor's activities. USACE, Savannah will evaluate and approve in writing the Exchange Partner's management firm's qualifications and scope of services. USACE, Savannah will also monitor the design and construction Quality Control processes to ensure that the appropriate processes are in place and functioning well.

This firm will retain oversight, relative to the Contractor's Quality Control program and be responsible for the daily on-site inspections and testing. The construction management firm will also be responsible for all contract administration activities associated with the design and construction of the projects. This includes, but is not limited to, approving and tracking the contractor's schedule, reviewing design and construction submittals, answering requests for information, approving pay estimates, processing contract modifications, providing field technical support, and providing the necessary written correspondence to the contractor. As soon as practicable, but not later than 30 days following execution of this LA by all parties, the Exchange Partner, will pay $186,000 to the USACE, Savannah, as the estimated cost of the services being provided therein. If the USACE, Savannah's costs under this LA are later forecasted to exceed the amount of funds available under this LA, it shall promptly notify the Exchange Partner of the amount of additional funds required to accomplish the items listed in Attachment A. Within thirty (30) days of completing the work under this LA, the USACE, Savannah, shall conduct an accounting to determine the actual costs of the work. Within thirty (30) days of completion of this accounting, the USACE, Savannah, shall return to the Exchange Partner any funds advanced in excess of the actual costs as then known. Established Federal Government accounting procedures shall be used. Except as provided herein the amount of funds advanced by the Exchange Partner, under this LA, shall be nonrefundable.

b. Funds shall be payable to "Finance & Accounting Officer, Savannah District in the form of a Cashier's or Bank Certified Check and forwarded to the following address with a copy of this CMLA attached.

USACE, Savannah
Attn: CESAS-RE
100 W. Oglethorpe Ave
Savannah, Georgia 31401

**3. MODIFICATION OR TERMINATION OF AGREEMENT**

a. Either party shall have the option to direct termination of work under this CMLA, subject to the Exchange Agreement, by giving written notice to all parties. Such notice shall specify the effective date of the termination of work, at least ten (10) days before such effective date. Within thirty (30) days following the effective date of the termination of work USAED, Savannah, shall provide to the Exchange Partner a final

accounting of the actual costs of the work by USACE, Savannah, and return to the Exchange Partner any funds advanced in excess of the actual costs as provided in Article 2.

b. This CMLA contains the entire agreement between the parties regarding funding the construction monitoring activities listed in Attachment “A” for the exchange of certain United States owned land at the Exchange Parcel, for Exchange Partner's real property in the form of improvements to be made at the Charlotte USARC, Charlotte, NC. Any revision of this CMLA shall be in writing and signed by the parties hereto. This Agreement shall not merge into any subsequent agreement between the Parties.

c. This CMLA shall be in effect as of the date executed by both parties and shall remain in effect until an exchange of property is completed or by written notice by a party to the other and after final accounting of funds under Article 2.a.

**4. QUALITY ASSURANCE ACTIVITIES**

The Corps of Engineers minimum oversight will be exercised to provide Government quality assurance in general accord with local jurisdiction practice for assuring code compliance and construction quality. All Corps of Engineers oversight activities will be coordinated with the Army Reserve. Such oversight will at a minimum consist of the following (the Government may elect to inspect construction progress on a periodic basis):

a. Approval of the final Construction Documents. Approval criteria shall rely upon compliance with the Army Reserve Real Property Exchange Criteria and Quality Standards. Government-specific requirements/specifications exceeding local and national codes may be waived at the option of the Government, except as required by law. Government representatives shall be invited to participate in all design review meetings and shall receive a minimum of four (4) copies of each design submittal. Government will be provided six (6) of as built drawings. The Final Design submittal shall include a draft DA Form1354, Transfer and Acceptance construction, a sample of which the Government shall provide to the Exchange Partner.

The Government will visit the site periodically during construction for the purpose of providing Government quality assurance in accordance with the CMLA. The Government will notify the Exchange Partner within 72 hours of each visit of any exceptions taken to the work. The Government's review and acceptance of the construction does not relieve the Exchange Partner from responsibility for compliance with all requirements of the Exchange Agreement.

The Government will typically visit the site at the following points in the construction process. The Exchange Partner must notify the Government a minimum of two weeks in advance when the project reaches these points to allow time for scheduling and making the visits.

1. Completion of all underground infrastructure and piping installation prior to backfilling of the trenching.

2. At a time when construction is essentially complete, for the purpose of preparing the Government punch list for completion of the work.

3. After completion of the Government punch list work, for the purpose of a final inspection of the work prior to acceptance of the replacement facility.

4. At a point nine (9) months after the replacement facility turnover, prior to expiration of Exchange Partner's one-year warranty period for the replacement facility.

**5. LIMITATION OF LIABILITY**

The Government's obligation to pay any money under this CMLA is subject to the availability of appropriated funds to the Department of Army, and nothing in this CMLA shall be interpreted to require obligations or payments by the United States in violation of the Anti-Deficiency Act, as amended, 31 U.S.C. §1341, provided that the Government shall otherwise comply with all applicable statutory requirements and its obligations under the terms of this LA.

**6. DISPUTES**

a. This Agreement is subject to the Contract Disputes Act of 1978, 41 U.S.C. 601-613 et seq., as amended. Except as provided in the Act, all disputes arising under or relating to this Agreement shall be resolved under this Article.

b. "Claim," as used in this Article, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this Agreement.

c. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by Exchange Partner seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by the following paragraph. A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this Article, if it is disputed either as to a liability or amount or is not acted upon in a reasonable time.

d. A claim by Exchange Partner shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against Exchange Partner shall be subject to a written decision by the Contracting Officer. For Exchange Partner claims exceeding $100,000 Exchange Partner shall submit with the claim a certification that the claim is made in good faith, supporting data are accurate and

complete to the best of Exchange Partner's knowledge and belief and the amount requested accurately reflects the contract adjustment for which Exchange Partner believes the Government is liable.

e. If Exchange Partner is an individual, the individual shall execute the certification. If Exchange Partner is not an individual, the certification shall be executed by a senior company official in charge at Exchange Partner's plant or location involved or an officer or general partner of Exchange Partner having overall responsibility for the conduct of Exchange Partner's affairs.

f. For Exchange Partner claims of $100,000 or less, the Contracting Officer must, if requested in writing by Exchange Partner, render a decision within sixty (60) days of the request. For EXCHANGE PARTNER certified claims over $100,000, the Contracting Officer must, within sixty (60) days, decide the claim or notify Exchange Partner of the date by which the decisions will be made.

g. The Contracting Officer's decision shall be final unless Exchange Partner appeals or files a suit as provided in the Act.

h The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Office receives the claim (property certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each six (6) month period as fixed by the Treasury Secretary during the pendency of the claim.

i. Exchange Partner shall proceed diligently with performance of this Agreement, pending final resolution of any request for relief, claim, appeal or action arising under this Agreement and comply with any decision of the Contracting Officer or the District Engineer, U.S. Army Engineer District, Savannah.

**7. NOTICES**

Notices pursuant to this CMLA will be sent by the parties to each other by U.S. Mail or by rapid courier (such as Federal Express) addressed to the following addresses, or such other addresses as the parties may from time to time designate to each other in writing.

**U.S. ARMY CORPS OF ENGINEERS**
**ATTN: CESAS-RE**
**100 W. OGLETHORPE AVE**
**SAVANNAH, GA 31401**

**EXCHANGE PARTNER**
**ADDRESS**

BASED ON THE FOREGOING, the Parties hereto, acting by and through their duly authorized representatives, have executed this CMLA as of the day and year first above written.

**THE UNITED STATES OF AMERICA**

BY: ________________________________

NAME: ______________________________

TITLE:

**EXCHANGE PARTNER**

BY: ________________________________

NAME: ______________________________

TITLE: ______________________________

# ATTACHMENT "A"
# CONSTRUCTION MONITORING COST ESTIMATE
# CHARLOTTE USARC, CHARLOTTE, NC
# REAL PROPERTY EXCHANGE

*DRAFT*

**To be completed in Letter Agreement**

# *Appendix 6*

*DRAFT*

KEY TEAM MEMBER EXPERIENCE

Design Firm Name: ________________________________________________

Construction Firm Name:____________________________________________

Provide descriptions of new construction building projects, up to five examples, completed within the last five years, which are similar to this project in size, scope (such as (but not limited to) training buildings, organizational maintenance shops) and dollar value. Provide up to one page per project and a color photo if available. In each description, describe the self-performed work.

Name of project/location:____________________________________________

General Scope of Project:____________________________________________

Role (prime, joint venture, subcontractor):________________________________

Self-performed work:________________________________________________

Construction Cost:__________________________________________________

Original Beneficial Occupancy Date:_____________________________________
Final Beneficial Occupancy Date:_______________________________________

Original Contract Amount:__________________Final Contract Amount:_____________

## *Appendix 7*

Environmental documents will be completed prior to execution of the exchange agreement.

***Appendix 8***
***Site1***



*Site 2*


PROJECT MAP
LOCATION OF PROJECT
ACQUISITION
DISPOSAL
LEGEND

# EXHIBIT 2

# LETTER AGREEMENT
BETWEEN
**THE UNITED STATES OF AMERICA**
AND
**LCG 1 CHAPEL AVE LLC**

This Letter Agreement (LA) is made as of the 5 day of MAY, 2016 by and between the United States of America, acting by and through the Department of the Army, U.S. Army Corps of Engineers, Savannah District (USACE), and LCG 1 Chapel Ave LLC. (hereinafter referred to as the "Exchange Partner").

WHEREAS, Title 10, United States Code, Section 18240, allows the Secretary of Defense to authorize the Secretary of the Army to acquire a facility, or an addition to an existing facility, needed to satisfy military requirements by exchange of an existing facility;

WHEREAS, The Defense Authorization Act of 1998, Section 2813(a), codified at 10 United States Code 2695, authorizes acceptance of funds to cover administrative expenses related to certain real property transactions with a non-federal person or entity such that "...the Secretary of a military department may accept amounts provided by the person or entity to cover administrative expenses incurred by the Secretary in entering into the transaction." Covered transactions are further described as follows:

1. The exchange of real property.

2. The grant of an easement over, in, or upon real property of the United States.

3. The lease or license of real property of the United States;

WHEREAS, the Exchange Partner's proposal was selected in response to the solicitation dated September 6, 2013, agreeing to the terms and conditions set forth in the solicitation package; and

WHEREAS, Certain activities (see Attachment A) relative to the exchange are necessary to further facilitate the contemplated exchange.

Now Therefore:

**1. PURPOSE AND INTENT**

a. The Parties acknowledge that this LA is in furtherance of good faith negotiations in contemplation of the conveyance of the Government property known as the Caven Point U.S. Army Reserve Center (USARC), located at 116 Chapel Ave & Caven Point Road, Jersey City, NJ and the Alexander Hamilton USARC, located at 76 Route 17 & Essex Street, Lodi, NJ in exchange for land and construction of a new USARC located on Harbor Drive, Jersey City, NJ.

b. This LA is specifically and solely intended to support all activities, to include those activities listed in Attachment A, necessary to complete the contemplated Exchange Agreement so that the exchange will be accomplished at minimal cost to the U.S. Government. This LA imposes no obligation on either Party beyond the terms and conditions of this LA, and either Party, at its sole discretion, may elect not to proceed with the contemplated exchange with no obligation or liability beyond the terms and conditions of this LA.

c. The Parties intend that this LA constitute a legally binding contract, notwithstanding the Parties have not yet entered into the Exchange Agreement. The Parties acknowledge that neither Party has made a decision concerning the contemplated exchange and that the Parties shall be obligated to proceed with the exchange only in the event the Parties execute a formal Exchange Agreement.

**2. OBLIGATIONS OF THE PARTIES**

a. In consideration of the services to be conducted or actions to be taken by USACE, listed on Attachment A, the Exchange Partner will furnish $186,000 upon execution of LA, to fund the estimated cost of the USACE services being provided therein. If the costs estimated by USACE under this LA are later forecasted to exceed the amount of funds available under this LA, USACE shall promptly notify the Exchange Partner of the amount of additional funds required to accomplish the items listed in Attachment A. While Attachment A is an attempt to identify the activities necessary to accomplish the contemplated Exchange Agreement, additional activities may subsequently be identified by the Government. If the required additional funds are not provided within 30 days of said notice, the Government will direct termination of the work under this LA. The Exchange Partner further understands that failure to provide the additional funds necessary to complete the actions for the contemplated exchange will preclude the formal execution of the Exchange Agreement as contemplated by the parties. On a monthly basis, if requested, USACE, shall provide to the Exchange Partner an accounting of the actual costs of work. Within thirty (30) days of completing the work under this LA, USACE shall conduct an accounting to determine the actual costs of the work. Within thirty (30) days of completion of this accounting, USACE, shall return to the Exchange Partner any funds advanced in excess of the actual costs as then known. Established Federal Government accounting procedures shall be used. Except as provided herein the amount of funds advanced by the Exchange Partner, under this LA, shall be nonrefundable.

b. Funds provided by the Exchange Partner shall be in the form of a Cashier's or Bank Certified check made payable to the "Finance and Accounting Officer, USACE, Savannah District" and forwarded to the following address with a copy of this LA attached.

U.S. Army Corps of Engineers
Attn: CESAS-RE
100 West Oglethorpe Ave
Savannah, GA 31401

c. The Exchange Partner must have fee title to property located on Harbor Drive prior to executing the Exchange Agreement.

d. The Exchange Partner must provide evidence of clear title prior to executing the Exchange Agreement.

e. The environmental conditions of the property located on Harbor Drive must be adequate and appropriately documented by the Government.

f. Due diligence for the property located on Harbor Drive must be conducted prior to entering an Exchange Agreement.

g. Due diligence for the property located on Harbor Drive must be completed by June 18, 2015.

**3. MODIFICATION OR TERMINATION OF AGREEMENT**

a. The Exchange Partner or USACE shall have the option to terminate this agreement by giving written notice to the other party, specifying the effective date of the termination of work, at least ten (10) days before such effective date. Within thirty (30) days following the effective date of the termination of work USACE shall provide to the Exchange Partner a final accounting of the actual costs of the work by USACE and return to the Exchange Partner any funds advanced in excess of the actual costs as provided in Article 2.

b. This LA contains the entire agreement between the parties regarding funding preliminary activities for the exchange of certain United States owned land at the Caven Point USARC and the Alexander Hamilton USARC, for Exchange Partner's land and construction of a new USARC located on Harbor Drive Jersey City, NJ, and any agreement hereafter made shall not operate to change, modify, or discharge this LA in whole or in part, unless that agreement is in writing and signed by the parties hereto. This LA shall not merge into any subsequent agreements by the parties to include the Exchange Agreement and all documents relating thereto.

c. This LA shall be in effect as of the date executed by both parties and shall remain in effect until the said infrastructure work is completed and accepted by the Government or by written notice by a party to the other and after final accounting of funds under Article 2.a.

**4. LIMITATION OF LIABILITY**

The Government's obligation to pay any money under this LA is subject to the availability of appropriated funds to the Department of Army, and nothing in this LA shall be interpreted to require obligations or payments by the United States in violation of the Anti-Deficiency Act, 31 U.S.C. 3142, as amended, provided that the Government shall otherwise comply with all applicable statutory requirements and its obligations under the terms of this LA.

**5. DISPUTES**

a. This contract is subject to the Contract Disputes Act of 1978, 41 U.S.C. 7101-7109 et seq., as amended. Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

b. "Claim", as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.

c. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by the following paragraph. A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to a liability or amount or is not acted upon in a reasonable time.

d. A claim by the Contractor shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer. For Contractor claims exceeding $100,000, the Contractor shall submit with the claim a certification that the claim is made in good faith, supporting data are accurate and complete to the best of the Contractor's knowledge and belief and the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

e. If the Contractor is an individual, the individual shall execute the certification. If the Contractor is not an individual, the certification shall be executed by a senior company official in charge at the Contractor's plant or location involved or an officer or general partner of the Contractor having overall responsibility for the conduct of the Contractor's affairs.

f. For Contractor claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date of which the decisions will be made.

g. The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

h. The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Office receives the claim (properly certified if required) or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6 month period as fixed by the Treasury Secretary during the pendency of the claim.

i. The contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action arising under the contract and comply with any decision of the Contracting Officer who shall be the Chief of Real Estate, Savannah District, U. S. Army Corps of Engineers.

**6. NOTICES**

Notices pursuant to this LA will be sent by the parties to each other by U.S. Mail or by rapid courier (such as Federal Express) addressed to the following addresses, or such other addresses as the parties may from time to time designate to each other in writing.

To: **USACE**

U.S. Army Corps of Engineers
Attn: CESAS-RE
100 West Oglethorpe Ave
Savannah, GA 31401
Phone: 912-652-5201

To: **EXCHANGE PARTNER**

LCG 1 Chapel Ave LLC
Attn: Lance Lucarelli
534 Broadway
Bayonne, New Jersey 07002
Phone: 201-679-5454

**BASED ON THE FOREGOING,** the Parties hereto, acting by and through their duly authorized representatives, have executed this Letter Agreement as of the day and year first above written.

**THE UNITED STATES OF AMERICA**

BY: [signature]

NAME: Ralph J. Werthmann

TITLE: Savannah District, Chief, Real Estate Division, Real Estate Contracting Officer

**EXCHANGE PARTNER**
LCG 1 Chapel Ave LLC

BY: LANCE T LIZZARELLI

NAME: [signature]

TITLE: PRES

**ATTACHMENT "A"**
**COST ESTIMATE**
**REAL PROPERTY EXCHANGE**

**TASK LIST**

| | |
|---|---|
| Appraisal Update | $25,000 |
| Appraisal Proposed Land | $15,000 |
| Exchange Agreement Development & Administration | $20,000 |
| LA Development & Administration | $4,000 |
| Review of Plans and Specs/Construction | $50,000 |
| Environmental | $25,000 |
| Attorney Review | $10,000 |
| Bill of Sale | $2,000 |
| Quit Claim Deed | $20,000 |
| Audit | $10,000 |
| Total Estimated Costs: | $186,000 |

Prepared in accordance with Department of Defense Financial Management Regulation, Chapter 1, Volume 11A.

Note: Costs are subject to actual cost. Estimate includes all known tasks necessary to perform complete exchange process and is an attempt to identify the activities necessary to accomplish the contemplated Real Property Exchange. Additional activities may subsequently be identified by the Government.

# EXHIBIT 3

**From:** Bruce, Stephen W SAS
**To:** Lance T. Lucarelli
**Subject:** Draft Exchange Agreement for review purposes only (UNCLASSIFIED)
**Date:** Monday, August 03, 2015 2:35:08 PM
**Attachments:** image2015-08-03-142738.pdf

---

Classification: UNCLASSIFIED
Caveats: NONE

Lance,

Attached is the draft template Exchange Agreement for review purposes only. We have to get access to the proposed property to ensure it's clean and buildable before moving forward.

Thanks,

Stephen Bruce
Realty Specialist
US Army Corps of Engineers
Savannah District
Office: 912-652-5201
BB: 912-650-1545

Disclaimer: The information contained within this message is for informational purposes and is not considered contractually binding upon the government in any way. Any other use of the email or attachments by you is prohibited.

Classification: UNCLASSIFIED
Caveats: NONE

# DRAFT EXCHANGE AGREEMENT

This Agreement entered into this _______day of ___________, 201__, by and between,

The UNITED STATES OF AMERICA, represented by the DEPARTMENT OF THE ARMY (the "Government"),

And

LCG 1 Chapel Ave LLC, hereinafter referred to as the EXCHANGE PARTNER.

WITNESSETH:

WHEREAS, the Government desires to acquire 20 ± acres of land, more or less, owned in fee by the EXCHANGE PARTNER, located at 90 Harbor Drive, 120 Harbor Drive, and 145 Industrial Drive, Bayonne, New Jersey, and the construction of a 66,376 square foot training building, 9,092 square foot maintenance shop, and a 4,254 square foot unheated storage ("Replacement Facilities"), described in **Exhibit(s) A (Exchange Partner Property – Property Description) & B (DD1391)** and **C (Design Narrative)**, transferred to the Government, and constructed by the EXCHANGE PARTNER;

WHEREAS, the EXCHANGE PARTNER, desires to acquire 24± acres of land, more or less, with improvements known as the Caven point U.S. Army Reserve Center (USARC) located at 1 Chapel Avenue and Caven Point Road, Jersey City, New Jersey, **Exhibit D (LEGAL DESCRIPTION)** and 6.45± acres of land, more or less, with improvements known as the Alexander Hamilton USARC located at 76 Route 17 & Essex Street , Lodi, New Jersey, **Exhibit E (Legal Description)** ("Government Property"), owned in fee by the Government;

WHEREAS, the Government desires to receive as additional consideration a leasehold interest of a portion of the Government Property, **Exhibit F,** after conveyance of the Government Property to the EXCHANGE PARTNER, to allow continued use of the Government Property until construction of the Replacement Facility is completed by the EXCHANGE PARTNER; AND

WHEREAS, authority for the Government to enter into this Agreement is found in Title 10, United States Code, Section 18240;

WHEREAS, pursuant to Section 18240(a), the Secretary of Defense has delegated to the Department of the Army his authority under Section 18240 to make such exchanges; and

WHEREAS, the Operating Agreement, dated ____________, authorizes EXCHANGE PARTNER to execute this Agreement any and all documents related to this exchange.

NOW THEREFORE, in consideration of the conveyance by the Government of Government property to the EXCHANGE PARTNER and the conveyance by the EXCHANGE

PARTNER of EXCHANGE PARTNER's property and Replacement Facility to the Government, the mutual covenants and conditions contained herein, and the duties and obligations incurred, the parties hereto agree as follows:

## I. GENERAL PROVISIONS

**A.** The terms and conditions of this Agreement and its attachments and exhibits apply to and bind the successors and assignees of the parties hereto.

**B.** All of the provisions of this Agreement and its attachments and exhibits shall survive the settlement of the exchange of conveyances contemplated herein, and shall remain obligations of the parties hereto until satisfied.

**C.** The EXCHANGE PARTNER warrants that it has not employed or retained any person or selling agency to solicit or secure this Agreement or any contracts or obligations arising from this Agreement, upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees of bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this Agreement or require payment from the EXCHANGE PARTNER for the amount of such commission, percentage or contingent fee.

**D.** No member of or Delegate of Congress or Resident Commissioner shall be admitted to any share or part of this Agreement or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this Agreement if made with a corporation for its general benefit.

**E.** The Government may, by written notice to the EXCHANGE PARTNER terminate the right of EXCHANGE PARTNER to proceed under this Agreement if it is found, after notice and hearing, by the Secretary of the Army or his duly authorized representative, that gratuities (in the form of entertainment, gifts, or otherwise) were offered or given by any agent or representative of EXCHANGE PARTNER, to any officer or employee of the Government with a view toward securing any contracts or obligations arising from this Agreement or securing favorable treatment with respect to the awarding or amending, of the making of any determinations with respect to the performing, of such contracts or obligations, provided that the existence of facts upon which the Secretary of the Army or his duly authorized representative make such findings shall be in issue and may be reviewed in any court of competent jurisdiction.

**F.** Neither the EXCHANGE PARTNER nor its contractor(s) will discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

**G.** The EXCHANGE PARTNER agrees that the District Engineer, U.S. Army Engineer District, Savannah, Georgia, or any of his duly authorized representatives shall, until the expiration of three (3) years after acceptance of the construction of the (Replacement Facilities) by the

Government, have access to and the right to examine any books, documents, papers and records of the EXCHANGE PARTNER or its contractor(s) involving activities or transactions related to this Agreement and its attachments.

**H.** The EXCHANGE PARTNER shall hold the Government harmless from any costs, claims, damages, loss or other costs, including fines and penalties, arising out of this exchange.

**I**. The Government has provided notice of the proposed exchange to the US Congress, pursuant to Title 10, U.S. Code, Section 18240.

## II. ACKNOWLEDGMENTS

**A. Environmental Documentation**. The environmental documentation includes, but is not limited to, the following:

**1. Environmental Condition of Property**. The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Environmental Condition of Property (ECP), sampling and/or testing, completed by the Government, for the Government Property and EXCHANGE PARTNER Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit** __.

**2. Finding of Suitability to Transfer**. The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Finding of Suitability to Transfer (FOST) for the Government Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit __.**

**3. Environmental Assessment.** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Environmental Assessment (EA), completed by the Government per the Government, for the Government Property and EXCHANGE PARTNER Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit __.**

**4. Finding of No Significant Impact**. The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Finding of No Significant Impact (FNSI), completed by the Government, for the Government Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit __.**

**5. Environmental Impact Statement.** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the Environmental Impact Statement (EIS), completed by the Government, for the Government Property and EXCHANGE PARTNER Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit __.**

**B. Land Surveys and Legal Descriptions.** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement, the surveys and legal descriptions completed by the Government, for the Government Property and EXCHANGE PARTNER Property. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibits ___, ___, ___ &___**.

**C. National Historic Preservation Act (NHPA).** The EXCHANGE PARTNER and the Government acknowledge and accept for the purpose of use with this Agreement the NHPA documentation completed by the Government. The EXCHANGE PARTNER acknowledges receiving a copy of same, **Exhibit** ___.

**D.** To the extent that the EXCHANGE PARTNER agrees to remediate the Government property for the future intended use, the EXCHANGE PARTNER agrees to provide in each contract for remediation, a provision that the contractor will indemnify and hold harmless the Government from any costs, claims, damages, loss or other costs, including fines and penalties, arising out of such investigation and remediation actions.

## III. OBLIGATIONS OF THE EXCHANGE PARTNER

**A**. EXCHANGE PARTNER shall provide Replacement Facilities satisfactory to the Government, in its sole discretion. The value of the Replacement Facilities to be provided to the Government shall be at least equal to the fair market value of the Government property to be conveyed.

**B.** EXCHANGE PARTNER shall reimburse the Government for all administrative costs and all costs of whatever kind or nature, contemplated or not, associated with the execution of this Agreement or in the fulfillment of its obligations under this Agreement, whether or not they are otherwise specifically provided for herein, as set forth in the Letter Agreement executed by the Exchange Partner dated 5 May 2015 (Letter Agreement). This Agreement shall not merge into any subsequent agreement between the Parties, including the Letter Agreement and documents related thereto.

C. EXCHANGE PARTNER has executed the Letter Agreement, to reimburse USAED, Savannah for estimated administrative costs associated with the transaction, including but not limited to, costs related to negotiation and review of this Agreement, engineering services and real estate actions such as all associated survey, recording, escrow, and closing fees (Exhibit ___). Exchange Partner acknowledges that the if the estimated costs under this LA are later forecasted to exceed the amount of funds available under the LA, it shall provide the additional funds within 30 days of notice by the Government to preclude direct termination of the work under this LA.

**D.** EXCHANGE PARTNER shall comply with the Army Reserve Design Criteria and Quality Standards manual and Installation Design Guide unless otherwise specifically agreed to herein this Agreement. EXCHANGE PARTNER hereby acknowledges receiving a copy of same.

**E**. EXCHANGE PARTNER shall obtain all necessary permits, licenses, services, and any and all approvals, at its own risk and expense, to accomplish the construction work under this section. This includes applying for and satisfying all requirements for a license or construction permit on Government Property as required in Federal (including Army) regulations. EXCHANGE PARTNER shall own and be responsible for all materials, equipment and personnel used in conjunction with the construction on Government property until such time as ownership is conveyed in accordance with this Agreement. Construction shall conform to all applicable local, state and Government standards. Approval of EXCHANGE PARTNER's draft Design Narrative and final Construction Documents (schedules, plans, drawings, specifications and permits to construct) will not constitute Government's acceptance of risk of or responsibility for such conformance unless explicitly included in this document.

**F**. The rights and obligations of EXCHANGE PARTNER in the contract(s), including all attachments thereto, to acquire land and build a structure suitable to the Government's needs, shall be deemed to be incorporated in this Agreement when fully executed between EXCHANGE PARTNER and their obligors and all benefits, rights, title and interest in said contract or contracts shall inure to the benefit of the Government. Said agreement shall provide that the land and improvements including all buildings shall be completed no later than _____ days after the execution date of this Agreement. Said time shall be expressed in the construction contract as a day certain based on these time lines and shall provide that time is of the essence. **(EXHIBIT ____)**

**G.** The Exchange Partner shall prepare all Construction Documents. The Government in its sole discretion will approve in writing the Design Narrative and all Construction Documents prior to their incorporation in the Exchange Partner's contract for construction. Further, at all times during and after construction, the Government shall have the right to enter upon the premises, from time to time, to determine compliance with said final Construction Documents, with the intent that the facilities will be constructed in a manner which complies with the standards of the Government regarding such, in order to allow the Government to accept such structures as hereinafter provided. Further, EXCHANGE PARTNER shall furnish any change or modification to the final Construction Documents to the Government in writing, and obtain written Government approval prior to commencement of construction.

**H.** EXCHANGE PARTNER shall execute the Construction Management Agreement simultaneously with this Agreement, provide the Government with funds sufficient to cover administrative costs associated with the construction of the Replacement Facilities, including but not limited to, the design and construction monitoring, as set forth in the Letter Agreement, **Exhibit** ___.

**I.** EXCHANGE PARTNER shall be responsible for any and all relocation costs associated with this Agreement.

**J. <u>Warranties</u>**

**1.** EXCHANGE PARTNER shall, after completion of all improvements to the land,

and in addition to any other warranties set forth elsewhere in this Agreement, furnish the Government a one (1) year warranty that the work performed and facilities built, materials and equipment installed by EXCHANGE PARTNER, its contractor(s), its sub-contractors(s), or supplier(s) performing work on said project at the request of EXCHANGE PARTNER, conforms to the Design Narrative and final Construction Documents and overall design of said project. This warranty shall continue for a period of one (1) year from the date of the Government's final acceptance of the work. The Contracting Officer will notify the EXCHANGE PARTNER in writing, within thirty (30) days of discovery of any failure, damage or defect in equipment or material furnished. If EXCHANGE PARTNER fails to remedy any failure, damage or defect within thirty (30) days after receipt of said notice, the Government shall have the right to repair, replace or otherwise remedy the failure, defect damage, and the EXCHANGE PARTNER shall reimburse the Government within thirty (30) days of said repairs or replacements.

**2.** The EXCHANGE PARTNER shall remedy at the EXCHANGE PARTNER'S expense any failure to conform, or any defect. In addition, the EXCHANGE PARTNER shall remedy at the EXCHANGE PARTNER'S expense any damage to Government-owned or controlled real or personal property, when that damage is the result of (a) the EXCHANGE PARTNER'S, its contractor(s), or subcontractor(s) failure to conform to the Design Narrative and final Construction Documents as set forth herein or (b) any defect of equipment, material or workmanship furnished by the EXCHANGE PARTNER, its contractor(s) or subcontractor(s).

**3.** The EXCHANGE PARTNER shall restore any real property damaged in fulfilling the terms and conditions of the warranties set forth herein.

**4.** The EXCHANGE PARTNER'S warranty with respect to repairs shall run for one (1) year from the date of repair or replacement.

**5.** The warranties set forth herein shall not limit any Government rights, including, but not limited to, latent defects, gross mistake or fraud.

**6.** The Government's monitoring does not relieve the EXCHANGE PARTNER from the requirements set forth in the Design Narrative and final Construction Documents, and the Government's acceptance of said construction does not constitute acknowledgement or acceptance of any item(s) of the construction that do not conform to the final Construction Documents without the Government's written authorization as stated in Paragraph G of this section.

**K. <u>Final Acceptance</u>**

Final acceptance by the Government will be given in writing and determined by the following:

1. Completion of construction, as determined in the sole discretion of the Government;

2. Upon delivery by the EXCHANGE PARTNER and acceptance by the Government of

the Operator manuals to systems installed in, on or around said structure. Six (6) bound copies of the mechanical and electrical system operation and maintenance (O&M) manuals. The manuals shall be loose binder format, indexed, and clearly divided by technical sections. The manuals shall list the name, phone numbers and addresses of all manufacturer's points of contact. In addition, the manuals shall include manufacturer's standard product brochures, schematics, printed instructions, general operating procedures, and safety precautions. Additionally, the manuals shall outline step-by-step procedures required for system startup, operation, adjustment, preventive maintenance, inspection and testing. The O&M manual requirements must be provided prior to the building certification and will become a qualifying part of the punch list. Building or mechanical acceptance cannot be accomplished until this requirement is satisfied.

3. Upon delivery by the EXCHANGE PARTNER and acceptance by the Government of original marked up final Construction Documents showing "as-built" conditions, three (3) hard copy sets and three (3) sets on CD.

These items will be furnished by the EXCHANGE PARTNER to the Government, prior to final acceptance, at the following ADDRESS: _____________.

**L.** Further, EXCHANGE PARTNER shall furnish to the Government, before transfer of title to the property and its improvements to the Government, all operator manuals supplied by the manufacturer, to any system installed in, on or around said structure.

**M.** EXCHANGE PARTNER hereby assigns to the Government any warranties given to EXCHANGE PARTNER by its contractor(s) or its subcontractor(s).

**N.** EXCHANGE PARTNER shall, before transfer of title to the property and its improvements to the Government, furnish the Government one complete set of original marked up final Construction Documents showing "as-built" conditions.

**O.** Prior to the commencement of construction of a 66,376 square foot training building, 9,092 square foot maintenance shop, and a 4,254 square foot unheated storage, EXCHANGE PARTNER shall require each contractor to furnish it with a certificate of insurance, naming the Government as an additional insured, with minimum limits of bodily injury and property damage as follows:

1. $300,000 for each individual;

2. $1,500,000 for each incident involving bodily injury;

3. $500,000 aggregate for all property damage that may be incurred during the term of the policy;

4. $1,500,000 comprehensive general liability umbrella;

5. $3,000,000 builder's risk insurance.

Prior to construction, EXCHANGE PARTNER, shall furnish the certificate of insurance to the Government. EXCHANGE PARTNER must maintain all insurance coverage, without any lapse in service, at all times during construction of the Replacement Facilities and shall provide copies of each certificate of insurance to the Government.

**P.** EXCHANGE PARTNER shall provide, at its expense, utility line connections, replacement or relocations of existing utilities and pay any and all tapping and connection fees related thereto. Utility services shall experience no lapse in service. EXCHANGE PARTNER shall obtain any off-site easements necessary to effectuate these purposes and convey and assign all rights to such easements to the Government at the time of tender of the Warranty Deed/Bill of Sale.

Q. EXCHANGE PARTNER shall be responsible for all costs, to include all costs to the Government, of whatever kind or nature, contemplated or not, associated with this Agreement, whether or not they are otherwise specifically provided for herein.

**R.** The Government shall at its sole discretion determine whether the land and facilities are acceptable for the operation of a United States Army Reserve Center under the guidelines provided by Federal law and Army regulations. However, the Government's acceptance of the land and improvements shall not be unreasonably withheld.

**S.** EXCHANGE PARTNER shall, within sixty (60) days of acceptance of the _________ by the Government, convey, by Warranty Deed/Bill of Sale, preliminary, not final, draft of which is attached as **Exhibit** __, EXCHANGE PARTNER's interest to the 20± acres, more or less, with all improvements, free and clear of all encumbrances and special assessments which are a lien against said land and improvements, subject to existing easement(s) for public roads and highways, utilities, railroads and pipelines. EXCHANGE PARTNER acknowledges the attached Exhibit is a preliminary draft and is subject to change to accommodate changes including, but not limited to, changes in local, state or federal standards/Government standards. This preliminary draft may be modified based on issues that may arise, including, but not limited to, the outcome of all environmental analyses and studies, including the NEPA process. The delivery of the Quitclaim Deed to the EXCHANGE PARTNER for the Government property and acceptance of the conveyance of the EXCHANGE PARTNER property, shall be deemed full performance by the Government of its obligations hereunder with regard to the Government property conveyed thereby, except for the continuing obligation of the Government provided for in the deed of conveyance, and as may be specifically provided for in this Agreement. The EXCHANGE PARTNER shall remain liable for all losses and damages to the Private property not yet conveyed to the Government hereunder, and for all damages or injuries to persons or property occurring thereon or related thereto (except as may be caused by the negligence or willful misconduct of the Government or its agents), prior to the conveyance of said property to the Government hereunder.

**T.** EXCHANGE PARTNER shall coordinate with the Government in completing a real

property accountability form, DD1354 - Transfer and Acceptance of Military Real Property, in the format required. The EXCHANGE PARTNER shall furnish a draft of the document to the Government, upon transfer of title to the property and its improvements, which will then be reviewed and finalized for final approval and execution by the Government.

**U.** EXCHANGE PARTNER shall provide an Engineering Feasibility Study (for construction non-government land)/or a statement of constructability (for government land) which provides that the construction site is adequate for the construction of the Replacement Facilities **Exhibit** ___.

## IV. OBLIGATIONS OF THE GOVERNMENT

**A**. The Government will provide EXCHANGE PARTNER with access to all historical and environmental data for the Government Property consistent with applicable law and regulation. If any such data has been marked as "For Official Use Only", the Commander 99th Regional Support Command or his or her delegate will coordinate with the appropriate record custodian for release to EXCHANGE PARTNER for use related to this Agreement. EXCHANGE PARTNER agrees that, to the extent permitted by STATE law, use of any such data will be used solely for the purposes of this exchange action and that no data will be disclosed outside of EXCHANGE PARTNER or its environmental contractors, or consultants, if any, without the express written permission of the record custodian.

**B**. The Government has provided all environmental analyses and documentation necessary for the exchange of the properties.

**C**. The Government has provided the ECP for both the Government Property and EXCHANGE PARTNER Property.

**D**. The Government has provided the FOST for the Government property.

**E**. The Government has provided the EA and FNSI for the disposal of the Government property, as required and satisfactorily to the Government.

**F**. The Government has acquired a plat, survey, and legal description of the parcels of land suitable for recordation in the local land records as required by New Jersey law.

**G.** The Government has provided appraisals of the properties through the U. S. Army Corps of Engineers, Savannah District.

**H**. The Government has provided all consultation on behalf of the Government required under Section 106, NHPA, as implemented in 36 C.F.R. Section 800.

**I.** The Government will complete the necessary preliminary requirements and prepare and obtain such outgrants for the use of the properties, at the Exchange Partner's expense as set forth in the Letter Agreement. The Government will not unreasonably deny any appropriate request for use

of Government Property for such purposes. Outgrants will be issued by the appropriate authorities in accordance with AR 405-80. [DELETE THIS PARAGRAPH IF NOT APPROPRIATE FOR THE TRANSACTION]

**J**. The Government will obtain acceptable title insurance on the property to be conveyed to the Government on behalf of the Government.

**K**. The Government will reasonably approve all engineering and environmental reviews/analysis and required real estate documents related to this exchange.

**L**. The Government will conduct all NEPA reviews and execute Records of Environmental Consideration for any NEPA Categorical Exclusions, if necessary. If the Government determines that an EA is required for either of these actions, it will notify EXCHANGE PARTNER as soon as is practicable after making such determination.

**M**. The Government will not unreasonably delay acceptance of the construction of the Replacement Facilities because of incidental items of a minor nature which remain to be completed and which would not unduly delay occupancy and use of such building for the purpose for which it is intended, unless items specified in paragraph III.K. have not been furnished.

**N**. The Government will, within sixty (60) days of acceptance of the construction of the Replacement Facilities by the Government, convey by Quitclaim Deed, preliminary, not final, draft of which is attached as **Exhibit** __, the Government's interest to the 24± acres, more or less, subject to existing easement(s) for public roads and highways, utilities, railroads and pipelines. EXCHANGE PARTNER acknowledges the attached Exhibit is a preliminary draft and is subject to change to accommodate changes, including, but not limited to, changes in local, state or federal standards. This preliminary draft may be modified based on issues that may arise, including, but not limited to, the outcome of all environmental analyses and studies, including the NEPA process. Upon conveyance of the (Government property) to the EXCHANGE PARTNER as provided herein, the Government shall have no responsibility for the provision of police, fire, emergency medical services, trash pick-up, road maintenance, utility services or any other maintenance or other municipal type services to said property.

**O**. All of the Government property is conveyed under this Agreement in an "as is", "where is," condition, without any representation or warranty whatsoever by the Government or its agents concerning the state of repair or condition of said property, except as may otherwise be specifically provided hereunder or within the deed of conveyance.

## V. MUTUAL OBLIGATIONS

**A**. The Deeds/Bill of Sale shall be exchanged contemporaneously, after the Government has provided final acceptance of the Warranty Deed/Bill of Sale and all supporting documentation as referenced in III.K.2 herein.

**B**. The parties agree to immediately notify each other of any significant change in community sentiment or opposition to the proposed exchange by local, state or Federal Government officials.

**C**. Should retrocession of legislative jurisdiction be required for the property to be conveyed by the Government, both parties agree to make all efforts necessary to effectuate such retrocession, at the Exchange Partner's expense as set forth in the Letter Agreement.

**D.** EXCHANGE PARTNER, its contractors, and subcontractors shall comply with the requirements of the Davis-Bacon Act, Federal Acquisition Regulation (FAR) Section 52.222-6.

**VI. DISPUTES**

**A.** This contract is subject to the Contract Disputes Act of 1978, 41 U.S.C. 7101-7109 et seq., as amended. Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

**B.** "Claim", as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.

**C.** A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the EXCHANGE PARTNER seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by the following paragraph. A voucher, invoice or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act by complying with the submission and certification requirements of this clause, if it is disputed either as to a liability or amount or is not acted upon in a reasonable time.

**D.** A claim by the EXCHANGE PARTNER shall be made in writing and submitted to the Contracting Officer for a written decision. A claim by the Government against the EXCHANGE PARTNER shall be subject to a written decision by the Contracting Officer. For EXCHANGE PARTNER claims exceeding $100,000, the EXCHANGE PARTNER shall submit with the claim a certification that the claim is made in good faith, supporting data are accurate and complete to the best of the EXCHANGE PARTNER's knowledge and belief and the amount requested accurately reflects the contract adjustment for which the EXCHANGE PARTNER believes the Government is liable.

**E.** If the EXCHANGE PARTNER is an individual, the individual shall execute the certification. If the EXCHANGE PARTNER is not an individual, the certification shall be executed by a senior company official in charge at the EXCHANGE PARTNER's plant or location

involved or an officer or general partner of the EXCHANGE PARTNER having overall responsibility for the conduct of the EXCHANGE PARTNER's affairs.

**F.** For the EXCHANGE PARTNER claims of $100,000 or less, the Contracting Officer must, if requested in writing by the EXCHANGE PARTNER, render a decision within 60 days of the request. For EXCHANGE PARTNER certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the EXCHANGE PARTNER of the date of which the decisions will be made.

**G.** The Contracting Officer's decision shall be final unless the EXCHANGE PARTNER appeals or files a suit as provided in the Act.

**H.** The Government shall pay interest on the amount found due and unpaid from (1) the date the Contracting Office receives the claim (property certified if required) or (2) the date payment otherwise would be due, if that date is later, until the date of payment. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6 month period as fixed by the Treasury Secretary during the pendency of the claim.

**I.** The EXCHANGE PARTNER shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal or action arising under the contract and comply with any decision of the Contracting Officer or District Engineer, U.S. Army Engineer District, Savannah, Georgia.

**J.** Notwithstanding any other provision of the Contract Disputes Act of 1978, as amended, the EXCHANGE PARTNER and the Contracting Officer or District Engineer, U.S. Army Engineer District, Savannah, Georgia, may use any alternative means of dispute resolution under 5 USC 571, or other mutually agreeable procedures, for resolving claims. The EXCHANGE PARTNER shall certify the claim when required to do so as provided under this Act or as otherwise required by law. All provisions of 5 USC 58 et seq shall apply to such alternative means of dispute resolution.

## VII. MISCELLANEOUS PROVISIONS

**A.** This Agreement incorporates and includes all prior negotiations and agreements, except the Letter Agreement (Exhibit ___), applicable to the matters contained herein. The parties agree that this Agreement constitutes the entire understanding between the parties and supersedes previous representations whether written or oral and any other written or oral agreement between the parties.

**B.** This Agreement may be amended only by written mutual consent of the parties to this Agreement.

**C**. This transaction requires that the Government will receive replacement land and facilities that are equal to or greater than the value of the existing land and Replacement Facilities located at 90 Harbor Drive, 120 Harbor Drive, and 145 Industrial Drive, Bayonne, New Jersey.

**D**. Nothing contained in this Agreement will make or will be construed to make the parties hereto partners or joint venturers with each other nor be construed to render either of the parties hereto liable to any third party for debts or obligations of the other party hereto.

**E**. The failure of either party to insist upon strict performance of any of the terms, covenants, or conditions of this Agreement shall not be construed as a waiver or a relinquishment of that party's rights to future performance of any such term(s), covenants, or conditions by the other party.

**F**. All personal pronouns used in this Agreement, whether used in the masculine, feminine, or neuter gender, will include all other genders.

**G**. EXCHANGE PARTNER may not transfer or assign its rights and interests in and under this Agreement without the written consent of the Government. The covenants, agreements, rights, and responsibilities contained in this Agreement inure to the benefit of and are binding upon the parties hereto, their successors, and assigns. Nothing in this Agreement shall be construed as creating any rights of enforcement against any persons or entities that are not a party hereto, nor shall this agreement be construed as creating any rights, interest, or third party beneficiary status for any persons or entities not a signatory to this Agreement.

**H.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void then both parties shall be relieved of any obligations under that provision. Notwithstanding such a finding, this Agreement shall remain in full force and effect and be binding on the parties hereto as to the remaining terms to the fullest extent permitted by law.

**I**. **Notices**. A notice, demand, or other communication under this Agreement by either party to the other shall be sufficiently given or delivered if it is dispatched by registered or certified mail, postage prepaid, return receipt requested, or delivered personally, and, (1) in the case of the Government, is addressed to:

U.S. Army Corps of Engineers
Savannah District
Attn: Chief, Real Estate Division
100 W. Oglethorpe Ave
Savannah, Georgia 31041

and, (2) in the case of the EXCHANGE PARTNER, is addressed to:

LCG 1 Chapel Ave LLC
Attn: Lance Lucarelli

534 Broadway
Bayonne, New Jersey 07002

or such other address with respect to either party as that party may, from time to time, designate in writing and forward to the other party as provided in this Section.

**VIII. ANTI-DEFICIENCY ACT**

Should it be construed that the Government shall have been obligated under this Agreement to pay or reimburse any money hereunder, nothing in this Agreement shall be interpreted to require obligations or payments by the United States in violation of the Anti-Deficiency Act, as amended, 31 U.S.C. §1341.

**IX.** The effective date of this Agreement shall be the date on which this Agreement has been signed by the Deputy Assistant Secretary of the Army.

DRAFT

*DRAFT EXCHANGE AGREEMENT FOR REVIEW PURPOSES ONLY*

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and seals on the date subscribed opposite their respective names.

**LCG 1 CHAPEL AVE LLC**

____________________ BY: ____________________

Date Lance Lucarelli

TITLE: ____________________

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE ARMY**

____________________ BY: ____________________

Date

Brenda Johnson-Turner
Director of Real Estate

DRAFT

"BELOW ARE THE RECOMMENDED EXHIBITS FOR EACH EXCHANGE AGREEMENT"

*DRAFT EXCHANGE AGREEMENT FOR REVIEW PURPOSES ONLY*
(SAMPLE LIST) **EXHIBITS**

EXHIBIT __ - DD 1391

EXHIBIT __ - DESIGN NARRATIVE

EXHIBIT __ - GOVERNMENT PROPERTY - LEGAL DESCRIPTIONS

EXHIBIT __ - EXCHANGE PARTNER PROPERTY – PROPERTY DESCRIPTION

EXHIBIT __ - LEASEBACK

EXHIBIT __ - ECP

EXHIBIT __ - FOST

EXHIBIT __ - EA

EXHIBIT __ – FNSI

EXHIBIT __ - NHPA

EXHIBIT __ – PROJECT MAPS– GOVERNMENT PROPERTY

EXHIBIT __ – SURVEY – EXCHANGE PARTNER PROPERTY

EXHIBIT __ - CONSTRUCTION MANAGEMENT AGREEMENT

EXHIBIT __ - PERFORMANCE BOND

EXHIBIT __ - PAYMENT BOND

EXHIBIT __ - DRAFT WARRANTY DEED/DRAFT BILL OF SALE

EXHIBIT __ - DRAFT QUITCLAIM DEED

EXHIBIT __ - LICENSE FOR CONSTRUCTION

EXHIBIT __ - LETTER AGREEMENT

EXHIBIT __ - CONSTRUCTION SCHEDULE

DRAFT

DRAFT

# EXHIBIT 4

**Summary of Exchange Terms and Conditions**
**For Army Reserve Centers**
**located at the Caven Point and Lodi, New Jersey**
**By and Between**
**The United States of America, Acting By and Through**
**the Army Corps of Engineers**
**and**
**LCG 1 Chapel Ave LLC**

**Army:** United States of America, acting by and through the Department of the Army, Army Corps of Engineers ("**Army**").

**Exchange Partner:** LCG 1 Chapel Ave LLC (**"LCG"**).

**Purpose:** The Army and LCG desire to do a Real Property Exchange (RPX) under the authority of 10 USC 18240 and have agreed, in principle, to the principal terms and conditions herein to be included in an Exchange Agreement. Although the Army and LCG mutually intend to pursue an Exchange Agreement based on these terms and conditions, the intent to proceed and these terms and conditions are not binding upon either party unless and until incorporated into an Exchange Agreement signed by both parties following the process set forth herein.

**U.S. Army Reserve Centers (USARC) Descriptions:** Caven Point USARC - Approximately 27 acres of land and improvements in Jersey City, New Jersey, as more particularly described in Exhibit A (Caven Point project map).

Alexander Hamilton USARC – Approximately 5.33 acres of land and improvements in Lodi, New Jersey, as more particularly described in Exhibit B (Lodi project map).

Caven Point USARC and Alexander Hamilton USARC are referred to as the ("Reserve Center Parcels").

**LCG Owned Parcel Description:** Approximately 20 acres of land in Jersey City, New Jersey as more particularly described in Exhibit C ("LCG Parcel"). Land acreage to be confirmed via land survey, which will be an exhibit to the Exchange Agreement.

**Legal Authority:** Section 18240 of title 10, United States Code ("Section 18240").

**Exchange:** In consideration for the Army conveyance of the Reserve Center Parcels to the LCG, LCG shall convey the LCG Parcel to the Army and construct a new reserve center to include a 66,376 square foot Training Building, a 9,092 square foot Maintenance Building, a 4,254 square foot Unheated Storage Building, and supporting facilities, as listed on Exhibit D (DD 1391), on the parcel. The LCG Parcel and improvements are at least equal in value to the Army conveyance.

**Condition of Property:** LCG and the Army shall each have an opportunity to inspect and investigate the condition of the various properties prior to the execution of any Exchange Agreement. The Reserve Center Parcels shall be transferred in an "as-is" "where-is" condition, remediated to industrial standards by the Army. Any response or corrective action found to be necessary after the conveyance will be completed in accordance with CERCLA and Department of Defense policy. The LCG Parcel must be environmentally acceptable under federal law and regulations for acquisition by the United States. Nevertheless, nothing in this Summary of Exchange Terms and Conditions shall waive or otherwise modify the obligations of the parties under CERCLA or other provisions of law.

**Administrative Costs:** LCG agrees to reimburse the Army for the Army's reasonable agreed upon administrative costs pursuant to section 2695 of title 10, United States Code, and that certain Letter Agreement between the United States Army and LCG 1 Chapel Ave LLC dated May 5, 2015, in an estimated amount of one hundred eighty six thousand ($186,000.00) dollars, not to exceed $600,000.00.

**Terms and Conditions:** Prior to signing the Exchange Agreement, LCG will, but not limited to:

1. File an application with the Jersey City Planning Board to obtain development approvals for the construction of the new reserve center on the LCG Parcel.

2. File an application with the Jersey City Planning Board to obtain development approvals for the portion of the Caven Point USARC not subject to the leaseback but will not commence any construction until after closing and the exchange of deeds.
3. Provide evidence that clear title can be provided per Department of Justice standards to the LCG Parcel.
4. Close on the purchase of the LCG Parcel to become the fee owner of the LCG Parcel.
5. Terminate all leases on the LCG Parcel.
6. Provide a start date for the construction of the new reserve center.
7. Provide a Performance Bond for the construction of the new reserve center to ensure the delivery of a complete and useable facility prior to the exchange of deeds.
9. Conduct any environmental due diligence on the LCG Parcel and on the Reserve Center Parcels deemed necessary for its own purposes.

Prior to signing the Exchange Agreement the Army will, but not limited to:

1. Determine Fair Market Value of the Reserve Center Parcels and the LCG Parcel.
2. Complete Environmental Condition of Properties (ECPs) for the Reserve Center Parcels and the LCG Parcel. The Government will conduct clean-up to CERCLA standards consistent with past use of the property.
3. Comply with the National Environmental Policy Act (NEPA).
4. Conduct any environmental due diligence on the LCG Parcel deemed necessary for its own purposes. The Government shall have the option to make the determination that LCG Parcel is not environmentally acceptable for the RPX.
5. Obtain the survey/legal description for the LCG Parcel.
6. Provide maps/legal descriptions of the Reserve Centers Parcels.
7. Provide the unexecuted Quitclaim Deeds for the Reserve Center Parcels, the unexecuted Warranty Deed for the LCG Parcel, and the leaseback for a portion of the Caven Point USARC.
8. Consent (provide non-objection letter) to the submission of an application by LCG to the Jersey City Planning Board to obtain development approvals for the portion of the Caven Point USARC not subject to the leaseback and the LCG Parcel.

**Exchange Agreement:** Following the negotiation of satisfactory terms and conditions, the Army and LCG will prepare and execute an Exchange Agreement setting forth the terms, conditions and schedule for the exchange of the Reserve Center Parcels for the LCG Parcel and construction of a 66,376 square foot Training Building, a 9,092 square foot Maintenance Building, a 4,254 square foot Unheated Storage Building, and supporting facilities. The Exchange Agreement shall also include terms and conditions for the leaseback to the Army of the portion of the Caven Point USARC that contains the existing buildings and facilities currently used by the Army, as defined on Exhibit E (leaseback), and the remaining portion of the Caven Point USARC not subject to the leaseback may be developed by LCG pursuant to local land use, zoning and development regulations. The Exchange Agreement shall include as exhibits, among other things: DD 1391, Design Narrative (to be provided by LCG after execution of the Exchange Agreement), Performance Bond, Construction Schedule, survey/legal description for the LCG Parcel, maps/legal descriptions for the Reserve Center Parcels, NEPA documents, Environmental Condition of Properties (ECPs) for the Reserve Center Parcels and the LCG Parcel, Leaseback, Finding of Suitability to Transfer (FOST), unexecuted Quitclaim Deeds for the Reserve Center Parcels, and unexecuted Warranty Deed for the LCG Parcel.

**Project Plan:** The Project Plan is detailed in the milestones, Exhibit F (milestones). If the Exchange Agreement is not signed by December 31, 2016, the RPX is terminated.

**Exhibits:** The following exhibits are attached and made a part of this Summary of Exchange Terms and Conditions:

| | |
|---|---|
| Exhibit A: | Caven Point project map |
| Exhibit B: | Lodi project map |
| Exhibit C: | LCG Parcel |
| Exhibit D: | DD 1391 |
| Exhibit E: | Portion of Caven Point USARC subject to leaseback |
| Exhibit F: | Milestones |

**Summary of Exchange Terms and Conditions**
**Army Reserve Center at Caven Point/Lodi, NJ**
Page 5.

**APPROVED:**
LCG 1 CHAPEL AVE LLC

Lance Lucarelli

Date: 4-4-2016

WITNESS:

By:

**APPROVED:**
UNITED STATES OF AMERICA,
BY U.S. ARMY CORPS OF ENGINEERS

Real Estate Contracting Officer

Date: 4/7/2016

WITNESS:

By:




TRACT REGISTER

| DIR. | TRACT | LAND OWNER | ACREAGE FEE | ACREAGE EASM'NT | ACREAGE LICENSE | REMARKS |
|---|---|---|---|---|---|---|
| 1 | A | DEPARTMENT OF THE ARMY | 27.34 | | | Reassigned From Caven Point Army Terminal – Inst.1408 By 11th Ind. DCSLOG Dtd.12-27-60 (Par.1 0.42 Ac., Par.2 0.22 Ac., Par.3 18.30 Ac. And Par.4 5.40 Ac.) |
| 2 | B | DEPARTMENT OF THE ARMY | 28.00 | | | Reassigned From Caven Point Army Terminal – Inst.1408 By 7th Ind. DCSLOG Dtd. 1-26-62 (Par.1 10.00 Ac. And Par.2 18.00 Ac.) |
| 3 | C | DEPARTMENT OF THE ARMY | 28.00 | | | Reassigned From Caven Point Army Terminal – Inst.1408 By Comment No.2 DCSLOG Dtd.4-12-63 |
| 4 | D | DEPARTMENT OF THE ARMY | 219.84 | | | Reassigned From Caven Point Army Terminal – Inst.1408 By DF DCSLOG Dtd. 8-14-64 |
| 4 | EL-1 | DEPARTMENT OF THE ARMY (ESSO STANDARD OIL COMPANY) | | | 0.02 | License For Road, Trestle And Pipe Lines Dtd. 8-5-44 – Sup.Ag. Dtd.10-7-52 – Reassigned From Caven Point Army Terminal Inst.1408 By DF DCSLOG Dtd. 8-14-64 |
| 4 | EL-2 | DEPARTMENT OF THE ARMY (ESSO STANDARD OIL COMPANY) | | | 0.15 | License For Water Main Dtd. 6-26-44 – Sup.AG. Dtd.10-7-52 – Reassigned From Caven Point Army Terminal – Inst.1408 By DF DCSLOG Dtd. 8-14-64 |
| 5 | 100-E | CITY OF JERSEY CITY | | 3.94 | | Road Right Of Way Easement Reserved To The United States. Reservation Stated In Quitclaim Deed To City Of Jersey City, New Jersey Dated 7-6-73. |


CORPS OF ENGINEERS
U. S. ARMY
EXHIBIT B
TRACT REGISTER
DIR. No. | TRACT No. | LAND OWNER | ACREAGE FEE | PERMIT | REMARKS
A100 | MICHAEL SPINELLA | 4.47 | Civil No. 818-55 Filed 9-6-55.
DELEGATED AUTHORITY | A101 P | STATE OF NEW JERSEY | 0.20 | Permit For Sewer Line From 5-15-56 Contract No. NYDRE (A) 3009.
102 | STATE OF NEW JERSEY | 0.86 | Deed Dated 3-20-67 Acquisition Of The Tract Was Accomplished In Exchange For The Grant Of A Road Easement
LANDS OF NEW JERSEY STATE NATIONAL GUARD
RAMP FROM ESSEX STREET
NEW JERSEY ROUTE STATE 17
HIGHWAY
STREET
ESSEX
RAMP TO ESSEX STREET
NOTE
FINAL
PROJECT MAP
DEPT. OF THE ARMY
USING SERVICE U. S. A. R.
LOCATION OF PROJECT
STATE NEW JERSEY
COUNTY BERGEN
DIVISION NORTH ATLANTIC
DISTRICT NEW YORK
ARMY AREA FIRST
TRANSPORTATION FACILITIES
RAILROADS ERIE
FEDERAL ROADS 46
ACQUISITION
TOTAL ACRES ACQUIRED 5.53
DISPOSAL
TOTAL ACRES DISPOSED OF
LEGEND
RESERVATION LINE
TRACT BOUNDARY LINE
TRACT NUMBER
CONTOUR LINE
DISPOSAL
STATE INDEX
SITE
NEW JERSEY
VICINITY MAP
STATUTE MILES
ACQUISITION AUTHORIZATION
DELEGATED AUTHORITY
DEPARTMENT OF THE ARMY
NORTH ATLANTIC DIVISION
DRAWN BY M.A.C.
TRACED BY M.A.C.
REAL ESTATE
UNITED STATES ARMY RESERVE CENTER
HACKENSACK, (LODI) N. J.
MILITARY RESERVATION
CADASTRAL SURVEYOR
DATE 3-24-78
OFFICE, CHIEF OF ENGINEERS, WASHINGTON 25, D. C.
AUDITED
3-2-77
4384
INSTALLATION OR PROJECT NO.
SCALE IN FEET
DRAWING NO. NY-776
SUPERSEDES DRAWING NO. NJ 295
4384

# EXHIBIT C


7,140 SY's
POV PARKING
TRAINING
BUILDING
2 STORY
TRAINING
BUILDING
1 STORY
AMSA / UHS
17,485 SY's
MEP PARKING
Mason&Hanger
HARBOR DRIVE
SITE PLAN
C2


Untitled Map
Write a description for your map.
EXHIBIT E
Legend
APN:
APN:
CSAO National Docks Secondary
Chapel Ave
Jersey City Recreation
Chapel Ave
Google earth
© 2015 Google
600 ft
N

| CAVEN POINT - MAJOR MILESTONES | EXHIBIT F | | |
|---|---|---|---|
| **DATE** | **TASK** | **RESPONSIBLE** | **REMARK** |
| Novmber 19, 2015 | Site visit for environmental | All | Completed |
| March-16 | Term Sheet Signed | All | |
| March-16 | Environmental Condition of Property (ECP) Harbor Drive Property | USACE | |
| May-16 | Submit site plans drawings to Jersey City Planning Board | EP | EP needs 4-6 wks once the Term Sheet is signed to file with the City, then it's a 6 month process to get city approval. Once EP has city approval, an additional 45 days is needed for public comment, then the City gives final approval. (Both Properties) |
| May-16 | Complete/comply National Environmental Policy Act (NEPA) | USACE | |
| June-16 / July-16 | Appraisal, Title, Survey: Receive/Approve | USACE | |
| July-16 | Complete signed Finding of Suitablity to Transfer (FOST) | AR | |
| August-16 | Provide unexecuted deeds and Leaseback to the EP / Address any comments | USACE | |
| August-16 | EP own Harbor Drive property in fee | EP | |
| August-16 | EP terminate any leases on Harbor Drive & tenants moved | EP | |
| August-16 | Title update | USACE | |
| September-16 | Fully executed Exchange Agreement | EP & USACE | |
| September-16 | Start foundation design/drawings for Replacement Facility | EP | |
| September-16 | Start construction architectual drawings of Replacement Facility | EP | design/construction drawings will take 6 months. This includes getting permit and 45 days for the City to review/approve. |

| | | | |
|---|---|---|---|
| December-16 | Site plan drawings approval by Jersey City Planning Board | EP | |
| December-16 | Peformance Bond | EP | USACE to draft bond language and determine amount to ensure complete and usable. |
| December-16 | Quitclaim deed signed by the Director of Real Estate | USACE | |
| December-16 | Warranty deed signed by the EP | EP | |
| December-16 | Exchange deeds / Leaseback | USACE & EP | Caven Point QC Deed for Harbor Dr Warranty Deed |
| December-16 | EP provide a Construction Schedule | EP | |
| January-17 | Start construction of foundation | | 18-24 months for construction |
| March-17 | USACE/ARIMD/99th approve design/construction architectual drawings of Replacement Facility | USACE & AR | |
| March-17 | Jersey City approval of completed design/construction drawings of Replacement Facility | EP | |
| March-17 | Start architectual construction | EP | |
| Sept 17 - Mar 18 | Construction Completed | EP | |
| FY19 | Lodi Remediation completed | | 99th RSC confirmed remediation should be completed sometime in FY19. The contract should be awarded this year, then will be able to provide a more accurate date. |
| FY19 | Convey Lodi USARC via QC Deed | USACE | Lodi QC Deed will be given to the EP once the new Caven Point USARC is complete and usuable. |

# EXHIBIT D

| 1. COMPONENT | FY 2019 MILITARY CONSTRUCTION PROJECT DATA | 2. DATE |
|---|---|---|
| AR | | Nov 12 |

| 3. INSTALLATION AND LOCATION | 4. PROJECT TITLE |
|---|---|
| Caven Point USARC<br>Jersey City,NJ | Army Reserve Center |

| 5. PROGRAM ELEMENT | 6. CATEGORY CODE | 7. PROJECT NUMBER | 8. PROJECT COST ($000) |
|---|---|---|---|
| 0532292A | 171 | CAR 19-CVNPT | |

9. COST ESTIMATES

| ITEM | U/M | QUANTITY | UNIT COST | COST ($000) |
|---|---|---|---|---|
| PRIMARY FACILITIES: | | | | |
| Training Building | SF | 66,376 | | |
| Maintenance Building | SF | 9,092 | | |
| Unheated Storage | SF | 4,254 | | |
| Sustainability/Energy Measures | LS | – | | |
| SUPPORTING FACILITIES: | | | | |
| Site Improvement | LS | – | | |
| MEP/Aprons | SY | 17,485 | | |
| POV Parking | SY | 7,140 | | |
| Access Roads | SY | 5,000 | | |
| Information Systems | LS | – | | |
| Antiterrorism/Force Protection | LS | – | | |
| TOTAL CONSTRUCTION COST | | | | |
| Contingencies (5.0%) | | | | |
| Supervision and Administration (5.7%) | | | | |
| TOTAL PROJECT COST | | | | |
| Equipment Provided By Exchange Partner | | | (Non-Add) | |

10. DESCRIPTION OF PROPOSED CONSTRUCTION

Construct a 600-member Army Reserve Center (ARC). Primary facilities include construction of an ARC training building, Organizational Maintenance Shop (OMS), and unheated storage building. Buildings will be of permanent construction with reinforced concrete foundations; concrete floor slabs; reinforced concrete or masonry walls; low-slope or sloped roof; Heating, Ventilation and Air Conditioning (HVAC); and plumbing, mechanical, security and electrical systems. Supporting facilities include land clearing, paving, fencing, general site improvements and utility connections. Accessibility for the disabled will be provided. Anti-Terrorism/Force Protection (AT/FP) and physical security measures will be incorporated into the design including maximum standoff distances from roads, parking areas and vehicle unloading areas. Sustainability/Energy measures will be provided. Facilities will be designed to a minimum life of 50 years. Energy efficiencies meeting, on average, American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) 189.1 standards through improved building envelope and integrated building systems performance.

| 1. COMPONENT<br>AR | FY 2019 MILITARY CONSTRUCTION PROJECT DATA | 2. DATE<br>Nov 12 |
|---|---|---|
| 3. INSTALLATION AND LOCATION<br>Caven Point USARC<br>Jersey City,NJ | | |
| 4. PROJECT TITLE<br>Army Reserve Center | | 5. PROJECT NUMBER<br>CAR 19-CVNPT |

10. DESCRIPTION OF PROPOSED CONSTRUCTION (CONT)

MISSION : Existing A/C Tonnage : 222

11. REQUIREMENT: 79,722 SF Adequate: 0 SF Substandard: 0 SF

PROJECT:

Construct a 600-member ARC training building, OMS, and unheated storage building. (Current Mission)

REQUIREMENT:

To be located in the vicinity of Caven Point, this project will provide a 600-member training facility with administrative, educational, assembly, library, learning center, vault, weapons simulator, and physical fitness areas for twenty two Army Reserve units. The maintenance shop will provide work bays and maintenance administrative support. The project will also provide for unit storage and adequate parking space for military and privately-owned vehicles.

CURRENT SITUATION:

Located on 6.45 acres of land in Lodi, NJ, the Alexander Hamilton United States Army Reserve Center (USARC) was constructed in 1956 and consists of a 38,583 sf training building and 6,298 sf OMS. Located on 26.99 acres of land in Jersey City, NJ, the Caven Point USARC was constructed in 1965 and consists of a 50,419 sf training building and 9,814 sf OMS. Neither facility is properly configured to meet current mission requirements or AT/FP setback standards.

IMPACT IF NOT PROVIDED:

If this project is not provided, the units will be forced to operate and train in facilities not properly configured to allow the most effective training to complete mission requirements. This will continue to have a negative impact on training and retention objectives.

ADDITIONAL:

A parametric cost estimate based upon project engineering design was used to develop this budget estimate. Sustainable principles will be integrated into the design, development, and construction of the project in accordance with Executive Order 13123 and other applicable laws and Executive Orders. This project has been coordinated with the installation physical security plan, and all physical security measures are included. All required anti-terrorism/force protection measures are included. Alternative methods of meeting this requirement have been explored during project development. This project is the only feasible option to meet the requirement. The Deputy Assistant Secretary of the Army (Installation and Housing) certifies that this project has been considered for joint use potential. The facility will be available for use by other components.

12. SUPPLEMENTAL DATA

a. Estimated design data:

| 1. COMPONENT | FY 2019 MILITARY CONSTRUCTION PROJECT DATA | 2. DATE |
|---|---|---|
| AR | | Nov 12 |

3. INSTALLATION AND LOCATION
Caven Point USARC
Jersey City,NJ

4. PROJECT TITLE
Army Reserve Center

5. PROJECT NUMBER
CAR 19-CVNPT

12. SUPPLEMENTAL DATA

(1) Status:
(a) Date Design Started.................................. _
(b) Percent Complete As Of .......................... _
(c) Date Design 35% Complete........................... _
(d) Date Design Complete................................ _
(e) Parametric Cost Estimating Used to Develop Cost...... Yes
(f) Type of Design Contract............................ Design - Bid - Build

(g) An energy study and life cycle cost analysis will be documented during the final design.

(2) Basis:
(a) Standard or Definitive Design....................... No
(b) Where Design Was Most Recently Used................. N/A

(3) Total Cost (c) = (a) + (b) or (d) + (e) ($000):
(a) Production of Plans and Specifications............... _
(b) All Other Design Costs............................. _
(c) Total.............................................. _
(d) Contract........................................... _
(e) In-house........................................... _

(4) Construction Award.................................. _
(5) Construction Start.................................. _
(6) Construction Completion............................. _

b. Equipment associated with this project will be provided by the exchange partner:

| Equipment Nomenclature | Procuring Appropriation | Fiscal Year Appropriated or Requested | Cost ($000) |
|---|---|---|---|
| Furniture | OMAR | 2020 | |
| Collateral Equip. | OMAR | 2020 | |
| IT Equipment | OMAR | 2020 | |
| | | Total: | |

Point of Contact: Mr. Gregory, (703) 806-6779

| 1. COMPONENT | FY 2019 GUARD AND RESERVE MILITARY CONSTRUCTION | 2. DATE |
| --- | --- | --- |
| AR | | Nov 12 |
| 3. INSTALLATION AND LOCATION | | 4. AREA CONSTR COST INDEX |
| Caven Point USARC,Jersey City, NJ | | 1.2 |

5. FREQUENCY AND TYPE UTILIZATION

| | | |
| --- | --- | --- |
| Reservist | 3 weekends/month | 1 nights/week |
| Full-Time Personnel - | 5 days/week | |

6. OTHER ACTIVE/GUARD/RESERVE INSTALLATIONS WITHIN 15 MILE RADIUS

ARNG, Armory, Jersey City, NJ - 1 Miles, 0 SF,
USA, Base, Ft Hamilton, NY - 15 Miles, 0 SF,
AR, Center, Staten Island, NY - 13 Miles, 0 SF,
ARNG, Armory, Tea neck, NJ - 11 Miles, 0 SF,
USAR, Center, Bronx, NY - 13 Miles, 0 SF,

7. PROJECTS REQUESTED IN THIS PROGRAM

| CATEGORY CODE | PROJECT TITLE | SCOPE | COST ($000) | (DESIGN STATUS) START | COMPLETE |
| --- | --- | --- | --- | --- | --- |
| 171 | Army Reserve Center | 79,722 SF | | N/A | N/A |

8. STATE RESERVE FORCES FACILITIES BOARD RECOMMENDATION

Facilities identified in item 6 have been examined by the 13 Sep 2012 *(Date)* Joint Service Reserve Component Facility Board for possible joint use/expansion. The board recommends unilateral construction.

9. LAND ACQUISITION REQUIRED

None

0 AC (Number of Acres)

10. PROJECTS PLANNED IN NEXT FOUR YEARS

| | FISCAL YEAR | COST ($000) |
| --- | --- | --- |
| None | | |

| 1. COMPONENT | FY 2019 GUARD AND RESERVE MILITARY CONSTRUCTION | 2. DATE |
|---|---|---|
| AR | | Nov 12 |
| 3. INSTALLATION AND LOCATION<br>Caven Point USARC,Jersey City, NJ | | 4. AREA CONSTR COST INDEX<br>1.2 |

11. PERSONNEL STRENGTH AS OF 16 Nov 2012

| | PERMANENT | | | | GUARD/RESERVE | | |
|---|---|---|---|---|---|---|---|
| | TOTAL | OFFICER | ENLISTED | CIVILIAN | TOTAL | OFFICER | ENLISTED |
| AUTHORIZED | 25 | 0 | 14 | 11 | 593 | 32 | 561 |
| ACTUAL | 44 | 0 | 28 | 16 | 638 | 20 | 618 |

12. RESERVE UNIT DATA

ASGD/AUTH 108%

| UNIT DESIGNATION | STRENGTH AUTHORIZED | STRENGTH ACTUAL |
|---|---|---|
| FAC MGT OFC 99TH RSC | 0 | 0 |
| SRPC SAT NJ008 | 0 | 0 |
| 80 DET 1 (INSTR DEPT) BN ( | 28 | 30 |
| 385 DET 1 (CO C,D, E) | 54 | 52 |
| RETENTION OFFICE NJ008 | 2 | 2 |
| RETENTION OFFICE NJ009 | 1 | 1 |
| 533 CO A DISTR BSB CSB (ME | 88 | 102 |
| 320 PLT 5 (BIDS) | 31 | 18 |
| UNITS NOT SHOWN | 389 | 433 |
| Totals | 593 | 638 |

Total Units Not Shown = 14

13. MAJOR EQUIPMENT AND AIRCRAFT

| TYPE | AUTHORIZED | ACTUAL |
|---|---|---|
| Wheeled Vehicles | 198 | 121 |
| Trailers | 198 | 124 |
| Tracked Vehicles | 2 | 2 |
| Totals | 398 | 247 |

14. OUTSTANDING POLLUTION AND SAFETY DEFICIENCIES

| | ($000) |
|---|---|
| Air Pollution | 0 |
| Water Pollution | 0 |
| Safety and Occupational Health | 0 |

Project Number : CVNPT
Project Title : Army Reserve Center
FACID : NJ008

## Project Validation

The Reserve manpower potential to meet and maintain authorized strengths of all Reserve units in the area in which this facility is to be located has been reviewed in accordance with DOD Directive 1225.7. It has been determined, in coordination with all other Services having Reserve units in the area, that the number of units of the Reserve components of the Armed Forces presently located in the area and those which have been allocated to the area for future activation, is not and will not be larger than the number that reasonably can be expected to be maintained at authorized strength.

RSC/Installation Commander

REF: E-3 f(2), 140-483

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Information Systems

| Description | Authorized | Approved | Criteria |
|---|---|---|---|
| 1. Administrative Area: | | | |
| Full Time: | 21 | 21 | 1 per full time employee |
| Unit Exclusive: | 16 | 16 | 1 per auth excl space |
| Unit Common: | 15 | 15 | 1 per 6 on largest drill |
| Retention: | 1 | 1 | 1 per center |
| 2. Supply Areas: | | | |
| Supply Offices: | 5 | 5 | 1 per supply office |
| 3. Maintenance Shop Areas: | | | |
| OMS Shop Office: | 2 | 2 | 1 per 2 desks |
| AMSA Shop Office: | 0 | 0 | 1 per desk |
| AMSA Classrooms: | 0 | 0 | 1 per AMSA |
| AMSA Commo/Elec Shop: | 0 | 0 | 1 per shop |
| AMSA Instrument Repair: | 0 | 0 | 1 per shop |
| AMSA Small Arms Repair: | 0 | 0 | 1 per shop |
| OMS/AMSA Shop/Workbay Area: | 1 | 1 | 1 per shop |
| AMSA Supply Room: | 0 | 0 | 1 per shop |
| AMSA Tool Room: | 0 | 0 | 1 per shop |
| 4. Support Areas: | | | |
| Fire Alarm: | 1 | 1 | 1 per center |
| IDS/JSIDS: | 1 | 1 | 1 per center |
| Special: | 0 | 0 | as justified on encl. |
| Total Instruments: | 63 | 63 | as justified on encl. |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Information Systems

| Description | Authorized | Approved | Criteria |
|---|---|---|---|
| Construction Primary Funded ($000) | | | |
| Construction Support Funded ($000) | | | |
| Equipment Funded ($000) | | | |
| ISCE Last Modified Date | | 16/11/2012 | |
| ISCE Last Modified Date | | | |

# Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are In (DD/MM/YYYY) Format

Basic Information

RSC/Arcom : 99TH RSC FACID NJ008

Facility Name : Caven Point Usarc

Street : 1 Chapel Ave & Caven Point Rd

City : Jersey City State : NJ Zip : 07305-4020

Preparation Date of Documents : 16/11/2012

* Pattern of Facility Usage

Full Time Personnel 5 Days/Week

Reservist 1 Nights/Week

Reservist 3 Weekend/Month

* State Facility Review Board Recommendation

Date of Recommendation 13/09/2012

Recommendation is Modernization Construction

* Existing Sizes

| | |
|---|---|
| Administrative | 0 |
| Assembly | 0 |
| Kitchen | 0 |
| Weapons | 0 |
| Education | 0 |
| Storage | 0 |
| Special Training | 0 |
| Support | 0 |

Total Facility (existing/avail) : 0 / 0

Total Shop (existing/avail) : 0 / 0

Unheated Storage (existing/avail) : 0 / 0

* Land Acquisition and Additional Projects

Acres Required For Land Acquisition : 0 AC

Type Interest/ Acquisition Method : None

Acres Available : 0 AC

* Additional Project Planned in Next Years

Project 1)

Project 2)

* Nearest Six Military Installations

| | Component | Activity | City | STATE | Milt Act Dist | Size | U/M | Year Built |
|---|---|---|---|---|---|---|---|---|
| 1 | ARNG | Armory | Jersey City | NJ | 1 | 0 | SF | |
| 2 | USA | Base | Ft Hamilton | NY | 15 | 0 | SF | |
| 3 | AR | Center | Staten Island | NY | 13 | 0 | SF | |
| 4 | ARNG | Armory | Tea neck | NJ | 11 | 0 | SF | |
| 5 | USAR | Center | Bronx | NY | 13 | 0 | SF | |

# Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are In (DD/MM/YYYY) Format

* Unit Information

| | | |
|---|---|---|
| Unit Name | : | FAC MGT OFC 99TH RSC |
| UIC | : | @8BY28 |
| Drill Weekend | : | 2 |
| Type of Unit | : | TDA OTHER |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | N |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 0 | 0 | 0 | |
| Authorized | 0 | 0 | 0 | |
| Assigned | 0 | 0 | 0 | |
| **Full Time Personnel** | | | | |
| Authorized | 0 | | 0 | 3 |
| Assigned | 0 | | 0 | 3 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 3 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 0 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | N |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 0 | 0 |
| Trailers | 0 | 0 |
| Crew Served Weapons | 0 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | | |
|---|---|---|
| Unit Name | : | SRPC SAT NJ008 |
| UIC | : | W6KHJH |
| Drill Weekend | : | 2 |
| Type of Unit | : | TDA OTHER |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | N |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 0 | 0 | 0 | |
| Authorized | 0 | 0 | 0 | |
| Assigned | 0 | 0 | 0 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 4 |
| Assigned | 0 | | 0 | 4 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 4 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 0 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | N |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 0 | 0 |
| Trailers | 0 | 0 |
| Crew Served Weapons | 0 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 80 DET 1 (INSTR DEPT) BN (

UIC : W73G02

Drill Weekend : 1

Type of Unit : TDA USAR SCHOOL

Accounts :

| | |
|---|---|
| Unit Supply | Y |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 2 | 0 | 26 | |
| Authorized | 2 | 0 | 26 | |
| Assigned | 2 | 0 | 28 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 1 |
| Assigned | 0 | | 1 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 1 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 1 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 1 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 56 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 0 | 0 |
| Trailers | 0 | 0 |
| Crew Served Weapons | 0 | |
| Rcas Workstations | 1 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

# Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are In (DD/MM/YYYY) Format

* Unit Information

Unit Name : 385 DET 1 (CO C,D, E)

UIC : W76702

Drill Weekend : 2

Type of Unit : TDA USAR SCHOOL

Accounts :

| | |
|---|---|
| Unit Supply | Y |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 6 | 0 | 48 | |
| Authorized | 6 | 0 | 48 | |
| Assigned | 4 | 0 | 48 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 1 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 3 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 3 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 24 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 0 | 0 |
| Trailers | 0 | 0 |
| Crew Served Weapons | 5 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | | |
|---|---|---|
| Unit Name | : | RETENTION OFFICE NJ008 |
| UIC | : | W8BYRD |
| Drill Weekend | : | 1 |
| Type of Unit | : | TDA OTHER |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | N |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 0 | 0 | 2 | |
| Authorized | 0 | 0 | 2 | |
| Assigned | 0 | 0 | 2 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 2 | 0 |
| Assigned | 0 | | 2 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 2 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 0 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | N |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 0 | 0 |
| Trailers | 0 | 0 |
| Crew Served Weapons | 0 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT
Project Title: Army Reserve Center
Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : RETENTION OFFICE NJ009
UIC : W8BYRE
Drill Weekend : 1
Type of Unit : TDA OTHER

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | N |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 0 | 0 | 1 | |
| Authorized | 0 | 0 | 1 | |
| Assigned | 0 | 0 | 1 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 1 | 0 |
| Assigned | 0 | | 1 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 1 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 0 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | N |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 0 | 0 |
| Trailers | 0 | 0 |
| Crew Served Weapons | 0 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT
Project Title: Army Reserve Center
Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 533 CO A DISTR BSB CSB (ME
UIC : WRD6A0
Drill Weekend : 3
Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | Y |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 4 | 2 | 82 | |
| Authorized | 4 | 2 | 82 | |
| Assigned | 4 | 0 | 98 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 3 | 0 |
| Assigned | 0 | | 3 | 2 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 2 |
| Supply | 1 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 1 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 1 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 12 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 43 | 26 |
| Trailers | 83 | 50 |
| Crew Served Weapons | 24 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 320 PLT 5 (BIDS)

UIC : WRJFA5

Drill Weekend : 3

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 30 | |
| Authorized | 1 | 0 | 30 | |
| Assigned | 0 | 0 | 18 | |
| **Full Time Personnel** | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 1 | 1 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 1 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 8 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 15 | 9 |
| Trailers | 7 | 5 |
| Crew Served Weapons | 1 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | |
|---|---|
| Unit Name : | 411 PLT 5 (BIDS) |
| UIC : | WRJQA5 |
| Drill Weekend : | 3 |
| Type of Unit : | MTOE |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 30 | |
| Authorized | 1 | 0 | 30 | |
| Assigned | 1 | 0 | 19 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 1 |
| Assigned | 0 | | 8 | 2 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 1 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 9 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 15 | 9 |
| Trailers | 7 | 5 |
| Crew Served Weapons | 1 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | |
|---|---|
| Unit Name : | 328 PLT 2 CO (SPT) |
| UIC : | WRY5A2 |
| Drill Weekend : | 3 |
| Type of Unit : | MTOE |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 29 | |
| Authorized | 1 | 0 | 29 | |
| Assigned | 0 | 0 | 39 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 1 |
| Assigned | 0 | | 4 | 1 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 1 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 1 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 3 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 2 | 2 |
| Wheeled Vehicles | 20 | 12 |
| Trailers | 9 | 6 |
| Crew Served Weapons | 4 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | |
|---|---|
| Unit Name : | DET 1, TAC PSYOP CO, DEV DET |
| UIC : | WSQSA1 |
| Drill Weekend : | 2 |
| Type of Unit : | MTOE |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 2 | 0 | 20 | |
| Authorized | 2 | 0 | 20 | |
| Assigned | 1 | 0 | 31 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 8 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 6 | 4 |
| Trailers | 3 | 2 |
| Crew Served Weapons | 0 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : DET 2, TAC PSYOP CO

UIC : WSQSA2

Drill Weekend : 2

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 15 | |
| Authorized | 1 | 0 | 15 | |
| Assigned | 0 | 0 | 17 | |
| **Full Time Personnel** | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 6 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 5 | 3 |
| Trailers | 5 | 3 |
| Crew Served Weapons | 5 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are In (DD/MM/YYYY) Format

* Unit Information

Unit Name : DET 3, TAC PSYOP CO

UIC : WSQSA3

Drill Weekend : 2

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 15 | |
| Authorized | 1 | 0 | 15 | |
| Assigned | 0 | 0 | 19 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 1 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 1 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 5 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 5 | 3 |
| Trailers | 5 | 3 |
| Crew Served Weapons | 5 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : DET 4, TAC PSYOP CO

UIC : WSQSA4

Drill Weekend : 2

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 15 | |
| Authorized | 1 | 0 | 15 | |
| Assigned | 1 | 0 | 15 | |
| **Full Time Personnel** | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 6 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 5 | 3 |
| Trailers | 5 | 3 |
| Crew Served Weapons | 5 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : DET 5, TAC PSYOP CO

UIC : WSQSA5

Drill Weekend : 2

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 15 | |
| Authorized | 1 | 0 | 15 | |
| Assigned | 0 | 0 | 17 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 6 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 5 | 3 |
| Trailers | 5 | 3 |
| Crew Served Weapons | 5 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | | |
|---|---|---|
| Unit Name | : | DET, HQ, TACT PSYOP CO |
| UIC | : | WSQST1 |
| Drill Weekend | : | 2 |
| Type of Unit | : | MTOE |

Accounts :

| | |
|---|---|
| Unit Supply | Y |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 2 | 0 | 16 | |
| Authorized | 2 | 0 | 16 | |
| Assigned | 1 | 0 | 27 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 2 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 1 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 1 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 1 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 1 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 4 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 5 |
| Maintenance Administrative Personnel | 1 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 4 | 3 |
| Trailers | 2 | 2 |
| Crew Served Weapons | 6 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT
Project Title: Army Reserve Center
Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 716 TM (SPT OPS)
UIC : WSSZA1
Drill Weekend : 1
Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 1 | 6 | |
| Authorized | 1 | 1 | 6 | |
| Assigned | 1 | 0 | 11 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 5 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 1 | 1 |
| Trailers | 1 | 1 |
| Crew Served Weapons | 1 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 716 PLT 1 (POL SPT)(50K)

UIC : WSSZA2

Drill Weekend : 1

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 52 | |
| Authorized | 1 | 0 | 52 | |
| Assigned | 1 | 0 | 50 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 8 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 20 | 12 |
| Trailers | 18 | 11 |
| Crew Served Weapons | 7 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

| | |
|---|---|
| Project Number: | CVNPT |
| Project Title: | Army Reserve Center |
| Date: | Nov 16, 2012 |

All Dates are in (DD/MM/YYYY) Format

* Unit Information

| | | |
|---|---|---|
| Unit Name | : | 716 PLT 2 (POL SPT)(50K) |
| UIC | : | WSSZA3 |
| Drill Weekend | : | 1 |
| Type of Unit | : | MTOE |

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 52 | |
| Authorized | 1 | 0 | 52 | |
| Assigned | 0 | 0 | 47 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 1 | 1 |
| Assigned | 0 | | 3 | 1 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 2 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 7 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 20 | 12 |
| Trailers | 18 | 11 |
| Crew Served Weapons | 7 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 716 PLT 3 (POL SPT)(210K)

UIC : WSSZA4

Drill Weekend : 1

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 52 | |
| Authorized | 1 | 0 | 52 | |
| Assigned | 1 | 0 | 48 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 8 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 20 | 12 |
| Trailers | 18 | 11 |
| Crew Served Weapons | 9 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 716 PLT 4 (EQUIP MAINT)

UIC : WSSZA5

Drill Weekend : 1

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | N |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | Y |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 0 | 1 | 40 | |
| Authorized | 0 | 1 | 40 | |
| Assigned | 0 | 1 | 60 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 0 | 0 |
| Assigned | 0 | | 0 | 0 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 0 |
| Supply | 0 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 0 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 0 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 0 |
| Cooks | 0 |
| Automotive/Engineer Mechanics | 17 |
| Maintenance Administrative Personnel | 4 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 11 | 7 |
| Trailers | 5 | 3 |
| Crew Served Weapons | 6 | |
| Rcas Workstations | 0 | |

* Mission Information

This is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

* Unit Information

Unit Name : 716 DET (HQ)

UIC : WSSZT1

Drill Weekend : 1

Type of Unit : MTOE

Accounts :

| | |
|---|---|
| Unit Supply | Y |
| COMSEC | N |
| AGCCS | N |
| Individual Weapons | Y |
| Maintenance Office | N |

* Unit Strengths

| Reserve Personnel | Officer | WO | Enlisted | Civilian |
|---|---|---|---|---|
| Required | 1 | 0 | 15 | |
| Authorized | 1 | 0 | 15 | |
| Assigned | 2 | 0 | 23 | |
| Full Time Personnel | | | | |
| Authorized | 0 | | 4 | 0 |
| Assigned | 0 | | 5 | 1 |

* Full Time Distribution

| | |
|---|---|
| Administrators | 3 |
| Supply | 1 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative | 0 |
| General Staff Civilian Executive Officers | 0 |

* Exclusive Space

| | |
|---|---|
| General Officers | 0 |
| Principal Staff Officers | 1 |
| Colonel | 0 |
| Lieutenant Colonel | 0 |
| Major Or Below | 1 |

* Common-Use Space

| | |
|---|---|
| Members Requiring Open Office Space | 2 |
| Cooks | 7 |
| Automotive/Engineer Mechanics | 0 |
| Maintenance Administrative Personnel | 0 |
| Draftpersons | 0 |

* Special Training Areas

| | |
|---|---|
| Band Room | N |
| Weapons Simulator Room | Y |
| Physical Exam Wing | N |
| Soil Testing Lab | N |
| Photo Lab | N |
| S.C.I.F | N |
| Medical Section | N |

* Unit Equipment

| | Authorized | Actual |
|---|---|---|
| Tracked Vehicles | 0 | 0 |
| Wheeled Vehicles | 3 | 2 |
| Trailers | 7 | 5 |
| Crew Served Weapons | 12 | |
| Rcas Workstations | 0 | |

* Mission Information

This Is an Existing Mission

| | |
|---|---|
| Modernization | Y |
| Replacement | N |
| New Construction | N |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

| | | Res Strength | | | Full Time Strength | | | |
|---|---|---|---|---|---|---|---|---|
| UIC | Unit Name | OFF | WO | ENL | OFF | ENL | CIV | Drill Weekend |
| @8BY28 | FAC MGT OFC 99TH RSC | 0 | 0 | 0 | 0 | 0 | 3 | 2 |
| W6KHJH | SRPC SAT NJ008 | 0 | 0 | 0 | 0 | 0 | 4 | 2 |
| W73G02 | 80 DET 1 (INSTR DEPT) I | 2 | 0 | 26 | 0 | 0 | 1 | 1 |
| W76702 | 385 DET 1 (CO C,D, E) | 6 | 0 | 48 | 0 | 0 | 0 | 2 |
| W8BYRD | RETENTION OFFICE NJC | 0 | 0 | 2 | 0 | 2 | 0 | 1 |
| W8BYRE | RETENTION OFFICE NJC | 0 | 0 | 1 | 0 | 1 | 0 | 1 |
| WRD6A0 | 533 CO A DISTR BSB CS | 4 | 2 | 82 | 0 | 3 | 0 | 3 |
| WRJFA5 | 320 PLT 5 (BIDS) | 1 | 0 | 30 | 0 | 0 | 0 | 3 |
| WRJQA5 | 411 PLT 5 (BIDS) | 1 | 0 | 30 | 0 | 0 | 1 | 3 |
| WRY5A2 | 328 PLT 2 CO (SPT) | 1 | 0 | 29 | 0 | 0 | 1 | 3 |
| WSQSA1 | DET 1, TAC PSYOP CO, I | 2 | 0 | 20 | 0 | 0 | 0 | 2 |
| WSQSA2 | DET 2, TAC PSYOP CO | 1 | 0 | 15 | 0 | 0 | 0 | 2 |
| WSQSA3 | DET 3, TAC PSYOP CO | 1 | 0 | 15 | 0 | 1 | 0 | 2 |
| WSQSA4 | DET 4, TAC PSYOP CO | 1 | 0 | 15 | 0 | 0 | 0 | 2 |
| WSQSA5 | DET 5, TAC PSYOP CO | 1 | 0 | 15 | 0 | 0 | 0 | 2 |
| WSQST1 | DET, HQ, TACT PSYOP C | 2 | 0 | 16 | 0 | 2 | 0 | 2 |
| WSSZA1 | 716 TM (SPT OPS) | 1 | 1 | 6 | 0 | 0 | 0 | 1 |
| WSSZA2 | 716 PLT 1 (POL SPT)(50K | 1 | 0 | 52 | 0 | 0 | 0 | 1 |
| WSSZA3 | 716 PLT 2 (POL SPT)(50K | 1 | 0 | 52 | 0 | 1 | 1 | 1 |
| WSSZA4 | 716 PLT 3 (POL SPT)(21C | 1 | 0 | 52 | 0 | 0 | 0 | 1 |
| WSSZA5 | 716 PLT 4 (EQUIP MAINT | 0 | 1 | 40 | 0 | 0 | 0 | 1 |
| WSSZT1 | 716 DET (HQ) | 1 | 0 | 15 | 0 | 4 | 0 | 1 |
| | Totals | 28 | 4 | 561 | 0 | 14 | 11 | |

## Basic Project Data - Analysis/ English

Project Number: CVNPT

Project Title: Army Reserve Center

Date: Nov 16, 2012

All Dates are in (DD/MM/YYYY) Format

## Project Totals - Analysis/ English

| | Authorized Size | Approved Size | Existing Size for Alteration | Size of Addition | Size of New Building |
|---|---|---|---|---|---|
| Training Building | 65,656 | 66,376 | 0 | 0 | 66,376 |
| Maintenance - Tank and Automotive | 9,039 | 9,092 | 0 | 0 | 9,092 |
| Unheated Storage | 4,254 | 4,254 | 0 | 0 | 4,254 |
| Total | 78,949 | 79,722 | 0 | 0 | 79,722 |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

### 171 - Training Building

| | Authorized | Approved | Existing | Memo |
|---|---|---|---|---|
| I. 171 - Training Buildings | | | | |
| A. Administrative Areas | 12,194 | 12,194 | 0 | |
| (1) Full Time Office Space | 2,520 | 2,520 | 0 | |
| (2) Unit Exclusive Space | 2,130 | 2,130 | 0 | |
| (3) Unit Common-Use Space | 5,934 | 5,934 | 0 | |
| (4) Retention Office | 250 | 250 | 0 | |
| (5) Family Support Office | 200 | 200 | 0 | |
| (6) Admin. Support Areas | 680 | 680 | 0 | |
| (a) General | 360 | 360 | 0 | |
| (b) Network OPS Center | 320 | 320 | 0 | |
| (c) Campus Center IT Closet | 0 | 0 | 0 | |
| (7) Lobby Area | 480 | 480 | 0 | |
| B. Assembly Area | 3,960 | 3,960 | 0 | |
| (1) Assembly Areas | 3,600 | 3,600 | 0 | |
| (2) Chair and Table Storage | 360 | 360 | 0 | |
| C. Kitchen - STD. Design | 811 | 811 | 0 | |
| D. Weapons Area | 1,090 | 1,090 | 0 | |
| (1) Arms Vault | 990 | 990 | 0 | |
| (2) Armorer Work Area | 100 | 100 | 0 | |
| E. Educational Areas | 6,342 | 6,342 | 0 | |
| (1) Classrooms | 2,400 | 2,400 | 0 | |
| (2) Library Reading Room | 450 | 450 | 0 | |
| (3) Library Storage | 240 | 240 | 0 | |
| (4) Learning Center | 300 | 300 | 0 | |
| (5) Training Aids Storage | 240 | 240 | 0 | |
| (6) COMSEC Training | 0 | 0 | 0 | |
| (7) COMSEC Storage | 0 | 0 | 0 | |
| (8) USARF Instruction Room | 600 | 600 | 0 | |
| (9) USARF Publication Storage | 2,112 | 2,112 | 0 | |
| F. Storage Areas | 12,607 | 12,607 | 0 | |
| (1) Unit/Individual Equipment Storage | 10,709 | 10,709 | 0 | |
| (2) Staging Area | 1,071 | 1,071 | 0 | |
| (3) Supply Office | 552 | 552 | 0 | |
| (4) Janitorial Storage | 75 | 75 | 0 | |
| (5) Flammable Storage | 0 | 0 | 0 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

### 171 - Training Building

| | Authorized | Approved | Existing | Memo |
|---|---|---|---|---|
| (6) Controlled Waste Storage | 0 | 0 | 0 | |
| (7) Facility Maintenance/Storage Area | 200 | 200 | 0 | |
| G. Special Training Areas | 3,200 | 3,700 | 0 | |
| (1) Weapons Simulator Room | 1,600 | 1,600 | 0 | |
| (2) Photo Lab | 0 | 0 | 0 | |
| (3) Band Room | 0 | 0 | 0 | |
| (4) Medical Section Area | 0 | 0 | 0 | |
| (5) Physical Exam Wing | 0 | 0 | 0 | |
| (6) SCIF | 0 | 0 | 0 | |
| (7) Soil Testing Lab | 0 | 0 | 0 | |
| (8) G. O. Conference | 0 | 0 | 0 | |
| (9) Drafting Room | 0 | 0 | 0 | |
| (10) Physical Readiness Area | 1,600 | 1,600 | 0 | |
| (11) AGCCS | 0 | 0 | 0 | |
| (12) Distant Learning Center | 0 | 0 | 0 | |
| (13) Large SIPRNet Cafe - 20 drops | 0 | 400 | 0 | |
| (14) Lactation Room | 0 | 100 | 0 | |
| (15) | 0 | 0 | 0 | |
| (16) | 0 | 0 | 0 | |
| H. Support Area | 9,535 | 9,580 | 0 | |
| (1) Mens Toilets & Showers | 1,481 | 1,481 | 0 | |
| (2) Womens Toilets & Showers | 741 | 741 | 0 | |
| (3) Locker Room | 2,100 | 2,100 | 0 | |
| (4) Vending Alcove | 48 | 48 | 0 | |
| (5) Break Area | 218 | 218 | 0 | |
| (6) Electrical Space | 460 | 460 | 0 | |
| (7) Demarcation Telephone Space | 380 | 380 | 0 | |
| (8) Mechanical Room | 4,107 | 4,152 | 0 | |
| Total Center Net Training Area | 49,739 | 50,284 | 0 | |
| Circulation Allowance (15% or 22%) | 10,943 | 11,063 | 0 | |
| Structural Allowance (10% of Net SF) | 4,974 | 5,029 | 0 | |
| Total Center Gross Area | 65,656 | 66,376 | 0 | |
| Outgranted Area | | | 0 | |
| Total Center Available Gross Area | | | 0 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

### 214 - Maintenance - Tank and Automotive

| | Authorized | Approved | Existing | Memo |
|---|---|---|---|---|
| V. 214 - Maintenance - Tank and Automotive | | | | |
| A. Organizational Maintenance Shop (OMS) | 2,021 | 1,963 | 0 | |
| (1) Shop Office | 456 | 816 | 0 | |
| (2) Tool & Parts Room | 480 | 729 | 0 | |
| (3) Storage Room | 480 | 0 | 0 | |
| (4) Flammable Storage | 125 | 68 | 0 | |
| (5) Controlled Waste Storage | 480 | 228 | 0 | |
| (6) Electrical Room | 0 | 122 | 0 | |
| (7) | 0 | 0 | 0 | |
| B. Area Maintenance Support (AMSA) | 0 | 65 | 0 | |
| (1) Shop Office | 0 | 0 | 0 | |
| (2) Locker Room | 0 | 0 | 0 | |
| (3) Class Room/Break Area | 0 | 0 | 0 | |
| (4) Tool Room | 0 | 0 | 0 | |
| (5) Parts Room | 0 | 0 | 0 | |
| (6) Library | 0 | 0 | 0 | |
| (7) Battery Room | 0 | 65 | 0 | |
| (8) Commo/Electronics Shop | 0 | 0 | 0 | |
| (9) Instrument Repair | 0 | 0 | 0 | |
| (10) Small Arms Repair | 0 | 0 | 0 | |
| (11) Small Arms Vault | 0 | 0 | 0 | |
| (12) Flammable Storage | 0 | 0 | 0 | |
| (13) Controlled Waste Storage | 0 | 0 | 0 | |
| (14) | 0 | 0 | 0 | |
| (15) | 0 | 0 | 0 | |
| C. DS/GS Maintenance Shop Special Areas | 0 | 0 | 0 | |
| Maximum Authorized = 5,250 SF/488 m2 | | | | |
| (1) | 0 | 0 | 0 | |
| (2) | 0 | 0 | 0 | |
| (3) | 0 | 0 | 0 | |
| (4) | 0 | 0 | 0 | |
| (5) | 0 | 0 | 0 | |
| (6) | 0 | 0 | 0 | |
| D. Joint Maintenance Areas (OMS/AMSA) | 5,845 | 5,761 | 0 | |
| (1) Work Bays | 4,640 | 3,840 | 0 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

### 214 - Maintenance - Tank and Automotive

| | Authorized | Approved | Existing | Memo |
|---|---|---|---|---|
| (2) Mechanical/Custodial | 375 | 376 | 0 | |
| (3) ARNET/IT Closet | 280 | 80 | 0 | |
| (4) Equipment Alcove | 200 | 672 | 0 | |
| (5) Mens Toilets & Showers | 200 | 207 | 0 | |
| (6) Womens Toilets & Showers | 150 | 118 | 0 | |
| (7) Fluid Distribution Room | 0 | 228 | 0 | |
| (8) SATS Trailer Canopy | 0 | 240 | 0 | |
| Total Shop Net Area | 7,866 | 7,789 | 0 | |
| Circulation Allowance (15% of Net SF) | 386 | 524 | 0 | |
| Structural Allowance (10% of Net SF) | 787 | 779 | 0 | |
| Total Shop Gross Area | 9,039 | 9,092 | 0 | |
| Outgranted Area | | | 0 | |
| Total Shop Available Gross Area | | | 0 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

### UNH - Unheated Storage

| | Authorized | Approved | Existing | Memo |
|---|---|---|---|---|
| VII. UNH - Unheated Storage | | | | |
| Equipment Storage | | | | |
| Unheated Storage | | | | |
| (1) Unit/Individual Storage | 3,092 | 3,092 | 0 | |
| (2) Staging Area | 310 | 310 | 0 | |
| Total Unheated Storage Net Area | 3,402 | 3,402 | 0 | |
| Circulation (15% of Net SF) | 511 | 511 | 0 | |
| Structural Allowance (10% of Net SF) | 341 | 341 | 0 | |
| Total Unheated Storage Gross Area | 4,254 | 4,254 | 0 | |
| Outgranted Area | | | 0 | |
| Total Unheated Storage Available Gross Area | | | 0 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

## SPRT - Support Facilities

| | Authorized | Approved | Existing | Memo |
|---|---|---|---|---|
| X. Supporting Facilities | | | | |
| A. Privately Owned Vehicle Parking (POV) (SY) | 7,140 | 7,140 | 2,800 | |
| B. Military Equipment Parking (MEP) | 12,350 | 12,350 | 68,380 | |
| (1) OMS (SY) | 12,350 | 12,350 | 68,380 | |
| (2) AMSA (SY) | 0 | 0 | 0 | |
| (3) ECS | 0 | 0 | 0 | |
| Number of Vehicles at the ECS | 0 | 0 | 0 | |
| ECS (SY) | 0 | 0 | 0 | |
| C. Wash Platforms (EA) | 3 | 3 | 0 | |
| D. MEP Fencing (LF) | 1,336 | 1,336 | 0 | |
| E. MEP Lighting (EA) | 10 | 10 | 0 | |
| F. Access Roads (SY) | 1,235 | 5,000 | 6,502 | |
| G. Sidewalks (SY) | 300 | 300 | 0 | |
| H. Service/Access Apron (SY) | 560 | 5,135 | 0 | |
| (1) Maintenance Shop (SY) | 400 | 4,975 | 0 | |
| (2) Unheated Storage (SY) | 160 | 160 | 0 | |
| I. Fuel Storage and Dispensing (EA) | 0 | 0 | 0 | |
| J. Equipment Loading Ramp (EA) | 0 | 0 | 0 | |
| K. Marine Pier/Dock (EA) | 0 | 0 | 0 | |
| L. Flagpole (EA) | 1 | 1 | 0 | |
| M. Occupational Safety and Health Equipment (EA) | 0 | 0 | 0 | |
| (1) | 0 | 0 | 0 | |
| (2) | 0 | 0 | 0 | |
| N. | 0 | 0 | 0 | |
| O. MKT Concrete Pad (EA) | 0 | 0 | 0 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

### STAT - Statistics

| Description | Center | Shop | UNH Strg | WHS Strg |
|---|---|---|---|---|
| Total Square Footage For: | | | | |
| Authorized Size | 65,656 | 9,039 | 4,254 | 0 |
| Approved Size | 66,376 | 9,092 | 4,254 | 0 |
| Existing Size for Alteration | 0 | 0 | 0 | 0 |
| Size of Addition | 0 | 0 | 0 | 0 |
| Size of New Building | 66,376 | 9,092 | 4,254 | 0 |

| Center Statistics | Total Personnel | Weekend |
|---|---|---|
| Rated Capacity | 600 | |
| Largest Drill Weekend | 255 | 1 |
| Largest Admin Weekend | 86 | 1 |
| Largest Maintenance Weekend | 17 | 1 |
| Weekends Per Month | 3 | |

Project Number : CVNPT
Project Title : Army Reserve Center
Date: Nov 16, 2012

## Functional Space Details - Analysis/ English

## Project Totals - Analysis/ English

| | Authorized Size | Approved Size | Existing Size for Alteration | Size of Addition | Size of New Building |
|---|---|---|---|---|---|
| 171 Training Building | 65,656 | 66,376 | 0 | 0 | 66,376 |
| 214-Maintenance-Tank/Automotive | 9,039 | 9,092 | 0 | 0 | 9,092 |
| UNH-Unheated Storage | 4,254 | 4,254 | 0 | 0 | 4,254 |
| Totals (SF) | 78,949 | 79,722 | 0 | 0 | 79,722 |

Project Number : CVNPT
Project Title : Army Reserve Center
Date : Nov 16, 2012

Functional Space Details - Analysis/ English

# EXHIBIT 5

## CAVEN POINT - MAJOR MILESTONES EXHIBIT F

| DATE | TASK | RESPONSIBLE | REMARK |
|---|---|---|---|
| Novmber 19, 2015 | Site visit for environmental | All | Completed |
| March-16 | Term Sheet Signed | All | |
| March-16 | Environmental Condition of Property (ECP) Harbor Drive Property | USACE | |
| May-16 | Submit site plans drawings to Jersey City Planning Board | EP | EP needs 4-6 wks once the Term Sheet is signed to file with the City, then it's a 6 month process to get city approval. Once EP has city approval, an additional 45 days is needed for public comment, then the City gives final approval. (Both Properties) |
| May-16 | Complete/comply National Environmental Policy Act (NEPA) | USACE | |
| June-16 / July-16 | Appraisal, Title, Survey: Receive/Approve | USACE | |
| July-16 | Complete signed Finding of Suitablity to Transfer (FOST) | AR | |
| August-16 | Provide unexecuted deeds and Leaseback to the EP / Address any comments | USACE | |
| August-16 | EP own Harbor Drive property in fee | EP | |
| August-16 | EP terminate any leases on Harbor Drive & tenants moved | EP | |
| August-16 | Title update | USACE | |
| September-16 | Fully executed Exchange Agreement | EP & USACE | |
| September-16 | Start foundation design/drawings for Replacement Facility | EP | |
| September-16 | Start construction architectual drawings of Replacement Facility | EP | design/construction drawings will take 6 months. This includes getting permit and 45 days for the City to review/approve. |
| December-16 | Site plan drawings approval by Jersey City Planning Board | EP | |
| December-16 | Peformance Bond | EP | USACE to draft bond language and determine amount to ensure complete and usable. |
| December-16 | Quitclaim deed signed by the Director of Real Estate | USACE | |
| December-16 | Warranty deed signed by the EP | EP | |
| December-16 | Exchange deeds / Leaseback | USACE & EP | Caven Point QC Deed for Harbor Dr Warranty Deed |
| December-16 | EP provide a Construction Schedule | EP | |
| January-17 | Start construction of foundation | | 18-24 months for construction |
| March-17 | USACE/ARIMD/99th approve design/construction architectual drawings of Replacement Facility | USACE & AR | |
| March-17 | Jersey City approval of completed design/construction drawings of Replacement Facility | EP | |
| March-17 | Start architectual construction | EP | |
| Sept 17 - Mar 18 | Construction Completed | EP | |
| FY19 | Lodi Remediation completed | | 99th RSC confirmed remediation should be completed sometime in FY19. The contract should be awarded this year, then will be able to provide a more accurate date. |
| FY19 | Convey Lodi USARC via QC Deed | USACE | Lodi QC Deed will be given to the EP once the new Caven Point USARC is complete and usuable. |

EXPRESS MAIL
UNITED STATES POSTAL SERVICE®

**POST OFFICE TO ADDRESSEE**

*EU086052206US*

Mailing Label
Label 11-B May 2001

| ORIGIN (POSTAL USE ONLY) | | | |
|---|---|---|---|
| PO ZIP Code | Day of Delivery ☐ Next ☐ Second | Flat Rate Envelope ☐ | |
| Date In Mo. Day Year | ☐ 12 Noon ☐ 3 PM | Postage $ | |
| Time In ☐ AM ☐ PM | Military ☐ 2nd Day ☐ 3rd Day | Return Receipt Fee | |
| Weight lbs. ozs. | Int'l Alpha Country Code | COD Fee | Insurance Fee |
| No Delivery ☐ Weekend ☐ Holiday | Acceptance Clerk Initials | Total Postage & Fees $ | |

| DELIVERY (POSTAL USE ONLY) | | |
|---|---|---|
| Delivery Attempt Mo. 2 Day 14 | Time 1:27 ☐ AM ☑ PM | Employee Signature [signature] |
| Delivery Attempt Mo. Day | Time ☐ AM ☐ PM | Employee Signature |
| Delivery Date Mo. Day | Time ☐ AM ☐ PM | Employee Signature |

☐ WAIVER OF SIGNATURE (Domestic Only) Additional merchandise insurance is void if waiver of signature is requested. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

NO DELIVERY ☐ Weekend ☐ Holiday

Customer Signature

**CUSTOMER USE ONLY**

METHOD OF PAYMENT:
Express Mail Corporate Acct. No.

Federal Agency Acct. No. or
Postal Service Acct. No.

FROM: (PLEASE PRINT) PHONE ( 202 761-4548

USACE
441 G ST, NW
WASHINGTON, DC 20314-1000

TO: (PLEASE PRINT) PHONE ( )

LCG I CHAPEL AVE LLC
ATTN: LANCE LUCARELLI
534 BROADWAY
BAYONNE, NEW JERSEY

ZIP + 4 0 7 0 0 2 +

PRESS HARD.
You are making 3 copies.

FOR PICKUP OR TRACKING CALL 1-800-222-1811 www.usps.com EMS

# EXHIBIT 6

-----Original Message-----
From: Lance T. Lucarelli
Sent: Thursday, June 26, 2014 1:24 PM
To: Joel Meisel (jsm@meiselholdings.com) <jsm@meiselholdings.com>
Subject: FW: 286 Coles St.

Read the bottom Paul Fireman and forward

-----Original Message-----
From: John R. Cali [mailto:jrc@califutures.com]
Sent: Wednesday, June 25, 2014 1:16 PM
To: Lance T. Lucarelli
Subject: FW: 286 Coles St.

FYI see below.

-----Original Message-----
From: W. Nevins McCann [mailto:WMcCann@connellfoley.com]
Sent: Wednesday, June 25, 2014 1:10 PM
To: John Cali
Subject: Re: 286 Coles St.

I understand John but I am obviously disappointed. The delay has been with planning and the mayor's office. Ot really is a mess. I have been holding the bill until we got you the approval. I reached out over a week ago to let you know what Maryann was looking for.

I wish you all of the best and I look forward to your friendship for many years to come. I will send you the invoice in the meantime.

On another note, I would like to discuss the army base with you and Lance.

Paul Fireman has basically offers $5 million for the option or to step into your shoes, as well as to pave the chapel ave lot and get paid back out of the parking revenue 75/25 until paid off then flip 25/75 and the right to use the lot for a week every year there is a major tournament.

Lets talk tomorrow.

Sent from my iPhone

On Jun 25, 2014, at 12:20 PM, "John R. Cali" <jrc@califutures.com<mailto:jrc@califutures.com>> wrote:

Hi Nevins,
I hope all is well. I have retained the DeCotiis firm hto try to push through 286 Cole St. I have known Al DeCotiis for 30 years. (he was in my Roseland building in the 80's).
Please don't take this as an end to our relationship. I hope to maintain a relationship with you for many years. In this case, I have been very frustrated with the process and with the planning dept in JC , and I want to try a new approach.

All my best, John R Cali

# EXHIBIT 7

# Developer pitches $4.6B Jersey City casino

Associated Press *2:16 p.m. EDT July 9, 2014*



*(Photo: AP)*

TRENTON — New Jersey lawmakers say a venture capitalist wants to build a $4.6 billion casino in Jersey City, a move that would be possible only if the state would make a major policy change and allow casinos outside of Atlantic City.

State Sen. Raymond Lesniak, who said he was briefed on the plan about a month ago, says the plan calls for a more than 90-story hotel and residential tower, the world's largest Ferris wheel and a car-racing stadium that could seat more than 100,000 fans.

The plan was first reported by The Star-Ledger.

The investor behind the push, he said, is Reebok founder Paul Fireman. Fineman, who is based in Boston, did not immediately return a call to The Associated Press.

"This Paul Fireman guy is the real deal," Lesniak said. "This is a solid proposal and he's willing to put the money up for it."

For years, Lesniak has been calling to allow casinos outside of Atlantic City and then use part of the revenue to boost that resort city, which has been struggling for years largely because of increased competition in nearby states. Online gambling through the state's casinos, which became legal last year, has failed so far to be the savior its proponents were hoping for. One casino — The Atlantic Club — closed in January and two others — Revel Casino Hotel and Showboat Casino Hotel — have warned that they could, too.

It would take a state constitutional amendment to allow casino gambling outside of Atlantic City. Lesniak would like to see lawmakers take quick action to put it to a public vote on this November's ballot, but a public vote is unlikely until at least next year.

Since Fireman's group has begun briefing politicians, Gov. Chris Christie and state Senate President Steve Sweeney have both talked about the possibility of allowing casinos elsewhere in the state.

Lesniak said the Jersey City proposal near Liberty State Park would be comparable only to casinos in Macau, the Chinese city that has become a gambling destination. He said something that impressive is needed to be an attraction with a pull large enough that it won't simply cut into Atlantic City's existing business.

"This will compete with Macau and exceed it," said Lesniak, a Democrat from Elizabeth. "What Macau doesn't have is the metropolitan area and the New York skyline."

Assemblyman Ralph Caputo, a former casino executive and the chairman of the Assembly's tourism and gaming committee, noted that the plans are preliminary.

He said the tax rate on any northern New Jersey casino's revenues should be at least 50 percent — far higher than the 8 percent Atlantic City casinos pay. And he said that unlike the Atlantic City's newest casino, Revel, there would be no tax incentives to help fund construction.

Caputo said that despite Atlantic City's problems, casinos are still a powerful means for the state to generate revenue year after year.

Read or Share this story: http://on.app.com/1mg72gn

# EXHIBIT 8

Menu Set Weather Subscribe Sign In Search
(http://ads.nj.com/RealMedia/ads/click_lx.ads/www.nj.com/politics/2014/07/venture_capitalist_wants_to_build_massive_casino...
(http://www.nj.com/)

53 comments

# A casino in Jersey City? Venture capitalist wants to make it happen



The former head of Reebok has been quietly shopping around plans to build a massive casino and entertainment complex in Jersey City, shown in this 2011 file photo *(Frances Micklow/The Star-Ledger)*

Sponsored by: CLICK HERE
(http://ads.nj.com/RealMedia/ads/click_lx.ads/www.nj.com/politics/2014/07

Print (http://blog.nj.com/politics_impact/print.html?entry=/2014/07/venture_capitalist_wants_to_build_massive_casino_in_jersey_city.html)
(http://connect.nj.com/user/matt_friedman/index.html) By Matt Friedman/The Star-Ledger (http://connect.nj.com/user/matt_friedman/posts.html)
Email the author | Follow on Twitter (https://twitter.com/MattFriedmanSL)
on July 08, 2014 at 8:21 PM, updated July 09, 2014 at 6:49 AM

**TRENTON (http://www.nj.com/politics)** — A venture capitalist from Massachusetts has been quietly meeting with leading New Jersey politicians in recent months, pushing a proposal for a casino and hotel rising 95 floors above New York Harbor.

The $4.6 billion project would also feature residences, a 107,500-seat motor sports stadium and what is billed as the largest Ferris wheel in the world.

But there's one catch — it would not be in Atlantic City, the only city where New Jersey has allowed gambling since its legalization almost 40 years ago. Rather, it would rise in Jersey City, with sweeping views of Manhattan and sit almost eyeball to eyeball with the new 104-story World Trade Center just across the harbor.

"I'm excited about the potential for a world-class facility that includes a casino, hotel and convention center as well as the largest ferris wheel in the world all located next to the best park in New Jersey," Mayor Steve Fulop said. "I still need more information regarding the racetrack to be confident it will not harm Liberty State Park. This development would create 25,000 jobs and over $5 billion of investment, which would be one of the largest construction projects in the United States."

Even a former mayor of Atlantic City, state Sen. Jim Whelan (D-Atlantic), accepted the inevitability of the project, or one like it.

"I'm sure there are a lot of people who will take me to task for daring to even consider casinos outside of Atlantic City," Whelan said. "I'd love to be wrong, but I think that's the reality of where we are."

## Video of the Day

**Heartbreak in the Ironbound: Newark's Brazilian stronghold stunned by World Cup loss to Germany (http://videos.nj.com/nj/201**

## N.J. Politics News In Your Inbox

From Christie to Booker, get your daily N.J. politics fix.

Enter your e-mail address OPTIONAL Enter Zip

**Submit**

Check here if you do not want to receive additional email offers and information.
See our privacy policy (/privacypolicy/)

**Political Viewpoints**

**Tom Moran's latest columns (http://connect.nj.com/user/tr**

The man behind the proposal is Paul Fireman, a former chief executive of Reebok who runs **Fireman Capital Partners (http://www.firemancapital.com/)** in Boston, and whose wealth Forbes placed in 2006 at $1.1 billion.

Fireman has met with several lawmakers about his proposal, according to two who provided details to The Star-Ledger. But Fireman himself did not return calls and emails seeking comment.

"It's huge," said state Sen. Raymond Lesniak (D-Union), who has met with Fireman. "It has the wow factor ... It will blow away Macau as a destination place for gaming."

According to the lawmakers, the casino would be situated near the waterfront, next to the **Liberty National Golf Course (http://www.libertynationalgc.com/)**, which Fireman built in 2006.

Assemblyman Ralph Caputo (D-Essex), a former casino executive and chairman of the Assembly Tourism, Gaming and Arts Committee, said he, too, had discussed the project with Fireman.

"When companies or investors lay out a... plan like that — an expensive, massive project — it very possibly can work," Caputo said.

The proposal is in its infancy, and many of the details — including how it would connect with NJ Transit's nearby light rail system — were not available. But mega projects — like the trouble-plagued **American Dream (http://www.nj.com/politics/index.ssf/2014/04/christie_attends_signing_to_kick_start_american_dream_project.html)**, formerly known as Xanadu — often don't end up as originally planned, if at all.

Then there's the huge obstacle in its path: Opening a casino anywhere outside Atlantic City would require the approval of New Jersey voters to amend the state constitution.

In 2011, Gov. Chris Christie and lawmakers **put a five-year plan in place to revive Atlantic City (http://www.nj.com/politics/index.ssf/2011/02/gov_christie_signs_atlantic_ci.h** which began hemorrhaging profits once casinos started opening in neighboring states. And despite an infusion of money from the state, the resort is still struggling, with two casinos closing their doors so far this year and another filing for bankruptcy.

Christie and Senate President Stephen Sweeney (D-Gloucester), after years steadfastly refusing to allow casino gambling anywhere else in the state, are starting to relent.

Sweeney said last week he was willing to consider **putting forth a constitutional amendment (http://www.nj.com/politics/index.ssf/2014/07/sweeney_says_nj_voters_could_ hether_to_expand_casino_gambling** voters to approve to allow gambling elsewhere in the state 2015 — as long as it included a way to help Atlantic City.

For his part, **Christie said last week (http://www.nj.com/politics/index.ssf/2014/07/christie_says_hes_open_to_discussing_gambling_outside_of_atlantic_city.htr** he was "happy to have that conversation" with Sweeney.

While Sweeney declined to comment specifically on the Jersey City proposal, he did say that "if we're going to look at opening (gambling) up, it could be in Jersey City or somewhere else up north where a casino could be beneficial."

Whelan, the former Atlantic City mayor, said he would like future legislation to require any new North Jersey casino operators to also open a casino in Atlantic City, restrict the gaming expansion only to North Jersey, and to make sure revenue makes its way south in the same way that Atlantic City casinos funded projects around the state for years.

Until now, those in favor of expanding gambling into North Jersey have generally wanted to build a casino in the Meadowlands. Lesniak said he would still like to see that to happen, though it would serve a different market.

"The Meadowlands would co-exist," he said. "They really would have two separate attractions. The Meadowlands would be more of an average day player, whereas this would attract the high rollers from around the world."

He said up to $1 billion in revenue from two casinos over 10 years would be devoted to

**Paul Mulshine's latest columns (http://connect.nj.com/user/p**

**Editorials from The Star-Ledger (http://connect.nj.com/staff/n**

## Trending Videos

Some NJ residents struggling to gain access to medical records



## Most Read


Murder-suicide: Lake Hopatcong man shot his wife, then himself, authorities say (http://www.nj.com/morris/index.ssf/2014/07/murder-suicide_lake_hopatcong_man_shot_his_wife_then_himself_aut read)


Sudden deaths of Jefferson couple shrouded in mystery (http://www.nj.com/morris/index.ssf/2014/07/sudden_deaths_of read)


7 Facebook pages about N.J. you should be following (http://www.nj.com/entertainment/index.ssf/2014/07/7_new_jer read)


... jumping in front of tractor-trailer on Route 3, police say (http://www.nj.com/bergen/index.ssf/2014/07/pedestrian_dies_a trailer_on_route_3_police_say.html#incart_most-read)


World Cup 2014 TV schedule: What channel is Brazil vs. Germany on? (http://www.nj.com/soccer-news/index.ssf/2014/07/world_cup_2014_tv_schedule_wha_8.ht read)

## Active Discussions

1 Chris Christie returning to New Hampshire for fundraiser, report says (http://www.nj.com/politics/index.ssf/2014/07/chris_christie comments)
(179 comments)

2 Christie's defense of gun veto is 'unfortunate,' says parent of Sandy Hook victim (http://www.nj.com/politics/index.ssf/2014/07/christies_def comments)
(303 comments)

transforming Atlantic City from a past-its-prime gambling mecca into an all-around tourist destination. Lesniak added that the Jersey City proposal, like any other casino proposed outside of Atlantic City casino, would have to compete for a license under the terms laid out in future legislation.

"There's a lot invested in Atlantic City," Lesniak said, "and rather than this proposal leaving it high and dry, it actually is a means for it to be saved."

**RELATED COVERAGE**

- Sweeney says NJ voters could decide whether to expand casino gambling, report says (http://www.nj.com/politics/index.ssf/2014/07/sweeney_says_nj_voters_could_decide_whether_to_expand_casino_gambling
- Christie says he's open to discussing gambling outside of Atlantic City (http://www.nj.com/politics/index.ssf/2014/07/christie_says_hes_open_to_discussing_gambling_outside_of_atlantic_city.htm
- More Politics (http://www.nj.com/politics/)

**FOLLOW STAR-LEDGER POLITICS: TWITTER (https://twitter.com/NJ_Politics) · FACEBOOK (https://www.facebook.com/SLPolitics) · GOOGLE+ (https://plus.google.com/110265785244032497831/posts)**


3 NJ councilman a no-show at protest calling for his ouster (http://www.nj.com/sussex-county/index.ssf/2014/07/dispute_over_nj_councilman_wh police_cartoon_on_facebook.html#incart_most-comments)
(132 comments)

4 Councilwoman, clergyman at odds over 'illegals' in Edison's Indian community (http://www.nj.com/middlesex/index.ssf/2014/07/sapana_s comments)
(86 comments)

5 Here's why sleeping Yankees fan who filed 'idiotic' defamation lawsuit has no shot at winning (http://www.nj.com/yankees/index.ssf/2014/07/sleeping_ya comments)
(51 comments)

See more comments » (http://www.nj.com/interact/)

nj.com Real Estate

FOR RENT Bayonne, NJ

FOR RENT Bayonne, NJ

Sponsored by: (http://ads.nj.com/RealMedia/ads/click_lx.ad
(http://ads.nj.com/RealMedia/ads/click_lx.ad
(http://ads.nj.com/RealMedia/ads/click_lx.ads/www.nj.com/politics/2014 0128.html/524d48586e314d615261384143 4e55630)
(http://ads.nj.com/RealMedia/ads/click_lx.ad
(http://ads.nj.com/RealMedia/ads/click_lx.ads/www.nj.com/politics/2014
(http://ads.nj.com/RealMedia/ads/click_lx.ads/www.nj.com/politics/2014/07/ventur

Tweet 48 Like 260 Share 0 Reddit Email

Introducing Our LOWEST PREMIUMS for SMALL BUSINESS Learn More
(http://adclick.g.doubleclick.net/aclk?sa=L&ai=BlvBzC0y9U-2xOerX0AHLuIGQCQAAAAAQASAAOABQhOf_2QNY39HvG2DJnuCKtKTYD 4AbxgocB&num=0&sig=AOD64_2603NlRZaOUN_liUZlqicveENtdw&client


**Related Stories**

| | |
|---|---|
| (http://www.nj.com/hudson/index.ssf/ 5 things you need to know today in Hudson County, July 9, 2014 (http://www.nj.com/hudson/index.ssf/ | (http://www.nj.com/jjournal-news/index.ssf/2014/07/cornelius_r_pa Lifelong Jersey City resident and activist, Cornelius R. Parker dies at 98 (http://www.nj.com/jjournal-news/index.ssf/2014/07/cornelius_r_pa |


SUMMER CAMPUS TOURS & INFORMATION SESSIONS
FAIRLEIGH DICKINSON UNIVERSITY Weekdays and Select Weekends
(http://ads.nj.com/RealMedia/ads/click_lx.ads/www.nj.com/politics/2014/07


53 comments

Sign in

Post comment as...

Newest | Oldest

bob (http://connect.nj.com/user/njbob1/index.html) (http://connect.nj.com/user/njbob1/index.html) 1 hour ago

*"A venture capitalist from Massachusetts has been quietly meeting with leading New Jersey politicians in recent months,"*

That says it all. Does that venture capitalist have special rights that I don't have? We already know the NJ politicians do!

# EXHIBIT 9

**From:** W. Nevins McCann
**To:** Lance T. Lucarelli
**Subject:** FW: PGA Tour Use of Caven Point Army Reserve Center
**Date:** Tuesday, February 07, 2017 12:08:52 PM
**Attachments:** image001.png
image002.png

---

Lance,

Here is the string of e-mails below regarding the use of the base.

As I had mentioned, the local base operators have ok'd the use in the past, as well as this time but then it was shot down from Washington.

We need to secure the use of the base for the event.

Call me with your thoughts.

Thank you,

Nevins

**W. Nevins McCann**
*Partner*
*Please note the change to our mailing address below and update your records accordingly.*
Connell Foley LLP
Harborside 5 185 Hudson Street, Suite 2510 Jersey City, NJ 07311
Phone 201.521.1000
Direct 201.631.7804
Fax 201.521.0100
wmccann@connellfoley.com
website | bio | vCard | map |

CONNELL FOLEY
A TRADITION OF LEGAL EXCELLENCE SINCE 1938

**Roseland • Jersey City • Newark • New York • Cherry Hill • Philadelphia**

STATEMENT OF CONFIDENTIALITY: The information contained in this transmission including any attached documentation is privileged and confidential. It is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Connell Foley LLP immediately by replying to this email. Please delete all copies of this message and any attachments immediately.

**From:** Matt Kamienski [mailto:MattKamienski@pgatourhq.com]
**Sent:** Thursday, December 22, 2016 10:52 AM
**To:** W. Nevins McCann
**Cc:** Peter Mele; Patrick Hurley
**Subject:** Fwd: PGA Tour Use of Caven Point Army Reserve Center

See below regarding Caven Point Army base.

Doesn't look like it will be available? Nevins your thoughts?

MPK

Sent from my iPhone

Begin forwarded message:

**From:** "Gregory, Robert R CIV USARMY OCAR (US)" <robert.r.gregory10.civ@mail.mil>
**Date:** December 22, 2016 at 10:48:24 AM EST
**To:** "Sayah, Paul S CIV USARMY 99 RSC (US)" <paul.s.sayah.civ@mail.mil>, "Robinson, David P CIV USARMY OCAR (US)" <david.p.robinson.civ@mail.mil>
**Cc:** "MattKamienski@pgatourhq.com" <MattKamienski@pgatourhq.com>, "Nierva, Julian R LTC USARMY 99 RSC (US)" <julian.r.nierva.mil@mail.mil>, "Smith, John J Jr CIV USARMY 99 RSC (US)" <john.j.smith62.civ@mail.mil>, "Roth, Adam S COL USARMY 99 RSC (US)" <adam.s.roth2.mil@mail.mil>, "Baker, Deidre A CIV USARMY 99 RSC (US)" <deidre.a.baker.civ@mail.mil>, "Hrzic, Jeffrey M CIV USARMY 99 RSC (US)" <jeffrey.m.hrzic.civ@mail.mil>
**Subject: RE: PGA Tour Use of Caven Point Army Reserve Center**

Paul,

In view of the progress being made on consummating the Exchange Agreement, and the City's approval of the Exchange Partner's Master Plan, we anticipate that some construction will start within the next 6 - 8 months on our site. This, coupled with security concerns, would preclude allowing any outside source access and use of the facilities.

Thank you,

Bob
Robert (Bob) Gregory
RPX Program Manager
Army Reserve Installation Management Directorate
6075 Goethals Road, Building 1908, Suite 103 Fort Belvoir, VA 22060
(703)-806-6779
robert.r.gregory10.civ@mail.mil

-----Original Message-----
From: Sayah, Paul S CIV USARMY 99 RSC (US)
Sent: Monday, August 29, 2016 1:59 PM
To: Robinson, David P CIV USARMY OCAR (US)

<david.p.robinson.civ@mail.mil>
Cc: MattKamienski@pgatourhq.com; Gregory, Robert R CIV USARMY OCAR (US)
<robert.r.gregory10.civ@mail.mil>; Nierva, Julian R LTC USARMY 99 RSC (US)
<julian.r.nierva.mil@mail.mil>; Smith, John J Jr CIV USARMY 99 RSC (US)
<john.j.smith62.civ@mail.mil>; Roth, Adam S COL USARMY 99 RSC (US)
<adam.s.roth2.mil@mail.mil>; Baker, Deidre A CIV USARMY 99 RSC (US)
<deidre.a.baker.civ@mail.mil>; Hrzic, Jeffrey M CIV USARMY 99 RSC (US)
<jeffrey.m.hrzic.civ@mail.mil>
Subject: FW: PGA Tour Use of Caven Point Army Reserve Center

Good afternoon Dave,

Bob is OOO therefore reaching out to you.

The PGA Tour is requesting to use the Army Reserve facilities at Caven Point, NJ in connection with a tour event scheduled 25 Sep - 1 Oct 2017.

Additionally there is also interest in an RPX. For this matter we are only focusing on the request for 2017.

I am cautious to consider an 833 at Caven Point due to the ongoing discussions and RPX that your office is working.

Please review the request below and feel free to talk with Mr. Matt Kamienski of PGA TOUR, INC. on this matter.

They are looking to primarily use the site for TV equipment/ studio air coverage.

We are looking for any advice that will help us in determine if an 833 is doable for the planned event..

Thank you,
Paul Sayah
Deputy DPW
99th RSC
5231 South Scott Plaza
Fort Dix, NJ 08640
609.562.7639 Office
412.327.6314 Blackberry

-----Original Message-----
From: Matt Kamienski [mailto:MattKamienski@pgatourhq.com]
Sent: Monday, August 29, 2016 9:17 AM
To: Nierva, Julian R LTC USARMY 99 RSC (US)
<julian.r.nierva.mil@mail.mil>
Cc: Roth, Adam S COL USARMY 99 RSC (US) <adam.s.roth2.mil@mail.mil>;

Giles,
Richard D II LTC USARMY USARCENT (US) <richard.d.giles.mil@mail.mil>;
Hrzic,
Jeffrey M CIV USARMY 99 RSC (US) <jeffrey.m.hrzic.civ@mail.mil>;
Almeida,
Arlindo F CSM USARMY 99 RSC (US) <arlindo.f.almeida.mil@mail.mil>;
Wills,
James P CSM USARMY USARC HQ (US) <james.p.wills.mil@mail.mil>;
Smith, John J
Jr CIV USARMY 99 RSC (US) <john.j.smith62.civ@mail.mil>; USARMY
Reserve 99
RSC Mailbox OSJA <usarmy.usarc.99-rsc.mbx.osja@mail.mil>; John Flaschner
<JohnFlaschner@pgatourhq.com>
Subject: [Non-DoD Source] RE: PGA Tour Use of Caven Point Army Reserve
Center

Dear Julian -

I trust this email finds you well and that you have had a good summer. My apologies for the extreme delay in getting back to you regarding your email below. I have no excuse other than the busy summer schedule has gotten away from me.

I wanted to see if you might be available for a phone call this week to discuss use of the Caven Point Army Reserve Center during our event next year. In the near term we are hoping to acquire use of the land for parking, staging and TV operations in the lead up and during the Presidents Cup which will be held at Liberty National Golf Club the week of September 25th next year. There is long term vision surrounding the possibility of land swap etc. based on the 25 year agreement between LNGC and the PGA TOUR
that will see at minimum 8 events played over the course of the contract. I think it's best to focus on the near term needs and discuss other possibilities as they become more clear.

Please let me know what might world for you this week. I'm in Jersey City/NYC today through Wednesday and happy to meet face to face it that makes more sense.

All the best and again apologies for my delay in getting back to you - really appreciate your help in this matter.

Regards,

MPK

Matt Kamienski
PGA TOUR, INC.
Vice President and Executive Director - The Presidents Cup and World Cup of Golf M - 904.401.4228 Email - mattkamienski@pgatourhq.com

-----Original Message-----
From: Nierva, Julian R LTC USARMY 99 RSC (US)
[mailto:julian.r.nierva.mil@mail.mil]
Sent: Wednesday, May 04, 2016 1:12 PM
To: Matt Kamienski <MattKamienski@pgatourhq.com>
Cc: Roth, Adam S COL USARMY 99 RSC (US) <adam.s.roth2.mil@mail.mil>;
Giles,
Richard D II LTC USARMY 99 RSC (US) <richard.d.giles.mil@mail.mil>;
Hrzic,
Jeffrey M CIV USARMY 99 RSC (US) <jeffrey.m.hrzic.civ@mail.mil>;
Almeida,
Arlindo F CSM USARMY 80 TNG CMD (US)
<arlindo.f.almeida.mil@mail.mil>;
Wills, James P CSM USARMY USARC HQ (US)
<james.p.wills.mil@mail.mil>; Smith,
John J Jr CIV USARMY 99 RSC (US) <john.j.smith62.civ@mail.mil>;
USARMY
Reserve 99 RSC Mailbox OSJA <usarmy.usarc.99-rsc.mbx.osja@mail.mil>; John
Flaschner <JohnFlaschner@pgatourhq.com>
Subject: PGA Tour Use of Caven Point Army Reserve Center

Mr. Kamienski:

Your colleague, Mr. John Flaschner advised that you are the point of contact for a request by the PGA Tour to use the Army Reserve facilities at Caven Point, NJ in connection with a tour event scheduled 25 Sep - 1 Oct 2017. The 99th Regional Support Command has responsibility for that facility and can assist you with this request. However, at this juncture, we are unsure of exactly what your organization is asking of us. Preliminary indications were that your organization wanted an area to park vehicles but in speaking with Mr. Flaschner, it appears that your request may involve much more, to include a possible real property exchange.

Accordingly, we require more facts to evaluate and assess your request to determine its viability and the scope of assistance we are able to render. To that end, I ask that you send a detailed request specifically laying out what your organization seeks from the 99th RSC. LTC Richard Giles, Deputy Regional Engineer, is the primary point of contact for the 99th RSC for matters relating to real property and so your message should be directed to him. He may be reached by phone at 609-562-7639 or via email at richard.d.giles.mil@mail.mil. Please also include COL Adam Roth, the 99th RSC Regional Engineer and Mr. Jeff Hrzic on all future email correspondence. They are both cc'd above.

Very Respectfully,

Julian R. Nierva

LTC, Deputy Staff Judge Advocate
99th Regional Support Command
Phone: 609-562-1384
Email: julian.r.nierva.mil@mail.mil
SJA Inbox: usarmy.usarc.99-rsc.mbx.osja@mail.mil

The information contained in this transmission and any attachments may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT 10

**From:** Gregory, Robert R CIV USARMY OCAR (US)
**To:** Lance T. Lucarelli
**Subject:** RE: Caven Point
**Date:** Thursday, July 20, 2017 12:26:43 PM

Lance,

The golf course utilized Caven Point Reserve Center as a staging area back in August 2013, just before our Industry Day that occurred 18 and 19 September, so it doesn't look like there was a conflict. Problem is with our side in that it appears at the moment it may have been allowed without paperwork. Not sure yet and I have people digging to verify. Also, the request to get an easement was supposedly prior to that, but again, I am waiting on documents to verify. The point of contact who approached the Army
to utilize the Reserve Center for this is a Mr. Hurley - not sure if he is associated with Liberty National or just the PGA. Don't have a first name yet
but working on it and more info.

The person I am more concerned with on the Army side and who I need to find out whether or not he is getting any kind of free stuff from any of this is a
Paul Sayah with the 99th. He has been there all of this time and has a strange approach to all of this. As I get more info I will get it to you.

Thanks,

Bob

-----Original Message-----
From: Lance T. Lucarelli [mailto:Lance@LGroup1.com]
Sent: Thursday, July 20, 2017 10:52 AM
To: Gregory, Robert R CIV USARMY OCAR (US) <robert.r.gregory10.civ@mail.mil>
Subject: [Non-DoD Source] RE: Caven Point

I need the info for the 2013 request from the Liberty national golf course looking to pay the army the 8 million

-----Original Message-----
From: Gregory, Robert R CIV USARMY OCAR (US)
[mailto:robert.r.gregory10.civ@mail.mil]
Sent: Thursday, July 20, 2017 6:24 AM
To: Lance T. Lucarelli <Lance@LGroup1.com>
Subject: Caven Point

Lance,

Per our discussion yesterday, attached is a map showing the areas that the golf course is asking to be allowed to use under a permit for approximately 3 months. Will send you more info once I have a chance to talk to my boss and a few others.

Bob

Robert (Bob) Gregory
RPX Program Manager
Army Reserve Installation Management Directorate
6075 Goethals Road, Building 1908, Suite 103 Fort Belvoir, VA 22060
(703)-806-6779
robert.r.gregory10.civ@mail.mil

# EXHIBIT 11

**From:** W. Nevins McCann
**To:** Lance T. Lucarelli
**Subject:** Fwd: Army Base
**Date:** Wednesday, August 02, 2017 2:28:20 PM

Sent from my iPhone

Begin forwarded message:

From: Patrick Hurley <PatrickHurley@pgatourhq.com<mailto:PatrickHurley@pgatourhq.com>>
Date: August 2, 2017 at 2:13:51 PM EDT
To: "W. Nevins McCann" <WMcCann@connellfoley.com<mailto:WMcCann@connellfoley.com>>
Cc: Matt Kamienski <MattKamienski@pgatourhq.com<mailto:MattKamienski@pgatourhq.com>>, Peter Mele <PeterMele@pgatourhq.com<mailto:PeterMele@pgatourhq.com>>
Subject: Army Base

Nevins,

In the past we have used this Army Base for staging space (2009 & 2013) and didn't need it for working space, however they would of allowed us for use in 2013 if we so chose to do so. In the past, we have also funded their Holiday Party, which we would certainly look to do again in 2017.

I've been working with Brandi Peraria and Vinny Giordiano who have been as accommodating as can be (both are with 99th RSC, DPW, Real Estate). They have been a huge help, and really have worked with us to get to where we are today. We've been meeting and talking with them for the last year +, have a solid plan for how we will be utilizing the base, security, etc., which everyone on their team has blessed and signed off on (General of the base included I believe). This started out as conversations and dialog that these guys would love to work with us, support this important event in JC, and how it's been escalated to the top (Washington) where they need to do an appraisal, get fair market value, etc.

For us, this piece of land is one of the most crucial as it's serving as NBC Sports Broadcast Compound, who will be broadcasting the event to over a billion people around the world. This is the first time the Presidents Cup has been in the NY/NJ Metro area.

The PGA TOUR has had a close working relationship with the military, and support of our troops. We are hosting an Operation Shower at Liberty National Golf Club on the Sunday before event week for wives and families of military men oversees which is a big program across the board at the PGA TOUR.

Please let us know if you need anything else Nev,

PH

Patrick Hurley
PGA TOUR | The Presidents Cup
Office: 904.280.5028
Cell: 508.314.4170

The information contained in this transmission and any attachments may contain privileged and confidential

information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT 12

**From:** Lance T. Lucarelli
**Sent:** Tuesday, November 21, 2017 10:13 AM
**To:** 'Bruce, Stephen W SAS' <Stephen.W.Bruce@usace.army.mil>
**Subject:** FW: 22096 Lucarelli - Chapel Avenue, Jersey City

Stephen,
I need you to sign the bottom of both of these attached documents and this allows me to seek the site plan approval from jersey city for the project that I will be constructing at the site I cannot wait anymore
Lance

**From:** Michael Miceli [mailto:mmiceli@weiner.law]
**Sent:** Friday, November 17, 2017 9:13 AM
**To:** Lance T. Lucarelli <Lance@LGroup1.com>
**Subject:** Fwd: 22096 Lucarelli - Chapel Avenue, Jersey City

See below and attached.

Sent from my iPhone

Begin forwarded message:

> **From:** Rosemarie Gerber <rgerber@weiner.law>
> **Date:** November 16, 2017 at 2:05:38 PM EST
> **To:** Michael Miceli <mmiceli@weiner.law>
> **Subject: 22096 Lucarelli - Chapel Avenue, Jersey City**
>
> Mike:
>
> Joe Daly drafted the Affidavit of Ownership and Affidavit of Performance and the Application has a few additions/revisions from Joe Sparone.
>
> Thanks,
> Ro
>
> Rosemarie Gerber
> Legal Assistant to Michael Miceli, Esq.
> Steven Tombalakian, Esq. & Jeanne McManus, Esq.

# EXHIBIT 13

**From:** Bruce, Stephen W CIV USARMY CESAS (US)
**To:** Lance T. Lucarelli
**Cc:** Werthmann, Ralph J CIV USARMY CESAS (US); Hinely, John S CIV USARMY CESAS (US)
**Subject:** RE: 22096 Lucarelli - Chapel Avenue, Jersey City
**Date:** Wednesday, November 29, 2017 3:57:38 PM

Lance,

Since an exchange agreement has not been executed, the work you have been performing is at your own risk. We discussed this back in May/June 2017. The Reserves have a meeting in mid-December to finalize the path forward. As I have stated before, I will contact you once the Reserves have made a decision.

Thanks,

Stephen Bruce
Senior Realty Specialist
U.S. Army Corps of Engineers
Savannah District
Office: 912-652-5201
BB: 912-650-1545

Disclaimer: The information contained within this message is for informational purposes and is not considered contractually binding upon the government in any way. Any other use of the email or attachments by you is prohibited.

-----Original Message-----
From: Lance T. Lucarelli [mailto:Lance@LGroup1.com]
Sent: Tuesday, November 21, 2017 10:13 AM
To: Bruce, Stephen W CIV USARMY CESAS (US) <Stephen.W.Bruce@usace.army.mil>
Subject: [EXTERNAL] FW: 22096 Lucarelli - Chapel Avenue, Jersey City

Stephen,

I need you to sign the bottom of both of these attached documents and this allows me to seek the site plan approval from jersey city for the project that I will be constructing at the site I cannot wait anymore

Lance

From: Michael Miceli [mailto:mmiceli@weiner.law]
Sent: Friday, November 17, 2017 9:13 AM
To: Lance T. Lucarelli <Lance@LGroup1.com>
Subject: Fwd: 22096 Lucarelli - Chapel Avenue, Jersey City

See below and attached.

Sent from my iPhone

Begin forwarded message:

From: Rosemarie Gerber <rgerber@weiner.law <mailto:rgerber@weiner.law> >
Date: November 16, 2017 at 2:05:38 PM EST
To: Michael Miceli <mmiceli@weiner.law <mailto:mmiceli@weiner.law> >
Subject: 22096 Lucarelli - Chapel Avenue, Jersey City

Mike:

Joe Daly drafted the Affidavit of Ownership and Affidavit of Performance and the Application has a few additions/revisions from Joe Sparone.

Thanks,

Ro

Rosemarie Gerber

Legal Assistant to Michael Miceli, Esq.

Steven Tombalakian, Esq. & Jeanne McManus, Esq.

# EXHIBIT 14

**DEPARTMENT OF THE ARMY**
**U.S. ARMY CORPS OF ENGINEERS**
**441 G STREET, NW**
**WASHINGTON, DC 20314-1000**

CEMP-CR

LCG 1 Chapel Ave LLC
Attn: Mr. Lance Lucarelli
534 Broadway
Bayonne, New Jersey 07002

FEB 8 2018

SUBJECT: Caven Point USARC & Alexander Hamilton USARC Real Property Exchange (RPX)

Dear Mr. Lucarelli,

After a comprehensive analysis and review of evolving requirements for the units using the Caven Point Reserve Center, the Army has decided not to continue with the subject RPX. Per the Letter Agreement executed May 5, 2015, Section 3.a, the United States of America is exercising its right to terminate this RPX effective February 20, 2018. Final accounting referenced in Section 3.a. is not necessary since there were no funds collected through the Letter Agreement.

Please contact Mr. Clayton Redmond at (202) 761-1548 should you have any questions.

Sincerely,

Brenda M. Johnson-Turner
Director of Real Estate

Printed on Recycled Paper